UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JEFFREY NELSON, individually and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GREP WASHINGTON, LLC, a foreign limited liability company; GREP SOUTHWEST, LLC, a foreign limited liability company; GREYSTAR DEVELOPMENT AND CONSTRUCTION, L.P., a foreign limited partnership; GREYSTAR DEVELOPMENT ENHANCEMENTS, LLC, a foreign limited liability company; GREYSTAR GP II, LLC, a foreign limited liability company; GREYSTAR MANAGEMENT SERVICES, L.P., a foreign limited partnership; GREYSTAR RS NW, LLC, a Washington Limited Liability Company; GREYSTAR RS WEST, LLC, a foreign limited liability company; and GREYSTAR SEATAC DEVELOPMENT, LLC, a foreign limited liability company,<br><br>Defendants. | Case No. _______________<br><br>[King County Superior Court Case No. 25-2-12121-6 SEA]<br><br>**NOTICE OF REMOVAL** |

**TO: THE CLERK AND HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON**

PLEASE TAKE NOTICE that Defendant GREP Washington, LLC ("GREP Washington"), by and through its counsel, Cozen O'Connor, hereby removes this action from the King County Superior Court (Case No. 25-2-12121-6) ("State Court Action") to the United States District Court for the Western District of Washington, pursuant to 28 U.S.C. §§



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

1332(d)(2) and (d), 1453, 1441, 1446. GREP Washington hereby provides "a short and plain statement of the grounds for removal" pursuant to 28 U.S.C. § 1446(a). GREP Washington is filing a copy of this notice with the King County Superior Court.

## I. VENUE AND JURISDICTION

1. Venue is proper in this Court under 28 U.S.C. §§ 128, 1332(d)(2), and 1446 because the Superior Court of the State of Washington for King County, where the Complaint was filed, is a state court within the Western District of Washington.

2. This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332, 1441, and 1453. This Court specifically has jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), codified in part at 28 U.S.C. §§ 1332(d)(2) and 1453(b), because it is a civil action styled as a class action in which: (1) the number of members of the proposed plaintiff class is not less than one hundred, in the aggregate; (2) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and (3) any member of the class of plaintiffs is a citizen of a State from any defendant. 28 U.S.C. §§ 1332(d)(2), (d)(5)(B) and (d)(6).

## II. PROCEDURAL POSTURE

3. On or about April 21, 2025, Jeffrey Nelson ("Plaintiff"), an adult individual, commenced this matter by filing a Complaint in the Superior Court for King County. *See* Ex. 1 ("Compl.").

4. Plaintiff alleges the following in pertinent part:

> Greystar uses the same or substantially the same residential lease and lease terms as Plaintiff's for all the properties it manages in Washington, including the "Early Move-Out" provision. . . . The "Early Move-Out" provision purports to give tenants two "options" when they move out prior to the end of the lease's term: (a) pay a non-refundable "buy-out" fee immediately, or (b) pay future rent for the entire remainder of the lease's term. For the latter "option," the tenant faces yet another fee (a "reletting charge") if the amount is not paid in full at the time the tenant moves out. . . .



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

> Greystar engages in the common practice of demanding fees and/or future rent as described in the preceding paragraphs, in derogation of its duty to mitigate, and regardless of whether it has or will exercise such efforts at some point in the future (e.g., by re-renting the unit to another tenant). . . . Greystar retains and profits from tenants' security deposits, ostensibly applying them toward move-out fees that are not, in fact, owed or lawful.

Compl. ¶¶ 2.17–2.20.

Plaintiff claims that by demanding certain fees relating to early termination of a tenancy, including "buy-out" fees, "reletting charges," and/or future rent at the time of the move-out, and retaining security deposits and otherwise applying tenants' money toward such fees and/or future rent, Plaintiff and the class have been damaged in amounts to be proven at trial. *Id.* ¶¶ 3.1–3.2.

5. Plaintiff purports to bring his claims on behalf of himself and similarly situated tenants and former tenants as follows:

> All tenants who moved out prior to the end of their lease term and who were charged and/or paid money toward, or had some or all of their security deposits applied to, a "buy-out" fee, "reletting charge," and/or future rent. *See* Compl. ¶ 2.21. The Complaint does not specify a class period, nor does it limit the class in geographic scope.

Compl. ¶ 2.21.

6. On or about April 21, 2025, Plaintiff filed a Summons. *See* Ex. 2.

7. On or about April 24, 2025, GREP Washington received service of process through their respective registered agent, CT Corporation System. *See* Ex. 5. This Notice of Removal is thus timely pursuant to 28 U.S.C. § 1446(b)(1), which states removal shall be filed within thirty days of *service* of the initial pleading and/or summons.

8. The following pleadings, as are available in the file of the State Court Action, encompass all of the pleadings received by or filed in this action as reflected on the Court's docket, as of May 22, 2025:

- Class Action Complaint;
- Case Schedule;



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

- Summons;
- Case Info Cover Sheet; and
- Declaration of Service.

*See* Exs. 1-5.

9. In accordance with the requirements of 28 U.S.C. § 1446(a), attached hereto collectively as Exhibits 1-5, are true and correct copies of all pleadings that Defendant obtained either from the King County Court or from Plaintiff's counsel.

10. Service of this Notice of Removal is being made on all adverse parties as shown by the attached Certificate of Service as required by 28 U.S.C. § 1446(d).

11. This is a civil putative class action commenced by Plaintiff, a resident and citizen of Snohomish County, Washington, as indicated in the Complaint. Ex. 1 at ¶ 1.1.

12. GREP Washington's principal place of business is located at 465 Meeting St. Ste 500, Charleston, South Carolina, 29403-7123. *See* Decl. Karl Neumann ("Neumann Decl.") ¶ 2, Ex. A. GREP Washington is incorporated under the laws of Delaware. *Id.*

13. GREP Southwest, LLC's principal place of business is located at 465 Meeting St. Ste 500, Charleston, South Carolina, 29403-7123. *See* Neumann Decl. ¶ 3, Ex. B. GREP Southwest, LLC is incorporated under the laws of Delaware. *Id.*

14. Greystar Development and Construction, L.P.'s principal place of business is located at 465 Meeting St. Ste 500, Charleston, South Carolina, 29403-7123. *See* Neumann Decl. ¶ 4, Ex C. Greystar Development and Construction, L.P. is incorporated under the laws of Delaware. *Id.*

15. Greystar Development Enhancements LLC's principal place of business is located at 465 Meeting St. Ste 500, Charleston, South Carolina, 29403-7123. *See* Neumann Decl. ¶ 5, Ex. D. Greystar Development Enhancements LLC is incorporated under the laws of Delaware. *Id.*



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

16. Greystar GP II, LLC's principal place of business is located at 465 Meeting St. Ste 500, Charleston, South Carolina, 29403-7123. *See* Neumann Decl. ¶ 6, Ex. E. Greystar GP II, LLC is incorporated under the laws of Delaware. *Id.*

17. Greystar Management Services, L.P.'s principal place of business is located at 465 Meeting St. Ste 500, Charleston, South Carolina, 29403-7123. *See* Neumann Decl. ¶ 7, Ex. F. Greystar Management Services, L.P. is incorporated under the laws of Delaware. *Id.*

18. Greystar RS NW, LLC had its principal place of business located at 465 Meeting St. Ste 500, Charleston, South Carolina, 29403-7123. *See* Neumann Decl. ¶ 8, Ex. G. Greystar RS NW, LLC was incorporated under the laws of Washington. *Id.* On or around December 28, 2023, Greystar RS NW, LLC merged into Greystar RS Group, LLC. *See* Neumann Decl. ¶ 9, Ex. H. The Greystar RS NW, LLC entity accordingly is no longer active. *Id.*

19. Greystar RS West, LLC had its principal place of business located at 465 Meeting St. Ste 500, Charleston, South Carolina, 29403-7123. *See* Neumann Decl. ¶ 10, Ex. I. Greystar RS West, LLC was incorporated under the laws of Delaware. *Id.* On or around December 28, 2023, Greystar RS West, LLC merged into Greystar RS Group, LLC. *See id.* The Greystar RS West, LLC entity accordingly is no longer active. *Id.*

20. Greystar SeaTac Development, LLC's principal place of business is located at 465 Meeting St. Ste 500, Charleston, South Carolina, 29403-7123. *See* Neumann Decl. ¶ 11, Ex. J. Greystar SeaTac Development, LLC is incorporated under the laws of Delaware. *Id.*

21. Plaintiff does not plead a specific amount of damages or an amount in controversy. Nonetheless, Plaintiff seeks:

a. Actual damages;

b. Statutory damages, including treble damages, under the CPA and double or treble damages under the RLTA;

c. Prejudgment interest;



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

d. Declaratory relief that [certain leases are] unenforceable as to any clause or term that calls for immediate payment of fees or future rent by tenants who end their tenancy early;

f. Attorneys' fees and costs; and

g. Such other relief as the Court deems proper.

Ex. 1 at Prayer for Relief (pg. 7).

22. Removal of this action to the United States District Court is proper pursuant to 28 U.S.C. §§ 1332(d), 1453(b) because there is minimal diversity of citizenship between, on the one side, Plaintiff (a resident of Washington) and, on the other side, GREP Washington. Compl. ¶ 1.2; Neumann Decl. ¶ 2, Ex. A. The United States District Court would, therefore, have had original jurisdiction of this matter pursuant to 28 U.S.C. § 1332(d) had the action been brought in federal court originally.

23. Promptly after filing this Notice of Removal, and as required by 28 U.S.C. § 1446(d), GREP Washington will serve on Plaintiff and file with King County Superior Court a "Notice of Filing of Notice of Removal" in the form attached hereto as Exhibit 6 that will include a copy of this Notice of Removal as an Exhibit thereto. *See* Neumann Decl. ¶ 14.

24. GREP Washington denies any and all alleged wrongdoing and liability asserted by Plaintiff. By filing this Notice of Removal, GREP Washington does not waive any defenses that may be available to it. GREP Washington will file a responsive pleading within the time set forth in Rule 81(c) of the Federal Rules of Civil Procedure, or as agreed to with Plaintiff's counsel.

## III. GROUNDS FOR REMOVAL

### A. Liberal Standard for Removal

25. In *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87, 135 S. Ct. 547 (2014), the United States Supreme Court clarified the standards applicable to notices of removal, confirming a liberal standard in favor of removing defendants. Specifically, the



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

Supreme Court found that the similarity of language between the removal statute, 28 U.S.C. § 1446, and Rule 8(a) can only mean that the same liberal pleading standards applied to complaints must also apply to notices of removal. *Id.* The Supreme Court also held in *Dart* that a removing defendant is not required to include evidence with its pleading in order to establish that the elements of federal subject matter jurisdiction are met. *Id.* at 552-553. Only if the Court or another party challenges jurisdiction should the Court require a removing defendant to prove, under the applicable "preponderance" standard, that the jurisdictional requirements are met – the Court noted "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold" and evidence establishing the amount is only required where the amount is contested by the plaintiff or in question with the court. *Id.* at 554.

Further, there exists no "presumption against removal" in CAFA cases, because CAFA was specifically enacted by Congress "to facilitate adjudication of certain class actions in federal court." *Id.*

**B. <u>Plaintiff Asserts a Class Action Against Defendants, and CAFA Applies</u>**

25. Plaintiff plainly brings this lawsuit as a class action. The Complaint itself is titled "CLASS ACTION COMPLAINT," and Plaintiff states "Plaintiff files this lawsuit on behalf of himself and similarly situated tenants and former tenants[.]" Compl. ¶ 2.21. In Plaintiff's Prayer for Relief, he prays for "[c]ertification of this case as a Class Action pursuant to CR 23." *See* Compl. ¶ 4.1. Accordingly, CAFA applies. 28 U.S.C. § 1332(d)(2) states as follows:

> The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which - -
>
> (A) Any member of a class of plaintiffs is a citizen of a Sate different from any defendant;



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

> (B) Any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or
>
> (C) Any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or citizen of a foreign state.

**C. <u>Minimal Diversity Exists</u>**

26. CAFA's minimal diversity requirement is satisfied, *inter alia*, when "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. §§ 1332(d)(2)(A); 1453(b). Minimal diversity of citizenship exists here because Plaintiff and at least one Defendant are citizens of different states.

27. Plaintiff has conceded in the Complaint that he is a citizen of Washington. Compl. ¶ 1.2. Allegations of residency in a state court complaint can create a rebuttable presumption of domicile supporting diversity of citizenship. *Lew v. Moss*, 797 F.2d 747, 751 (9th Cir. 1986).

28. Conversely, GREP Washington is not a citizen of Washington. Under CAFA, "an unincorporated association shall be deemed to be a citizen of the state it has its principal place of business and the State under whose laws it was organized." 28 U.S.C. § 1332(d)(10). Courts have determined that an LLC is a citizen of the states in which its principal place of business is located and its state of incorporation. *Jack v. Ring* LLC, 553 F.Supp.3d 711 (N.D. Cal. 2021). The principal place of business is "where a corporation's officers direct, control, and coordinate the corporation's activities." *See Hertz Corp. v. Friend*, 130 U.S. 1181, 1192-93 (2010).

29. GREP Washington is organized under the laws of the state of Delaware and its principal place of business is in South Carolina, where its corporate offices and headquarters are, and where its executive and administrative functions are located. *See* Neumann Decl. ¶ 2, Ex. A. In fact, all non-defunct defendants are organized under the laws of the state of Delaware with their respective principal place of businesses in South Carolina. *Id.* ¶¶ 2–11,



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

Exs. A–J. This diversity satisfies the minimal diversity requirements for removal of a class action. 28 U.S.C. § 1332(d)(10).

**D. <u>The Amount in Controversy Exceeds $5 Million</u>**

30. A proponent of removal bears the burden of establishing the jurisdictional requirements are satisfied. *Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 682-86 (9th Cir. 2006). However, in its notice of removal, a defendant need only include a plausible allegation that the amount in controversy exceeds the jurisdictional threshold. *Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89, 135 S.Ct. 547, 190 L.Ed.2d 495 (2014). "The amount in controversy considers the amount in dispute, not the amount that a plaintiff is likely to recover." *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir .2010). Although a defendant cannot establish removal jurisdiction by mere speculation and conjecture with unreasonable assumptions, "when a removing defendant makes specific factual allegations establishing jurisdiction and can support them . . . with evidence combined with reasonable deductions, reasonable inferences, or other reasonable extrapolations[,] [t]hat kind of reasoning is not akin to conjecture, speculation, or star gazing." *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015). In assessing the amount in controversy, courts must "assume that the allegations of the complaint are true and assume that a jury will return a verdict for the plaintiff on all claims made in the complaint." *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F. Supp.2d 993, 1001 (C.D. Cal. 2002). Additionally, "the amount in controversy is not measured by the low end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated." *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004) (stating that "[t]he amount-in-controversy inquiry in the removal context is not confined to the face of the complaint") (citations omitted).

31. Congress intended federal jurisdiction to be appropriate under CAFA "if the value of the matter in litigation exceeds $5,000,000 either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (e.g., damages,



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

injunctive relief, or declaratory relief)." Senate Judiciary Committee Report, S. REP. 109-14 at 42. In addition, the Senate Judiciary Committee's Report on the final version of CAFA makes clear that any doubts regarding the maintenance of interstate class actions in state or federal court should be resolved in favor of federal jurisdiction. S. REP. 109-14 at 42-43 ("[I]f a federal court is uncertain about whether 'all matters in controversy' in a purported class action 'do not in the aggregate exceed the sum or value of $5,000,000,' the court should err in favor of exercising jurisdiction over the case … **Section 1332(d) should be read broadly, with a strong preference that interstate class actions should be heard in federal court if removed by the defendant**." (emphasis added).

32. Plaintiff here seeks to certify a class regarding the early termination of tenant leases. Specifically, Plaintiff seeks certification of "[a]ll tenants who moved out prior to the end of their lease term and who were charged and/or paid money toward, or had some or all of their security deposits applied to, a 'buy-out' fee, 'reletting charge,' and/or 'future rent.'" *See* Compl. ¶ 2.21. The Class is ***unlimited*** in time. Although the Complaint only asserts causes of action under Washington law (Washington's Consumer Protection Act and Residential Landlord Tenant Act), the Complaint on its face is not limited to properties managed by GREP Washington in the State of Washington.[1] Even then, the amount in controversy exceeds $5,000,000.

33. Information provided within this Notice is provided solely for purposes of removal. GREP Washington does not waive and reserves all rights regarding the provided data, including to the extent it may or may not implicate work product, attorney-client privilege, and/or other protections regarding confidential and/or highly-sensitive business and/or personal information. GREP Washington reserves all rights regarding discovery, that

[1] As written, the putative class as defined is not even limited to "buy-out" fees or "reletting charge[s]" by Defendants.



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

the class should not be certified, and/or the seeking of pertinent confidentiality and/or protective orders.

34. It is GREP Washington's good faith belief that the amount in controversy exceeds $5,000,000. GREP Washington currently manages over 180 properties in the State of Washington on behalf of third-party property owners. *See* Neumann Decl. ¶ 12. Based on data regarding ten randomly selected properties in Washington State, in addition to the subject property Plaintiff resided at, there was approximately or at least $5,300,000 in early termination fees charged by third-party property owners, which Plaintiff characterizes as "buy-out" fees, "reletting charges," and/or future rent over the last approximately four years. *Id.* Even just taking a small sample of the properties currently managed by GREP Washington in the State of Washington, the amount in controversy clearly exceeds $5,000,000. *Id.*

**E. <u>Attorneys' Fees</u>**

35. Attorneys' fees are also includable in the amount in controversy where the underlying statute authorizes an award of fees. *Lowdermilk v. U.S. Bank Nat'l Ass'n*, 479 F.3d 994, 1000 (9th Cir. 2007) *overruled on other grounds by Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 133 S.Ct. 1345, 185 L.Ed.2d (2013). Plaintiff asserts a cause of action under the Washington Consumer Protection Act, which states that "a person who is injured by a violation of this chapter may bring an action for recovery of actual damages, including court costs and attorneys' fees." RCW 19.138.280. The Ninth Circuit has recognized 25% as an appropriate benchmark for fee awards in class action cases. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998). The above information regarding early termination fees already demonstrates that the amount in controversy threshold is met. Adding the benchmark certainly only serves to underscore the conclusion that this case easily exceeds the $5,000,000 CAFA threshold.



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
999 THIRD AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98104
(206) 340-1000

**F. <u>The Class Size Exceeds 100 Members</u>**

36. Plaintiff seeks to represent a class of "[a]ll tenants who moved out prior to the end of their lease term and who were charged and/or paid money toward, or had some or all of their security deposits applied to, a 'buy-out' fee, 'reletting charge,' and/or 'future rent.' *See* Compl. ¶ 2.21. The Complaint does not specify whether the class is limited in time or by geography.

37. Although Plaintiff's Complaint does not allege a specific number of persons who meet his proposed class definition, data based on a random sample of ten Washington properties in addition to the subject property, indicate more than 600 unique individuals were charged early termination fees by the respective third-party owners of those properties, which Plaintiff characterizes as "buy-out" fees, "reletting charges," and/or "future rent" in the last approximately four years. *See* Neumann Decl. ¶ 13. Thus, as the putative class is defined in the Complaint, it exceeds 100.

**G. <u>No Exception to CAFA Jurisdiction Applies</u>**

38. No exception to CAFA jurisdiction applies to this matter.

DATED this 23rd day of May. 2025.

COZEN O'CONNOR

By: */s/ Karl Neumann*
Karl Neumann, WSBA No. 48078
E-mail: kneumann@cozen.com
Jeremy Knight, WSBA No. 58607
E-mail: jknight@cozen.com

999 Third Avenue, Suite 1900
Seattle, WA 98104
Phone: (206) 340-1000

Attorneys for Defendant GREP Washington, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated below, I electronically filed the foregoing document and any attachments with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record as indicated below:

Lindsay L. Holm
Andrew D. Boes
Schroeter, Goldmark & Bender
401 Union Street, Suite 3400
Seattle, WA 98101
halm@sgb-law.com
boes@sgb-law.com

*Via Messenger*
*Via Email*
*Via CM/ECF System*

and

T. Tyler Santiago
Jason D. Anderson
Anderson Santiago, PLLC
207B Sunset Boulevard N.
Renton, WA 98057
tyler@alkc.net
jason@alkc.net

*Attorneys for Plaintiff*

DATED: May 23, 2025.

*/s/ Dava Bowzer*
Dava Bowzer, Legal Practice Assistant
dbowzer@cozen.com

# EXHIBIT 1

FILED
2025 APR 21 01:18 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 25-2-12121-6 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| JEFFREY NELSON, individually and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GREP WASHINGTON, LLC, a foreign limited liability company; GREP SOUTHWEST, LLC, a foreign limited liability company; GREYSTAR DEVELOPMENT AND CONSTRUCTION, L.P., a foreign limited partnership; GREYSTAR DEVELOPMENT ENHANCEMENTS, LLC, a foreign limited liability company; GREYSTAR GP II, LLC, a foreign limited liability company; GREYSTAR MANAGEMENT SERVICES, L.P., a foreign limited partnership; GREYSTAR RS NW, LLC, a Washington Limited Liability Company; GREYSTAR RS WEST, LLC, a foreign limited liability company; and GREYSTAR SEATAC DEVELOPMENT, LLC, a foreign limited liability company,<br><br>Defendants. | No.<br><br>CLASS ACTION COMPLAINT |

Plaintiff claims against Defendants as follows:

## I. PARTIES & JURISDICTION



SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

1.1 Plaintiff Jeffrey Nelson is a resident of Snohomish County, Washington, and a former tenant of "Park on 20th Apartments" located in Lake Stevens, Washington, operated or managed by an entity doing business as "Greystar."

1.2 GREP Washington, LLC, d.b.a. Greystar is a foreign Limited Liability Company headquartered in South Carolina and registered and doing business in Washington State, including in King County.

1.3 Several other entities operate under the name "Greystar" in Washington State, with the same South Carolina headquarters, including: Defendants GREP Southwest, LLC, Greystar Development and Construction, L.P., Greystar Development Enhancements, LLC, Greystar GP II, LLC, Greystar Management Services, L.P., Greystar RS NW, LLC, Greystar RS West, LLC, and Greystar Seatac Development, LLC (together with Defendant GREP Washington, "Greystar").

1.4 Greystar is a "landlord" as defined by Washington's Residential Landlord Tenant Act ("RLTA"), RCW 59.18, *et seq.*

1.5 The Superior Court of Washington has jurisdiction over Plaintiff's claims pursuant to RCW 2.08.010 and CR 23.

1.6 According to Greystar's website (www.greystar.com), the company's regional office is located in downtown Seattle, Washington in King County.

1.7 Venue in King County is appropriate pursuant to RCW 4.12.025 because one or more Defendants transact business in King County.

## II. STATEMENT OF FACTS

2.1 Greystar provides property management services to property owners throughout the State of Washington, including "Park on 20th Apartments" in Lake Stevens.



SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

<u>Allegations of Plaintiff Nelson</u>

2.2 Mr. Nelson moved into Unit #E103 at Park on 20th Apartments in September 2020. The unit was brand new, and he was the first to occupy it. He signed a year-long lease and paid a $250 security deposit.

2.3 Mr. Nelson re-let his unit again in 2021, 2022, and 2023. On each occasion, Nelson was required to execute a new lease.

2.4 Mr. Nelson's 2023 lease (Exhibit A) ran from September 2023 to September 2024, with a monthly rent of $1,745 plus utilities.

2.5 The 2023 lease includes an "Early Move-Out" penalty provision that Greystar applies in the event the tenant moves out before the end of the term. Such provision purports to require tenants to pay all future rent for the entire lease term, plus a penalty of $1,453.50 if such future rent is not paid in full at the time the tenant moves out (a "move-out penalty").

2.6 To avoid the move-out penalty and the (unlawful) future rent charges, the 2023 lease gives tenants the "option" to instead pay a "buy-out" fee—$3,420 in Mr. Nelson's case. Such "buy-out" fee is non-refundable, even if Greystar quickly re-rents the unit or otherwise mitigates its losses.

2.7 A few months into Mr. Nelson's 2023 lease, a pipe burst in the apartment building—flooding Mr. Nelson's unit and damaging his belongings.

2.8 The damage to the unit was extensive and Mr. Nelson had no choice but to move out.

2.9 For several months, Greystar made promises to Mr. Nelson that it would repair his unit. Meanwhile, Mr. Nelson stayed in a hotel at his own expense and replaced his damaged belongings.



SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

2.10 Eventually, in early April 2024, with no certainty as to when Greystar would make the unit safe for his return, Mr. Nelson decided to give notice and find other housing.

2.11 Greystar did not return and has not returned Mr. Nelson's security deposit.

2.12 Instead, on April 19, a "Leasing Professional" with Greystar told Mr. Nelson in writing that he owed $3,420 as an "early lease break fee."

2.13 On May 3, Greystar issued a new demand—this time for $11,799.28, less "credits," including Mr. Nelson's security deposit. The balance included future rent charges for the remaining months on the lease (through September 11, 2024).

2.14 When Mr. Nelson inquired with Greystar management whether there had been some kind of mistake, the representative admitted the eleven-thousand-dollar figure was incorrect but urged him to pay the lesser "early lease break fee" instead.

2.15 When Mr. Nelson declined to pay the illegal charges, his account was transferred to a collection agency and Mr. Nelson was forced to seek legal counsel to understand his rights and the legality of the charges.

2.16 Greystar kept Mr. Nelson's security deposit, claiming it as a "credit" against the unlawful charges.

<u>Allegations Related to the Class</u>

2.17 On information and belief, Greystar uses the same or substantially the same residential lease and lease terms as Plaintiff's for all the properties it manages in Washington, including the "Early Move-Out" provision.

2.18 The "Early Move-Out" provision purports to give tenants two "options" when they move out prior to the end of the lease's term: (a) pay a non-refundable "buy-out" fee immediately, or (b) pay future rent for the entire remainder of the lease's term. For the latter



SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

"option," the tenant faces yet another fee (a "reletting charge") if the amount is not paid in full at the time the tenant moves out.

2.19 On information and belief, Greystar engages in the common practice of demanding fees and/or future rent as described in the preceding paragraphs, in derogation of its duty to mitigate, and regardless of whether it has or will exercise such efforts at some point in the future (e.g., by re-renting the unit to another tenant).

2.20 On information and belief, Greystar retains and profits from tenants' security deposits, ostensibly applying them toward move-out fees that are not, in fact, owed or lawful.

2.21 Plaintiff files this lawsuit on behalf of himself and similarly situated tenants and former tenants as follows:

a. All tenants who moved out prior to the end of their lease term and who were charged and/or paid money toward, or had some or all of their security deposits applied to, a "buy-out" fee, "reletting charge," and/or future rent.

Excluded from the class is any entity in which one or more of Defendants has a controlling interest, officers or directors of Defendants, this Court and any courthouse employees assigned to work on this case, and all employees of the law firms representing Plaintiff and the class.

2.22 **Numerosity**. The classes described above are sufficiently numerous such that joinder of all of them is impractical, as required by CR 23(a)(1).

2.23 **Commonality and Predominance**. There are questions of law and fact common to each of the classes that predominate over individual issues, including, but not limited to: whether the RLTA permits a landlord to collect fees and/or future rent from a departing tenant before it is known or can be known whether the landlord will mitigate; whether Greystar's lease provisions relating to early termination violate the RLTA; whether a "buy out fee" or "break lease fee" complies with the RLTA; whether Greystar has a practice



SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

of collecting or attempting to collect fees and future rent from tenants at or near the time of move-out; whether Greystar has a practice of applying security deposits toward such amounts; whether Greystar has been unjustly enriched.

2.24 **Typicality**. Plaintiff's claims are typical of the claims of all class members and of Defendants' anticipated affirmative defenses thereto.

2.25 **Adequacy**. Plaintiff will fairly and adequately protect the interests of the classes and has retained competent and capable attorneys experienced in class action litigation, including consumer class actions.

2.26 **Superiority**. Greystar has acted on grounds generally applicable to members of the Tenant Classes by uniformly charging move-out fees, buy-out fees, and/or future rent amounts; and a class action is the superior means of adjudicating this controversy.

## III. LIABILITY

**Count 1: Violation of the Residential Landlord Tenant Act**

3.1 Greystar's practice of demanding "buy-out" fees, "reletting charges," and/or future rent at the time of move-out, and retaining security deposits and otherwise applying tenants' money toward such fees and/or future rent at the time of move out, as described herein, violates the RLTA, including RCW 59.18.310 and .280. As a result of Greystar's acts and omissions, Plaintiff and the Class have been damaged in amounts to be proven at trial.

**Count 2: Violation of the Consumer Protection Act**

3.2 Greystar's practice of demanding "buy-out" fees, "reletting charges," and/or future rent at the time of move-out is an unfair or deceptive act that occurs in trade or commerce, harms the public interest, injures tenants, and violates the violates the Consumer



SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

Protection Act (CPA), RCW 19.86, *et seq*. As a result of Greystar's acts and omissions, Plaintiff and the Class have been damaged in amounts to be proven at trial.

3.3 Greystar's practice of taking or retaining tenants' money (including security deposits) and applying those sums to future rent charges before any amounts owed can possibly be determined is an unfair or deceptive act that occurs in trade or commerce, harms the public interest, injures tenants, and violates the Consumer Protection Act (CPA), RCW 19.86, *et seq*. As a result of Greystar's acts and omissions, Plaintiff and the Class have been damaged in amounts to be proven at trial.

## IV. PRAYER FOR RELIEF

4.1 Plaintiff prays for relief as follows individually and on behalf of persons similarly situated:

a. Certification of this case as a Class Action pursuant to CR 23.

b. Actual damages;

c. Statutory damages, including treble damages under the CPA and double or treble damages under the RLTA;

d. Prejudgment interest;

e. Declaratory relief that Greystar's Lease is unenforceable as to any clause or term that calls for immediate payment of fees or future rent by tenants who end their tenancy early;

f. Attorneys' fees and costs;

g. Such other relief as the Court deems proper.

DATED this 21st day of April, 2025.

SCHROETER GOLDMARK & BENDER

LINDSAY L. HALM, WSBA #37141
ANDREW D. BOES, WSBA #58508



SCHROETER GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

ANDERSON SANTIAGO, PLLC
T. Tyler Santiago, WSBA #46004
Jason D. Anderson, WSBA #38014
207B Sunset Blvd. N.
Renton, WA 98057

Counsel for Plaintiff

# EXHIBIT A

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

# APARTMENT LEASE CONTRACT

Date of Lease Contract: September 6, 2023
(when the Lease Contract is filled out)

***This is a binding document. Read carefully before signing.***

## Moving In — General Information

**1. PARTIES.** This Lease Contract (sometimes referred to as the "lease") is between *you*, the resident(s) *(list all people signing the Lease Contract):*

Jeffrey Nelson

and *us*, the owner: 10227 20th (Park), LLC

*(name of apartment community or title holder).* You've agreed to rent Apartment No. E103, at 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)* (the "apartment" or the "premises") for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors' in interest or assigns). Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached.

**2. OCCUPANTS.** The apartment will be occupied only by you and *(list all other occupants not signing the Lease Contract):*

No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than ______ days in any 12 month period or 14 consecutive days without our prior written consent. If the previous space isn't filled in, two days per month is the limit. Receipt of mail at the apartment by any person not listed on this agreement shall be deemed to be proof of occupancy by that person. Any person in the unit, with or without the Resident's knowledge, including but not limited to invitees of guests or other invitees, shall be deemed to be guests for purposes of this agreement.

**3. LEASE TERM.** *(Check one):*

1. ☐ This tenancy is a month-to-month tenancy commencing on ______________, ______.

If box 1 is checked above or information is completed for this section, at least 20 days notice to terminate is required before the end of the monthly rental period.

2. ☒ This tenancy is a lease that commences on the 12th day of September, 2023, and ends at 11:59 p.m. the 11th day of September, 2024.

If box 2 is checked above or information is completed for this section:

☒ The tenancy shall automatically revert to a month-to-month tenancy unless resident gives written notice at least 20 days prior to the last day of the Lease or we give notice as required by law.

☐ The lease shall terminate automatically by operation of law and no right of holdover.

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the apartment is $ 250.00, due on or before the date this Lease Contract is signed. **Your security deposit will be held in an escrow company or bank escrow account located in Washington until disposition.** See paragraphs 48 (Security Deposit Deductions and Other Charges), and 49 (Deposit Return, Surrender, and Abandonment), for security deposit return information. Any nonrefundable fees will be described in paragraph 10 (Special Provisions) or on addendums to this lease. If we sell the apartments, we will transfer your security deposit to the new owner who will give you any required statutory notices. In the case of multiple residents, the security deposit shall not be returned until the final Resident on the agreement has vacated and Owner reserves the right to issue any refund check in the name of all Residents or only in the name of the final remaining Resident. It is the Residents' sole responsibility to allocate any refunded amount between themselves.

**5. KEYS.** You will be provided 2 apartment key(s), 2 mailbox key(s), ______ FOB(s), and/or 2 other access device(s) for access to the building and amenities at no additional cost at move-in. If the key, FOB, or other access device is lost or becomes damaged during your tenancy or is not returned or is returned damaged when you move out, you will be responsible for the costs for the replacement and/or repair of the same.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $ 1745.00 per month for rent, payable in advance and without demand:

☒ at the on-site manager's office, or
☒ at our online payment site, or
☐ at ______________________

Prorated rent of $ 1105.17 is due for the remainder of the *[check one]:* ☐ 1st month or ☐ 2nd month, on September 12, 2023.

Otherwise, you must pay your rent, in advance, on or before the 1st day of each month (due date) with no grace period. No matter what day the rent is actually due under this Lease, the rental period shall be from the first day of the month to the last day of the month during the Lease and during any month-to-month tenancy following the end of the Lease. Cash is unacceptable for any amount due under this Agreement, without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. At our discretion, we may convert any and all checks via the Automated Clearing House (ACH) system for the purposes of collecting payment. Rent is not considered accepted if the payment/ACH is rejected, does not clear, or is stopped for any reason. If you don't pay all rent on or before the 6th day of the month (which date shall not be before the 5th day after the date rent is past due), you'll pay a late charge. Your late charge will be *(check one)*: ☒ a flat rate of $ 75.00 or ☐ ______ % of your total monthly rent payment. Resident understands and agrees that the rent is due on or before the first day of the month, and any grace period before late charges accrue shall not change the rent due date. You'll also pay a charge of $ 75.00 for each returned check or rejected electronic payment, plus a late charge. After any check is returned by your bank for any reason, all payments due during the 9 months following the date of the returned check, notwithstanding the signing of any new lease agreements, must be by cashier's check, certified check or money order only. If you don't pay rent on time, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll also have all other remedies for such violation. All money obligations to be paid under this Lease Contract shall be considered rent as defined by law. If this community has a drop box, it is provided only as a convenience to the Residents. Use of the drop box for payment of rent, or any other amount, and for providing notices to the Owner are at the sole risk of loss or theft of the Resident. If any payment is lost prior to receipt by the Owner, Resident agrees to immediately replace the payment at their sole cost. Resident is strongly encouraged

to make all payments directly to the Owner and to obtain a receipt for all payments. In addition to the monthly rent, you agree to pay the sum of $ 0.00 as a one-time, non-refundable administrative fee. The fee will not be returned or credited to any charges owing by you at the time of move out.

**City of Redmond only:** When late fees may be assessed after rent becomes due, You may propose that the due date be altered to a different date of the month. Additionally, according to RCW 59.18.170(3), We will agree to such a proposal if it is submitted in writing, and You can demonstrate that Your primary source of income is a regular, monthly source of governmental assistance that is not received until after the date rent is due in the Lease Contract. We will not refuse to enter into a lease contract with You because You request such accommodations.

**City of Tacoma only:** When late fees may be assessed after rent becomes due, You may propose that the date rent is due be altered to a different date of the month. According to RCW 59.18.170(3), We shall agree to such a proposal if it is submitted in writing and You can demonstrate that your primary source of income is a regular, monthly source of governmental assistance that is not received until after the date rent is due in the Lease Contract.

**City of Burien only:** You may adjust the due date of rent payments if you receive your regular primary source of income, monthly source of governmental assistance, or fixed income source (e.g. social security) on a date of the month that is incongruent with paying rent on the date otherwise specified in the lease contract.

7. **UTILITIES.** We'll pay for the following items, if checked:
❑ water ❑ gas ❑ electricity ❑ master antenna
❑ wastewater ❑ trash ❑ cable TV
☒ other None

You'll pay in full as billed for all other utilities, related deposits, and any charges, fees, or services on such utilities. You must not allow utilities to be disconnected—including disconnection for not paying your bills—until the lease term or renewal period ends. Cable channels that are provided may be changed during the lease term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting. If any utilities are sub-metered for the apartment, or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance. If recycling is mandated by law, then Residents will be equally charged if the community is assessed any recycling related fines.

8. **INSURANCE.** We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property or personal injury from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

In addition, we urge all Tenants, and particularly those residing in coastal areas, areas near rivers, and areas prone to flooding, to obtain flood insurance. Renter's insurance may not cover damage to your property due to flooding. A flood insurance resource which may be available includes the National Flood Insurance Program managed by the Federal Emergency Management Agency (FEMA).

We ❑ require ☒ do not require you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like. If no box is checked, renter's insurance is not required.

Additionally, you are *[check one]* ☒ required to purchase personal liability insurance ❑ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance throughout your tenancy, including any renewal periods and/or lease extensions, may be an incurable breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law. If personal liability insurance is required, you are required to provide proof of insurance upon commencement of the tenancy and upon written request.

You acknowledge that no portion of the rent paid by you under this agreement will be applied to the owner's structural fire insurance and that you are in no way a co-insured under any such policy.

9. **LOCKS AND LATCHES.** Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done before you move into your apartment.

You may at any time ask us to change or rekey locks or latches during the Lease Term. We must comply with those requests, but you must pay for them, unless otherwise provided by law.

**Payment for Rekeying, Repairs, Etc.** You must pay for all repairs or replacements arising from misuse or damage to devices by you or your occupants, or guests during your occupancy. You may be required to pay in advance if we notify you within a reasonable time after your request that you are more than 30 days delinquent in reimbursing us for repairing or replacing a device which was misused or damaged by you, your guest or an occupant; or if you have requested that we repair or change or rekey the same device during the 30 days preceding your request and we have complied with your request. Otherwise, you must pay immediately after the work is completed.

## Special Provisions and "What If" Clauses

10. **SPECIAL PROVISIONS.** The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed lease form.

See any additional special provisions.

11. **EARLY MOVE-OUT.** You'll be liable to us for a reletting charge of *[check one]* ☒ $ 1453.50 or ❑ ______ % of the rent (not to exceed 100% of the highest monthly rent during the Lease Contract term) if you:

(1) fail to give written move-out notice as required in paragraph 44 (Move-Out Notice) or any other applicable law; or
(2) move out without paying rent in full for the entire lease term or renewal period; or
(3) move out at our demand because of your default; or
(4) are judicially evicted.

The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease Contract.

**Not a Release.** The reletting charge is not a lease cancellation fee or buyout fee. It is an agreed-to liquidated amount covering only part of our damages, that is, our time, effort, and expense in finding and processing a replacement. These damages are uncertain and difficult to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, office overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of such damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs so far as they can be determined. The reletting charge does not release you from continued liability for: future or past-due rent; charges for cleaning, repairing, repainting, or unreturned keys; or other sums due.

**Lease Buy Out.** If you desire to buy out your Lease Contract early please refer to your Lease Buy Out Agreement. If you have not been provided with a Lease Buy Out Agreement you must contact us regarding such an agreement. A lease buy out may not be available in all cases. Other than as required by law or otherwise stated in this Lease Contract the Lease Buy Out Agreement shall govern the means by which you may terminate your tenancy before the end of its term.

12. **REIMBURSEMENT.** You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the apartment community due to a violation of the Lease Contract or rules, improper use, or negligence, by you or your guests or occupants. In addition, unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacement costs, and damage to the following that result from you or your invitees, guests, or occupants' negligence or intentional acts: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment. We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

**13. PROPERTY LEFT IN APARTMENT.**

**Removal After Surrender, Abandonment, or Eviction.** We or law officers may remove and/or store all property remaining in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) if you are judicially evicted or if you surrender or abandon the apartment (see definitions in paragraph 49 - Deposit Return, Surrender, and Abandonment).

**Storage.** Unless required by law, we have no duty to store property removed after judicial eviction, surrender, or abandonment of the apartment. We're not liable for casualty loss, damage, or theft unless otherwise provided by law. You must pay reasonable charges for our packing, removing, storing, and selling any property.

**Redemption.** If we've seized and stored property as authorized by the state statute, you may redeem the property by paying all reasonable moving and storage fees if you make written request for the return of the property before we have sold or disposed of it. We may return redeemed property at the place of storage, the management office, or the apartment (at our option). We may require payment by cash, money order, or certified check.

**Disposition or Sale.** We may throw away or give to a charitable organization all items of personal property that are: (1) left in the apartment after surrender or abandonment; or (2) left outside more than 1 day after a writ of restitution is executed, following a judicial eviction, or as allowed by law.

Animals removed after surrender, abandonment, or eviction may be kenneled or turned over to local authorities or humane societies. Property described in (1) and (2) above not thrown away or given to charity may be disposed of only by sale, which must be held no sooner than 45 days after written notice to you. Our notice may be sent to you first class mail to your last known address or to any other addresses you provided us in writing or any other address known to us for you. Our notice will include (1) our name and the address where we may be contacted, (2) the place where your property is stored, (3) a statement informing you that a sale or disposition of your property will take place in accordance with state law, (4) the date of the sale or disposal (which may be no sooner than 45 days from the date of notice), and (5) a statement informing you of your right (upon payment of storage charges) to have the property returned prior to its sale or disposition. Sale may be public or private, is subject to any third-party ownership or lien claims, must be to the highest cash bidder, and may be in bulk, in batches, or item-by-item. We'll hold any excess proceeds from the sale for you for one year from the date of sale. If no claim is made to the proceeds in that year, we may retain the proceeds.

However, if your property that we are storing has a cumulative value of $250 or less, we may sell or dispose of your property (except for personal papers, family pictures, and keepsakes) after 7 days from the date that we mailed notice to you of the prospective sale or disposal. We'll send you a 45 day notice before we dispose of any personal papers, family pictures, and keepsakes.

After writ of restitution is issued, if we receive timely notice from you or your representative that you want us to store your personal property, we will do so in accordance with the requirements of RCW 59.18.312.

**14. FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, or your failure to pay any subsequent rent or other charges owing under this Lease Contract, all future rent will be automatically accelerated without notice and immediately due. We also may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights and remedies under paragraphs 11 (Early Move-Out) and 33 (Default by Resident) apply to acceleration under this paragraph.

**15. RENT INCREASES AND LEASE CONTRACT CHANGES.** No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10 (Special Provisions), by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 19 (Community Policies or Rules/Facilities). If we give you at least 60 days (or longer as required by local law, or 30 days for non-rent related lease changes) written notice of rent increases or lease changes effective when the Lease term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or lease changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 44 (Move-Out Notice).

**16. DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay. The lease will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or lease termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the apartment is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the initial term as set forth in paragraph 3 (Lease Term)—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date—you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the initial term as set forth in paragraph 3 (Lease Term) and the notice states that construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new initial term as set forth in paragraph 3 (Lease Term) for all purposes. This new date may not be moved to an earlier date unless we and you agree.

**17. AD VALOREM TAXES/FEES AND CHARGES - ADDITIONAL RENT.** Unless otherwise prohibited by law, if, during the term of this Agreement, any locality, city, state, or Federal Government imposes upon Us, any fee, charge, or tax, which is related to or charged by the number of occupants, or by the apartment unit itself, such that we are charged a fee, charge, or tax, based upon your use or occupancy of the apartment, we may add this charge as Additional Rent, during the term of the Lease Contract, with sixty (60) days advance written notice to you. After this written notice (the amount or approximate amount of the charge, will be included), you agree to pay, as Additional Rent, the amount of the charge, tax or fee imposed upon us, as a result of your occupancy. As examples, these charges can include, but are not limited to: any charges we receive for any zoning violation, sound, noise or litter charge; any charge under any nuisance or chronic nuisance type statute, 911 or other life safety, per person, or per unit charge or tax and any utility bill unpaid by you, which is then assessed to us for payment.

**18. DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it without prior notice to you.

## While You're Living in the Apartment

**19. COMMUNITY POLICIES OR RULES/FACILITIES.** You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. All Lease terms, addenda terms or community policies shall be deemed to be material and substantial obligations for you for purposes of enforcement. After 30 days written notice, we may make changes to written rules, effective on completion of your lease term, or in a month-to-month tenancy, effective at the end of the next calendar month. You understand and agree that any and all facilities provided by us are provided as a gratuity and their use is not part of the rent that you pay. We reserve the right to change or limit the hours of any such facilities, or to eliminate them completely without prior notice to you or any other residents, and that any such action shall not constitute any claim by you for diminished rental value or a claim of default under the terms of this agreement by us.

**20. LIMITATIONS ON CONDUCT.** The apartment and other areas reserved for your private use must be kept clean and free of trash, garbage, and other debris. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. You agree to keep all passageways and common areas free of obstructions such as trash, storage items, and all forms of personal property. No person shall ride or allow bikes, skateboards, or other similar objects in the passageways. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in all common areas. You, your occupants, or guests may not anywhere in the apartment community: use candles or use kerosene lamps or kerosene heaters without our prior written approval; cook on balconies or outside;

or solicit business or contributions. Conducting any kind of business in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You agree to notify us if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us if you or any occupant registers as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive our right to evict you.

**21. PROHIBITED CONDUCT.** You are responsible for the conduct of any member of your household, guest or invitee. You, your occupants or guests, or the guests of any occupants, may not engage in the following: harassment or sexual harassment of any person, including but not limited to unwanted sexual advances; criminal activities, behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia (as defined by either Washington State or Federal Law, including marijuana); engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in the common area in a way that may alarm others; storing anything in closets having gas appliances, or anything that may increase our insurance costs; tampering with utilities or telecommunications; bringing hazardous materials into the apartment community; or injuring our reputation by making bad faith allegations against us to others.

**22. PARKING.** We may regulate the time, manner, and place of parking of all cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles by anyone. Parking is not guaranteed. Parking spaces may not be used for storage of vehicles. Your vehicle(s) must be moved every __________ days, including vehicles parked in all guest or handicapped spaces. If you have a reserved parking space, or a garage, you are required to use that space, or your garage, first. We may have unauthorized or illegally parked vehicles towed. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable; or
(2) is on jacks, blocks or has wheel(s) missing; or
(3) has no current license plate or no current registration and/or inspection sticker; or
(4) takes up more than one parking space; or
(5) belongs to a resident or occupant who has surrendered or abandoned the apartment; or
(6) is parked in a marked handicap space without the legally required handicap insignia; or
(7) is parked in a space marked for manager, staff, or guest at the office; or
(8) blocks another vehicle from exiting; or
(9) is parked in a fire lane or designated "no parking" area; or
(10) is parked in a space marked for other resident(s) or unit(s); or
(11) is parked on the grass, sidewalk, or patio; or
(12) blocks garbage trucks from access to a dumpster ; or
(13) belongs to a resident and is parked in a visitor or retail parking space.

**23. RELEASE OF RESIDENT.** Unless you're entitled to terminate your tenancy under paragraphs 10 (Special Provisions), 16 (Delay of Occupancy), 32 (Responsibilities of Owner), 44 (Move-Out Notice), or any other applicable law, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, or bad health.

**24. RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke and carbon monoxide detectors, keyed deadbolt locks, keyless bolting devices, window latches, and access control.

**Statutory Notice Regarding Smoke Detectors and Carbon Monoxide Detectors.** We'll furnish a smoke detector and carbon monoxide detector in the apartment as required by statute. We'll test the smoke detector and carbon monoxide detector and provide working batteries (if applicable) when you first take possession. After that, you must maintain the smoke detector and carbon monoxide detector and replace any batteries as needed, at your expense. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report smoke-detector and carbon monoxide detector malfunctions to us. Neither you nor others may disable, remove, or damage smoke detectors or carbon monoxide detectors. If the foregoing is violated or you fail to replace a dead battery or report malfunctions to us, you will be liable to us and others for any loss, damage, or fines from fire, smoke, or water. You acknowledge that we have advised you: (i) that the apartment is equipped with a smoke detector and carbon monoxide detector, and (ii) that it's your responsibility to maintain the smoke detector and carbon monoxide detector in proper working condition. You confirm that the smoke detector and carbon monoxide detector was operational as of the date of your inspection, and following the commencement of the lease term, you will pay for and replace the smoke detector and carbon monoxide detector batteries, if any, as needed. You must not permit or cause the removal, disconnection, or disabling of the smoke detector or carbon monoxide detector.

**Casualty Loss.** Unless caused exclusively by our negligence, we're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, or vandalism, unless otherwise required by law. During freezing weather, you must ensure that the temperature in the apartment is sufficient to make sure that the pipes do not freeze (the appropriate temperature will depend upon weather conditions and the size and layout of your unit). If the pipes freeze or any other damage is caused by your failure to properly maintain the heat in your apartment, you'll be liable for damage to our and other's property. If you ask our representatives to perform services not contemplated in this Lease Contract, you will indemnify us and hold us harmless from all liability for those services.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity, or other emergency involving imminent harm. You should then contact our representative. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security unless required by statute. If we provide any access control devices or security measures upon the property, they are not a guarantee to prevent crime or to reduce the risk of crime on the property. You agree that no access control or security measures can eliminate all crime and that you will not rely upon any provided access control or security measures as a warranty or guarantee of any kind. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You must also furnish us with the law-enforcement agency's incident report number upon request.

**25. CONDITION OF THE PREMISES AND ALTERATIONS.** You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. To the extent allowed by law, we disclaim all implied warranties. You'll be given an Inventory and Condition form on or before move-in which must be completed by you and returned to us. Unless otherwise noted on the form, everything will be considered to be in a clean, safe, and good working condition upon move-in. You understand that items noted on a move in inspection form do not indicate an agreement by us to clean, repair or replace that noted item. All maintenance requests must be in writing and on a separate maintenance request form.

You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. But we'll permit a reasonable number of small nail holes

for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, additional phone or TV-cable outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors and carbon monoxide detectors, furniture, telephone and cable TV wiring, screens, locks, and access control devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

26. **REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY AUTHORIZED OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY-RELATED MATTERS—IT MUST BE SUBMITTED THROUGH EITHER THE ONLINE TENANT/MAINTENANCE PORTAL, OR SIGNED AND IN WRITING AND DELIVERED TO OUR DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or non-security matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; broken windows, wet areas on floors, walls or ceilings; electrical problems; malfunctioning lights; broken or missing locks or latches, toilets or faucets; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are not emergencies. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections. Rent will not abate in whole or in part.

If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate your tenancy within a reasonable time by giving you written notice. If your tenancy is so terminated, we'll refund prorated rent and all deposits, less lawful deductions.

27. **ANIMALS.** Unless otherwise provided under federal, state, or local law, no animals (including mammals, reptiles, birds, fish, rodents, and insects) are allowed, even temporarily, anywhere in the apartment or apartment Community unless we've so authorized in writing. You must remove an illegal or unauthorized animal within 24 hours of notice from us, or you will be considered in default of this Lease Contract. If we allow an animal as a pet, you must execute a separate animal addendum which may require additional deposits, rents, fees or other charges. An animal deposit is considered a general security deposit. We will authorize an assistance animal for a disabled person. When allowed by applicable laws, before we authorize an assistance animal, if the disability is not readily apparent, we may require a written statement from a qualified professional verifying the disability-related need for the assistance animal. If we authorize an assistance animal, we may require you to execute a separate animal and/or assistance animal addendum. Animal deposits, additional rents, fees or other charges will not be required for an assistance animal needed due to disability, including an emotional support or service animal, as authorized under federal, state, or local law. You must not feed stray or wild animals. No pets will be allowed to visit the property and no "pet-sitting" shall be allowed. If a pet becomes a problem in our sole opinion, we reserve the right to require that the pet be removed from the property. Once a pet has been removed from the property, the pet deposit for that pet shall not be returned during the tenancy even though the animal is no longer on the property. If you have pets, assistance or service animals, they must be secured during maintenance work. If they are not secured and pose any type of danger to Maintenance, in our sole opinion, Maintenance shall be entitled to leave the unit prior to the completion of the work and it shall be your sole responsibility to schedule a return by Maintenance for the completion of the work after the animal has been secured.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may kennel the animal or contact a humane society or local authority for pick up. When kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon request if it has not already been turned over to a humane society or local authority. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for any purpose.

28. **WHEN WE MAY ENTER.** If you or any guest or occupant is present and gives permission to enter, then repairers, servicers, contractors, our representatives or other persons listed in (2) below may peacefully enter the apartment at reasonable times for the purposes listed in (2) below. Otherwise, as allowed by law, the persons listed in (2) below may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary) if:

(1) written notice of the entry is hand delivered to someone in the apartment or is left in a conspicuous place in the apartment at least two (2) business days before entry (or one (1) business day before entry if entry is to show the apartment to prospective residents or purchasers at a specified time). No prior notice is needed in emergencies or situations when prior notice is impractical; and

(2) entry is for: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke-detector or carbon monoxide detector batteries; retrieving unreturned tools, equipment or appliances; preventing waste of utilities; exercising our contractual lien; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or access control; removing or rekeying unauthorized access control; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous materials), or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; retrieving property owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing entry by a law officer with a search or arrest warrant, or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given); or showing apartment to government inspectors for the limited purpose of determining housing and fire ordinance compliance by us and to lenders, appraisers, contractors, prospective buyers, or insurance agents. We reserve the right to refuse maintenance work if only a person under age 18 is present at the time of the scheduled work. Refusal to allow us or our agents or vendors to enter the unit after proper notice, if required, shall be a material violation of this agreement.

29. **JOINT AND SEVERAL RESPONSIBILITY.** Each resident is jointly and severally liable for all lease obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Security-deposit refunds and deduction itemizations of multiple residents will comply with paragraph 49 (Deposit Return, Surrender and Abandonment).

## Replacements

**30. REPLACEMENTS AND SUBLETTING.** Replacing a resident, subletting, assignment or granting a right or license to occupy is allowed only when we expressly consent in writing. If departing or remaining residents find a replacement resident acceptable to us before moving out and we expressly consent, in writing, to the replacement, subletting, assignment, or granting a right or any license to occupy, then:

(1) a reletting charge will not be due;
(2) a reasonable administrative (paperwork) fee will be due, and a rekeying fee will be due if rekeying is requested or required; and
(3) the departing and remaining residents will remain liable for all lease obligations for the rest of the original lease term.

**Procedures for Replacement.** If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right to occupancy or a security deposit refund, but will remain liable for the remainder of the original lease term unless we agree otherwise in writing—even if a new Lease Contract is signed.

## Responsibilities of Owner and Resident

**31. RESPONSIBILITIES OF OWNER.** We'll act with customary diligence to:

(1) keep common areas reasonably clean, subject to paragraph 26 (Condition of the Premises and Alterations);
(2) maintain fixtures, furniture, hot water, heating and A/C equipment;
(3) comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing;
(4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable;
(5) commence steps, within 24 hours after our receipt of written notice from you (except where circumstances are beyond our control), to restore hot or cold water, heat, electricity or to remedy situations imminently hazardous to life;
(6) commence steps, within 72 hours after our receipt of written notice from you (except where circumstances are beyond our control), to remove or remedy a condition that deprives you of the use of a refrigerator, range and oven, or major plumbing fixture supplied by us; and
(7) commence steps, within 10 days after our receipt of written notice from you (except where circumstances are beyond our control), to repair or remedy all other items for which we are responsible that are not described in (5) or (6) above.

We have no duty to repair if the defective condition was caused by you, your guests, or others acting under your control, or if you unreasonably fail to allow us access to the apartment to make such repairs.

You may not repair items yourself and deduct the cost of repairs from your rent unless you have fully complied with the statutory requirements for doing so. Under state statute, you must be current in your payment of rent (including utilities) before exercising any statutory or Lease Contract remedy.

**32. DEFAULT BY RESIDENT.** Your compliance with all terms of this Lease and any addendum thereto shall be deemed to be substantial and material obligations. You'll be in material and substantial default if you or any guest or occupant violates any terms of this Lease Contract including but not limited to the following violations: (1) you don't pay rent or other amounts that you owe when due; (2) you or any guest or occupant violates the apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application; (5) you or any occupant, in bad faith, makes an invalid habitability complaint to an official or employee of a utility company or the government; (6) you or any occupant is arrested, convicted, or given deferred adjudication for a criminal offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; (7) you or any guest or occupant engages in any of the prohibited conduct described in paragraph 21 (Prohibited Conduct); or (8) any illegal drugs or paraphernalia are found in your apartment or illegal drugs are used in your apartment.

**Lease Renewal When a Breach or Default Has Occurred.** In the event that you enter into a subsequent Lease prior to the expiration of this Lease and you breach or otherwise commit a default under this Lease, we may, at our sole and absolute discretion, terminate the subsequent Lease, even if the subsequent Lease term has yet to commence. We may terminate said subsequent Lease by sending you written notice of our desire to terminate said subsequent Lease.

**Eviction—Nonpayment of Rent.** If you default in rent payment we may end your right of occupancy by giving you a written notice to pay or vacate. The notice will state that you are required to either pay rent in full within the compliance period or vacate. Notice may be by: (1) personal delivery to any resident; (2) if a resident is unavailable, personal delivery at the apartment to any occupant of suitable age and discretion in addition to regular mail delivery to a resident; or (3) if no one of suitable age and discretion is home, by leaving a copy of the notice in a conspicuous place in the unit or on the door, delivering a copy to any person in the apartment (if one can be found), and mailing notice to a resident. Termination of your possession rights or subsequent reletting doesn't release you from liability for future rent or other lease obligations. After giving notice to vacate or filing an eviction suit, we may still accept rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages; or to past or future rent or other sums; or to continue with eviction proceedings.

**Eviction—All Other Violations.** If you default other than by nonpayment of rent, as defined by Washington state law, we may end your right of occupancy by giving you notice as required by law, and this notice will state that you must either remedy your breach or vacate the apartment within the compliance period. Notice may be given in the same manner as the nonpayment of rent notice described above. However, if you permit waste on the premises, operate an unlawful business, or if conduct by you or your guests constitutes a nuisance, or if you are occupying the unit without color of title or the permission of the owner, we may give you a notice to vacate. If you fail to vacate the apartment after service of a termination notice as required by law, we are not required to give you any additional notice. Resident understand that if Resident is given a notice to pay or comply or vacate and chooses to vacate the unit during the period of the notice, that the Resident shall remain liable for the rent through the end of the lease term or the next month in the case of a month-to-month tenancy.

**Acceleration.** All monthly rent for the rest of the lease term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent: (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the lease term or renewal period ends; and (2) you've not paid all rent for the entire lease term or renewal period. Such conduct is considered a substantial and material default for which we need not give you notice. Remaining rent also will be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) rent for the holdover period will be increased by 25% over the then-existing rent (9.5% in the city of Seattle), without notice; (3) subject to our mitigation duties, you'll be liable to us for all rent for the full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the lease term—for up to one month from the date of notice of lease extension—by delivering written notice to you or your apartment while you continue to hold over.

**Remedies Cumulative.** Any remedies set forth herein shall be cumulative, in addition to, and not in limitation of, any other remedies available to Landlord under any applicable law.

©2023, National Apartment Association, Inc. - 8/2023, Washington

**Other Remedies.** We may report unpaid amounts to credit agencies as allowed by law. If you default and move out early, you will pay us any amounts stated to be rental discounts in paragraph 10 (Special Provisions), in addition to other sums due. Upon your default, we have all other legal remedies, including tenancy termination. Unless a party is seeking exemplary, punitive, sentimental or personal-injury damages, the prevailing party may recover from the non-prevailing party reasonable attorney's fees and all other litigation costs as allowed by law. The Owner shall be deemed to be the prevailing party if the action voluntarily is halted by the Owner prior to judgment, or if the case is not filed, prior to filing, on the basis that the Owner accepted from the Resident all or part of the amounts alleged to be owing, or on the basis that the Resident vacated the rental unit. Late charges are liquidated damages for our time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts bear 12% interest per year from due date, compounded annually. You must pay all collection-agency fees if you fail to pay all sums due within 10 days after we mail you a letter demanding payment and stating that collection agency fees will be added if you don't pay all sums by that deadline.

**Mitigation of Damages.** If you move out early, you'll be subject to paragraph 11 (Early Move-Out) and all other remedies. We'll make a reasonable effort to relet and mitigate damages after we learn of your early move out or abandonment. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due. This section shall not apply to any Lease Buy Out by you.

## General Clauses

**33. ENTIRE AGREEMENT.** Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us.

**34. NO AUTHORITY TO AMEND UNLESS IN WRITING.** Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing. No verbal agreements, advertisements, warranties or representations have been made or relied upon by either party or any agent or employee of either party.

**35. NO WAIVER.** No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights, or our acceptance of rent after a notice of non-compliance or non-payment isn't a waiver under any circumstances.

**36. NOTICE.** Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter or fax that was given. Fax signatures are binding. All notices must be signed. Any eviction notice compliance period will be deemed to be in accordance with state and federal law, including the federal Cares Act, notwithstanding any shorter referenced period in the lease.

**37. MISCELLANEOUS.**

A. Exercising one remedy won't constitute an election or waiver of other remedies.
B. Unless prohibited by law or the respective insurance policies, insurance subrogation is waived by all parties.
C. All remedies are cumulative.
D. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf.
E. This Lease Contract binds subsequent owners.
F. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract.
G. All provisions regarding our non-liability and non-duty apply to our employees, agents, and management companies.
H. This Lease Contract is subordinate or superior to existing and future recorded mortgages, at lender's option.
I. All lease obligations must be performed in the county where the apartment is located.
J. Resident has completed an application in connection with executing this Lease. Owner has relied upon the statements set forth in said application in deciding to rent the Premises to Resident. It is agreed that should Owner subsequently discover any misstatements of fact in the Resident's application, such misstatements shall be deemed a material and incurable breach of this Lease and shall entitle Owner to serve Resident with a notice terminating the tenancy.
K. All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.
L. You agree that any and all facilities provided by us are provided as a gratuity and are not a part of the your rental agreement, and that we reserve the right to change or limit the hours of any such facilities, or to eliminate them completely without prior notice to you and that any such action by us shall not constitute a claim by you of any breach of this lease by us, nor be a basis for any reduction of your rent or early termination of your lease agreement. No management provided facilities, including but not limited to fitness rooms, pools, spas, or courts, or theater rooms, and no common areas or garages, may be used by you for any commercial or business purpose including teaching classes or training.

**38. CONTACTING YOU.** By signing this lease, you are agreeing that we, our representative(s) or agent(s) may contact you. You agree that we may contact you using any contact information relating to your lease including any number (i) you have provided to us (ii) from which you called us, or (iii) which we obtained and through which we reasonably believe we can reach you. You agree we may use any means to contact you. This may include calls made to your cellular telephone using an automatic telephone dialing system, artificial or prerecorded voice messages, text messages, mail, e-mail, and calls to your phone or Voice over Internet Protocol (VoIP) service, or any other data or voice transmission technology. You agree to promptly notify us if you change any contact information you provide to us. You are responsible for any service provider charges as a result of us contacting you.

**39. OBLIGATION TO VACATE.** If we provide you with a notice to vacate, or if you provide us with a written notice to vacate or intent to move-out in accordance with paragraph 3 (Lease Term), and we accept such written notice, then you are required to vacate the Apartment and remove all of your personal property therefrom at the expiration of the Lease term, or by the date set forth in the notice to vacate, whichever date is earlier, without further notice or demand from us.

**40. FORCE MAJEURE.** If we are prevented from completing performances of any obligations hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence which is beyond the control of the parties, then we shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

Furthermore, if such an event damages the property to materially affect its habitability by some or all residents, we reserve the right to vacate any and all leases and you agree to excuse us from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

**41. PAYMENTS.** Payment of all sums is an independent covenant. At our option and without notice, we may apply money received (other than sale proceeds under paragraph 13 (Property Left in Apartment) or utility payments subject to governmental regulations) first to pay any outstanding pay or vacate notice if payment is during the compliance period of that notice, then to current rent—regardless of notations or restrictive endorsements on checks or money orders and regardless of when the obligations arose, and finally to non-rent amounts owing. All sums other than rent are due upon our demand. After the due date, we do not have to accept the rent or any other payments except as specifically required by law.

**42. ASSOCIATION MEMBERSHIP.** We represent that either: (1) we or; (2) the management company that represents us, is at the time of signing this Lease Contract or a renewal of this Lease Contract, a member of both the National Apartment Association and any affiliated state and local apartment (multi-housing) associations for the area where the apartment is located.

## When Moving Out

**43. MOVE-OUT NOTICE.** Before moving out, either at the end of the lease term, any extension of the lease term, or prior to the end of the lease term, you must give our representative advance written notice of your intention to vacate as required by paragraph 3 (Lease Term). If you move out prior to the end of the lease term, your notice does not act as a release of liability for the full term of the Lease Contract. You will still be liable for the entire Lease Contract term if you move out early under paragraph 23 (Release of Resident) except if you are able to terminate your tenancy under the statutory rights explained under paragraphs 11 (Early Move-Out), 23 (Release of Resident), or other termination method allowed by Washington state law. All notices to vacate must be in writing and must provide the date by which you intend to vacate. If you are moving out prior to the end of the lease term, then you will be liable for the rent through the end of the lease term or until the apartment is re-rented. If you fail to vacate by the date set forth in your notice, you will automatically and immediately become a holdover tenant pursuant to state law, and we will have all remedies available under this Lease Contract and state law.

**44. MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the lease term or renewal period ends unless all rent for the entire lease term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under paragraphs 11 (Early Move-Out) and 33 (Default by Resident). You're prohibited by law from applying any security deposit to rent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must vacate the apartment before the 21-day period (or as amended by state law) for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**45. CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. Any carpets that are stained or damaged beyond wear resulting from ordinary use will be professionally cleaned at your expense. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges. In lieu of liability for cleaning charges, we may charge you a non-refundable cleaning fee which will be described in paragraph 10 (Special Provisions) or an addendum to this Lease Contract and will not be construed as part of any security deposit.

**46. MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection, but the move out inspection will not be delayed to accommodate your schedule. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

If a pre-move out inspection is held, the final charges for move out damages will be determined at the inspection after you have vacated the unit. No statements made by us during any pre-move out inspection shall limit those charges.

**47. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable, which may be withheld from your security deposit upon expiration of the Lease Contract (this list is not deemed to exclude charges for damages not specifically listed): unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing smoke-detector or carbon monoxide detector batteries; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized access control devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under paragraph 13 (Property Left in Apartment); removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges under paragraphs 6 (Rent and Charges) and 28 (Animals); government fees or fines against us for violation (by you, your occupants, or guests) of local ordinances relating to smoke detectors and carbon monoxide detectors, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for owner/manager's time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease Contract.

You acknowledge that the Unit was professionally cleaned prior to move in, including the carpet, and unless you provide invoices for professional cleaning that occurred within four (4) business days of move out, you may be charged for professional cleaning of the Unit and/or carpet.

You acknowledge and agree that any cleaning or damages due to smoke damage from any source, including but not limited to cigarettes,cigars, pipes, candles or incense, shall not be considered to be normal wear and tear and that you will be charged for all such cleaning, repair or replacement costs.

You'll be liable to us for: (1) charges for replacing all keys and access devices referenced in paragraph 5 (Keys) if you fail to return them on or before your actual move-out date; (2) accelerated rent if you have violated paragraph 33 (Default by Resident); and (3) a reletting fee if you have violated paragraph 11 (Early Move-Out).

**48. DEPOSIT RETURN, SURRENDER, AND ABANDONMENT.**
**Deposit Return and Forwarding Address.** You are required to provide us written notice of your forwarding address, on or before termination of this Lease Contract. We'll mail you your security deposit refund (less lawful deductions) and an itemized accounting of any deductions no later than 30 days or longer as amended by Washington state law after the lease is terminated, and you surrender the apartment, or 30 days or longer as amended by Washington state law after we learn of your abandonment. As allowed by Washington State law, we reserve the right to amend the charges listed due to later-discovered damages, or if only an estimate was available during the 30 day or longer as amended by Washington state law period and the actual amount differs from the estimated charges.

**Surrender.** You have surrendered the apartment when: (1) the move-out date has passed and no one is living in the apartment in our reasonable judgment; or (2) all apartment keys and access devices listed in paragraph 5 (Keys) have been turned in where rent is paid—whichever date occurs first.

**Abandonment.** You have abandoned the apartment when all of the following have occurred: (1) you are in default for nonpayment of rent, and (2) you have either told us you do not intend to continue tenancy or evidence indicates this intention. Evidence of this intention includes without limitation your removal of some or all of your clothes, furniture, or personal belongings or the disconnection of utilities to your unit that are not in our name.

Surrender, abandonment, or judicial eviction end your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the apartment; determine any security deposit deductions; and remove property left in the apartment. Surrender, abandonment, and judicial eviction affect your rights to property left in the apartment (paragraph 13 - Property Left in Apartment), but do not affect our mitigation obligations (paragraph 33 - Default by Resident).

## Severability, Originals and Attachments, and Signatures

49. **SEVERABILITY.** If any provision of this Lease Contract is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Lease Contract while preserving the intent of the parties.

50. **ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, with original signatures. We will provide you with a copy of the Lease Contract. Your copy of the Lease Contract may be in paper format, in an electronic format at your request, or sent via e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease Contract and provided to you at signing. When an Inventory and Condition form is completed, you should retain a copy, and we should retain a copy. Any addenda or amendments you sign as a part of executing this Lease Contract are binding and hereby incorporated into and made part of the Lease Contract between you and us. This lease is the entire agreement between you and us. You acknowledge that you are NOT relying on any oral representations. A copy or scan of this Lease Contract and related addenda, amendments, and agreements may be used for any purpose and shall be treated as an original.

**Name, address and phone number of owner or owner's representative for notice and process purposes (include name of county in State of Washington)**

Greystar
800 5th Avenue
______
Seattle, WA 98104
______
(206)282-5200

**Your security deposit will be deposited in:**

Escrow Company or Bank Name: Chase Bank
______

Address:
9009 Market Pl NE
Lake Stevens, WA 98258

Your canceled check will be your deposit receipt.

**You are legally bound by this document.**
**Read it carefully before signing.**

**Resident or Residents** *(all sign below)*

______
______
______
______
______
______

**Owner or Owner's Representative** *(signing on behalf of owner)*

______

**Name and address of locator service** (if applicable)

______
______
______
______

**Date form is filled out** *(same as on top of page 1)*

09/06/2023

State of Washington
County of ______

I certify that I know or have satisfactory evidence that ______
______
is/are the person(s) who appeared before me and acknowledged that he/she/they signed this instrument, and acknowledged it to be his/her/their free and voluntary act for the uses and purposes mentioned in the instrument.

______ Dated ______ My Commission Expires

______
Printed Name of Notary Public

______
Signature of Notary Public

*Note: Signatures of all parties must be notarized if lease is for more than one year.*

*(Use above space for notary stamp/seal)*

SPECIAL PROVISIONS (CONTINUED FROM PAGE 2). ______

JEFFREY NELSON
SIGNED 9/10/2023 AT 5:43PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

# UTILITY AND SERVICES ADDENDUM

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

This Utility Addendum is incorporated into the Lease Contract (referred to in this addendum as "Lease Contract" or "Lease") dated September 6, 2023 between 10227 20th (Park), LLC

("We" and/or "we" and/or "us) and Jeffrey Nelson

("You" and/or "you") of Apt. No. E103 located at 10227 20th St. SE #E103

(street address) in Lake Stevens, WA 98258 and is in addition to all terms and conditions in the Lease. This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

1. Responsibility for payment of utilities, and the method of metering or otherwise measuring the cost of the utility, will be as indicated below.
   a) **Water** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☒ water bills will be billed by the service provider to us and then allocated to you based on the following formula: 6
        - ☐ If flat rate is selected, the current flat rate is $ ______ per month.
        - ☒ 3rd party billing company if applicable Conservice
   b) **Sewer** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☒ sewer bills will be billed by the service provider to us and then allocated to you based on the following formula: 6
        - ☐ If flat rate is selected, the current flat rate is $ ______ per month.
        - ☒ 3rd party billing company if applicable Conservice
   c) **Gas** service to your dwelling will be paid by you either:
      - ☒ directly to the utility service provider; or
      - ☐ gas bills will be billed by the service provider to us and then allocated to you based on the following formula: ______
        - ☐ If flat rate is selected, the current flat rate is $ ______ per month.
        - ☐ 3rd party billing company if applicable ______
   d) **Trash** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☒ trash bills will be billed by the service provider to us and then allocated to you based on the following formula: 6
        - ☐ If flat rate is selected, the current flat rate is $ ______ per month.
        - ☒ 3rd party billing company if applicable Conservice
   e) **Electric** service to your dwelling will be paid by you either:
      - ☒ directly to the utility service provider; or
      - ☐ electric bills will be billed by the service provider to us and then allocated to you based on the following formula: ______
        - ☐ If flat rate is selected, the current flat rate is $ ______ per month.
        - ☐ 3rd party billing company if applicable ______
   f) **Stormwater** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☐ stormwater bills will be billed by the service provider to us and then allocated to you based on the following formula: ______
        - ☐ If flat rate is selected, the current flat rate is $ ______ per month.
        - ☐ 3rd party billing company if applicable ______
   g) **Cable TV** service to your dwelling will be paid by you either:
      - ☒ directly to the utility service provider; or
      - ☐ cable TV bills will be billed by the service provider to us and then allocated to you based on the following formula: ______
        - ☐ If flat rate is selected, the current flat rate is $ ______ per month.
        - ☐ 3rd party billing company if applicable ______
   h) **Master Antenna** service to your dwelling will be paid by you either:
      - ☒ directly to the utility service provider; or
      - ☐ master antenna bills will be billed by the service provider to us and then allocated to you based on the following formula: ______
        - ☐ If flat rate is selected, the current flat rate is $ ______ per month.
        - ☐ 3rd party billing company if applicable ______
   i) **Internet** service to your dwelling will be paid by you either:
      - ☒ directly to the utility service provider; or
      - ☐ internet bills will be billed by the service provider to us and then allocated to you based on the following formula: ______
        - ☐ If flat rate is selected, the current flat rate is $ ______ per month.
        - ☐ 3rd party billing company if applicable ______
   j) (Other) Common Area Gas & Electric service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☒ bills will be billed by the service provider to us and then allocated to you based on the following formula: 6
        - ☐ If flat rate is selected, the current flat rate is $ ______ per month.
        - ☒ 3rd party billing company if applicable Conservice
   k) (Other) ______ service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☐ bills will be billed by the service provider to us and then allocated to you based on the following formula: ______
        - ☐ If flat rate is selected, the current flat rate is $ ______ per month.
        - ☐ 3rd party billing company if applicable ______

METERING/ALLOCATION METHOD KEY
"1"- Sub-metering of all of your water/gas/electric use
"2" - Calculation of your total water use based on sub-metering of hot water
"3" - Calculation of your total water use based on sub-metering of cold water
"4"- Flat rate per month
"5"- Allocation based on the number of persons residing in your dwelling unit
"6"- Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
"7" - Allocation based on square footage of your dwelling unit
"8" - Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit
"9" - Allocation based on the number of bedrooms in your dwelling unit
"10" - Allocation based on a lawful formula not listed here
(Note: if method "10" is selected, a separate sheet will be attached describing the formula used)

© 2021, National Apartment Association, Inc. - 7/2021, Washington

2. If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Resident and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

   If a flat fee method for trash or other utility service is used, Resident and Owner agree that the charges indicated in this Agreement (as may be amended with written notice as specified above) represent a fair and reasonable amount for the service(s) provided and that the amount billed is not based on a monthly per unit cost.

3. When billed by us directly or through our billing company, you must pay utility bills within ________ days of the date when the utility bill is issued at the place indicated on your bill, or the payment will be late. If a payment is late, you will be responsible for a late fee as indicated below. The late payment of a bill or failure to pay any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there are any new account, monthly administrative, late or final bill fees, you shall pay such fees as indicated below.

| | | |
|---|---|---|
| New Account Fee: | $ 20.00 | (not to exceed $ 25.00) |
| Monthly Administrative Billing Fee: | $ 4.65 | (not to exceed $ 7.00) |
| Late Fee: | $ ________ | (not to exceed $ ________) |
| Final Bill Fee: | $ 17.50 | (not to exceed $ 20.00) |

   If allowed by state law, we at our sole discretion may amend these fees, with written notice to you.

4. You will be charged for the full period of time that you were living in, occupying, or responsible for payment of rent or utility charges on the dwelling. If you breach the Lease, you will be responsible for utility charges for the time period you were obliged to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utility services, we may charge you for any utility service billed to us for your dwelling and may charge a reasonable administration fee for billing for the utility service in the amount of $ 50.00.

5. When you move out, you will receive a final bill which may be estimated based on your prior utility usage. This bill must be paid at the time you move out or it will be deducted from the security deposit.

6. We are not liable for any losses or damages you incur as a result of outages, interruptions, or fluctuations in utility services provided to the dwelling unless such loss or damage was the direct result of negligence by us or our employees. You release us from any and all such claims and waive any claims for offset or reduction of rent or diminished rental value of the dwelling due to such outages, interruptions, or fluctuations.

7. You agree not to tamper with, adjust, or disconnect any utility sub-metering system or device. Violation of this provision is a material breach of your Lease and may subject you to eviction or other remedies available to us under your Lease, this Utility Addendum and at law.

8. Where lawful, all utilities, charges and fees of any kind under this Lease shall be considered additional rent, and if partial or full payments are accepted by the Owner, they will be allocated first to rent and to non-rent last.

9. **The following language replaces the language in Paragraph 8 for any community located in the city limits of Seattle.** Pursuant to Seattle Municipal Code 7.24.030.E., when any monthly or periodic payment is made pursuant to the rental agreement, we shall first apply the payment to the rent due before applying it to other payments due by you to us, except that if the payment is made in response to a notice issued pursuant to RCW 59.12.030 during the period of that notice, we shall first apply the payment to the amount specified in that notice, before applying it to the rent due or to other payments due by you to us.

10. You represent that all occupants that will be residing in the Unit are accurately identified in the Lease. You agree to promptly notify in writing Owner of any change in such number of occupants.

11. You agree that you may, upon thirty (30) days prior written notice from Owner to you, begin receiving a bill for additional utilities and services, at which time such additional utilities and services shall for all purposes be included in the term Utilities.

12. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. If any provision of this Addendum or the Lease is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease, the terms of this Addendum shall control.

13. The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Utility Addendum and will supersede any conflicting provisions of this printed Utility Addendum and/or the Lease Contract.
   **Method 10: Divided equally among all units. Billed trash expense may include, but is not limited to, actual trash invoice, internal trash-related expense, junk/bulky item pick up, porter service, consulting/management expense, equipment rental/maintenance, trash management costs, trash-related cleaning costs (including trash chute cleaning), odor control, trash auditing costs, and recycling charges.**

Resident Signature ____________________ Date ________
Resident Signature ____________________ Date ________
Resident Signature ____________________ Date ________
Resident Signature ____________________ Date ________
Resident Signature ____________________ Date ________
Resident Signature ____________________ Date ________
Management ____________________ Date ________

JEFFREY NELSON
SIGNED 9/10/2023 AT 5:44PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

# MOLD INFORMATION AND PREVENTION ADDENDUM

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

***Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize any mold growth in your dwelling. That is why this addendum contains important information for you, and responsibilities for both you and us.***

1. **DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:
Jeffrey Nelson

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

3. **ABOUT MOLD.** Mold is found virtually everywhere in our environment—both indoors and outdoors and in both new and old structures. Molds are naturally occurring microscopic organisms which reproduce by spores and have existed practically from the beginning of time. All of us have lived with mold spores all our lives. Without molds we would all be struggling with large amounts of dead organic matter.

Mold breaks down organic matter in the environment and uses the end product for its food. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing and other materials. When excess moisture is present inside a dwelling, mold can grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for person with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken.

4. **PREVENTING MOLD BEGINS WITH YOU.** In order to minimize the potential for mold growth in your dwelling, you must do the following:

- Keep your dwelling clean—particularly the kitchen, the bathroom(s), carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.
- Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible. Look for leaks in washing machine hoses and discharge lines—especially if the leak is large enough for water to infiltrate nearby walls. Turn on any exhaust fans in the bathroom and kitchen *before* you start showering or cooking with open pots. When showering, be sure to keep the shower curtain *inside* the tub or fully close the shower doors. Also, the experts recommend that after taking a shower or bath, you: (1) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.
- Promptly notify us in writing about any air conditioning or heating system problems you discover. Follow our rules, if any, regarding replacement of air filters. Also, it is recommended that you periodically open windows and doors on days when the outdoor weather is dry (i.e., humidity is below 50 percent) to help humid areas of your dwelling dry out.
- Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary.
- Keep the thermostat set to automatically circulate air in the event temperatures rise to or above 80 degrees Fahrenheit.

5. **IN ORDER TO AVOID MOLD GROWTH**, it is important to prevent excessive moisture buildup in your dwelling. Failure to promptly pay attention to leaks and moisture that might accumulate on dwelling surfaces or that might get inside walls or ceilings can encourage mold growth. Prolonged moisture can result from a wide variety of sources, such as:

- rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters rising above floor level;
- overflows from showers, bathtubs, toilets, lavatories, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines;
- leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks;
- washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking;
- leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and
- insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

6. **IF SMALL AREAS OF MOLD HAVE ALREADY OCCURRED ON *NON-POROUS* SURFACES** (such as ceramic tile, formica, vinyl flooring, metal, wood or plastic), the federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within 24 hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant® (original pine-scented), Tilex Mildew Remover® or Clorox Cleanup®. (Note: Only a few of the common household cleaners will actually kill mold). Tilex® and Clorox® contain bleach which can discolor or stain. **Be sure to follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.

Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be adjacent in quantities not yet visible to the naked eye. A vacuum cleaner

©2021, National Apartment Association, Inc. - 3/2021, Washington 

with a high-efficiency particulate air (HEPA) filter can be used to help remove non-visible mold products from porous items, such as fibers in sofas, chairs, drapes and carpets—provided the fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

7. **DO NOT CLEAN OR APPLY BIOCIDES TO:** (1) visible mold on *porous surfaces*, such as sheetrock walls or ceilings, or (2) *large areas* of visible mold on *non-porous* surfaces. Instead, notify us in writing, and we will take appropriate action.

8. **COMPLIANCE.** Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions regarding this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

   **If you fail to comply with this Addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

Washington State Department of Health

www.doh.wa.gov/mold

# Mold

## What are molds?
Molds are tiny microscopic organisms that digest organic matter and reproduce by releasing spores. Molds are a type of fungi and there are over 100,000 species. In nature, mold helps decompose or break-down leaves, wood and other plant debris. Molds become a problem when they go where they are not wanted and digest materials such as our homes.

## What makes molds grow in my home?
Mold enters your home as tiny spores. The spores need moisture to begin growing, digesting and destroying. Molds can grow on almost any surface, such as wood, ceiling tiles, wallpaper, paints, carpet, sheet rock, and insulation. The mold grows best when there is lots of moisture from a leaky roof, high humidity, or flood. There is no way to get rid of all molds and mold spores from your home. But you can control mold growth by keeping your home dry.

## Can I be exposed to mold?
When molds are disturbed, they release spores into the air. You can be exposed by breathing air containing these mold spores. You can also be exposed through touching moldy items, eating moldy food or accidental hand to mouth contact.

## Do molds affect my health?
Most molds do not harm healthy people. But people who have allergies or asthma may be more sensitive to molds. Sensitive people may experience skin rash, running nose, eye irritation, cough, nasal congestion, aggravation of asthma or difficulty breathing. People with an immune suppression or underlying lung disease, may be at increased risk for infections from molds. A small number of molds produce toxins called mycotoxins. When people are exposed to high levels of mold mycotoxins they may suffer toxic effects, including fatigue, nausea, headaches, and irritation to the lungs and eyes. If you or your family members have health problems that you suspect are caused by exposure to mold, you should consult with your physician.

## When is mold a problem?
You know you have mold when you smell the "musty" odor or see small black or white specks along your damp bathroom or basement walls. Some mold is hidden growing behind wall coverings or ceiling tiles. Even dry, dead mold can cause health problems, so always take precautions when you suspect mold. Mold is often found in areas where water has damaged building materials and furniture from flooding or plumbing leaks. Mold can also be found growing along walls where warm moist air condenses on cooler wall surfaces, such as inside cold exterior walls, behind dressers, headboards, and in closets where articles are stored against walls. Mold often grows in rooms with both high water usage and humidity, such as kitchens, bathrooms, laundry rooms, and basements. If you notice mold or know of water damaged areas in your home, it is time to take action to control its growth.

## When should I sample for mold?
You don't need to sample for mold because in most cases you can see or smell mold. Even a clean, dry house will have some mold spores, but not enough to cause health problems. If you smell mold it may be hidden behind wallpaper, in the walls or ceiling, or under the carpet. If you suspect you have hidden mold be very careful when you investigate, protect yourself from exposure in the same manner as you would for a clean-up. See the chart below.

## Can I control mold growth in my home?
Yes you can. Dry out the house and fix any moisture problems in your home:
- Stop water leaks, repair leaky roofs and plumbing. Keep water away from concrete slabs and basement walls.
- Open windows and doors to increase air flow in your home, especially along the inside of exterior walls. Use a fan if there are no windows available.
- Make sure that warm air flows into all areas of the home. Move large objects a few inches away from the inside of exterior walls to increase air circulation.
- Install and use exhaust fans in bathrooms, kitchens, and laundry rooms.
- Ventilate and insulate attic and crawl spaces. Use heavy plastic to cover earth floors in crawl spaces.

- Clean and dry water damaged carpets, clothing, bedding, and upholstered furniture within 24 to 48 hours, or consider removing and replacing damaged furnishings.
- Vacuum and clean your home regularly to remove mold spores.
- Check around your windows for signs of condensation and water droplets. Wipe them up right away so mold can't start to grow.

## What can I use to clean up mold?

Clean up mold and take care of the problem by following the advice above to keep your home dry and keep mold out. Act fast! Mold damages your home as it grows. Clean it up as soon as possible.

### Size the Moldy Area

Decide if you have a large or small area of mold. A small area is less than about ten square feet, or a patch three feet by three feet square. To clean a small area, follow the advice below. You may use a cotton face mask for protection. If you have a lot of mold damage (more than ten square feet) consider hiring a cleaning professional. If the moldy area has been contaminated by sewage or is in hidden places, hire a professional. To find a professional, check under "Fire and Water Damage Restoration" in your Yellow Pages. If you decide to clean up on your own, follow the guidance below.

### Use Protection

Wear goggles, gloves, and breathing protection while working in the area. For large consolidated areas of mold growth, you should wear an Occupational Safety and Health Administration (OSHA) approved particle mask.

### Seal the Area

Seal off area from the rest of your home. Cover heat registers or ventilation ducts/grills. Open a window before you start to clean up.

### Remove Items

Remove all your furnishings to a mold-free area. Clean the surrounding moldy area then follow cleaning directions below for the items you removed and the new space.

### Bag Moldy Trash

Bag all moldy materials and tie off the top of the bag. Bring them outdoors and place in your garbage container right away.

### Scrub Surfaces

- First wash with a mild detergent solution, such as laundry detergent and warm water. Allow to dry.
- (Optional step) Then wipe with a solution of 1/4 cup bleach to one gallon of water. Wait 20 minutes and repeat. Wait another 20 minutes.
- Last apply a borate-based detergent solution and don't rinse. This will help prevent mold from growing again. A borate-based laundry or dish washer detergent has "borate" listed on the ingredients label.

### Clean and Wash

Give the entire area a good cleaning, vacuum floors, and wash any exposed bedding or clothing.

### Monitor

Check regularly to make sure mold has not returned to the clean-up area.

## What cleans moldy furniture and other items?

- For wood, metal, plastic, glass, ceramics, and other objects that don't absorb water but are washable - wipe them with a solution of lukewarm water and laundry detergent.
- For clothes, bedding, and other materials that absorb water and are washable - wash them in the laundry.
- For beds, sofas, and other furniture that absorb water but are not washable - these items may need to be discarded. Or, try to save them by vacuuming well and allowing to air out. If there is no odor it may be okay. Mold can come back, so watch for any mold growth or mold related health problems. Discard the item if you suspect mold is growing inside or outside the item.

## Should I paint over mold?

No. Don't paint or caulk over mold. The mold will grow under the paint and the paint will peel.

## I'm a renter or landlord, what help can you provide for a mold problem?

Mold problems in buildings are a result of water and moisture problems. Excess moisture comes from leaks or condensation. Tenants and landlords both have responsibilities for addressing water and moisture problems that can cause mold. Generally, fixing leaks is the landlord's responsibility and reducing condensation is the renter's responsibility. See our mold resources for renters and landlords (www.doh.wa.gov/rentermold).

## Who are my local contacts for more information about mold?

In Washington, you can contact your local county health department (www.doh.wa.gov/localhealth) for more information about mold. If you live outside of Washington State, try contacting your county or state health department.

## More Information

- Mold and Indoor Air Quality Information Line: 360-236-3090
- Mold, CDC (www.cdc.gov/mold)
- Mold, EPA (www.epa.gov/mold)

**Resident or Residents**
*(All residents must sign here)*

______________________
______________________
______________________
______________________
______________________
______________________

**Owner or Owner's Representative**
*(Signs here)*

______________________

**Date of Lease Contract**

September 6, 2023



JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:45PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

© 2021, National Apartment Association, Inc.
Washington/National Apartment Association Official Form, March 2021.

# BED BUG ADDENDUM

Date: September 6, 2023
(when this Addendum is filled out)

***Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize the potential for any bed bugs in your dwelling or surrounding dwellings. This Addendum contains important information that outlines your responsibility and potential liability with regard to bed bugs.***

**1. DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:
Jeffrey Nelson

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE.** This Addendum modifies the Lease Contract and addresses situations related to bed bugs *(cimex lectularius)* which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we relied on your representations to us in this Addendum.

**4. INSPECTION AND INFESTATIONS.** BY SIGNING THIS ADDENDUM, YOU REPRESENT THAT:

- YOU HAVE INSPECTED THE DWELLING PRIOR TO MOVING IN, OR PRIOR TO SIGNING THIS ADDENDUM, AND YOU DID NOT FIND ANY EVIDENCE OF BED BUGS OR A BED BUG INFESTATION;

OR

- YOU WILL INSPECT THE DWELLING WITHIN 48 HOURS AFTER MOVING IN, OR WITHIN 48 HOURS AFTER SIGNING THIS ADDENDUM AND WILL NOTIFY US OF ANY BED BUGS OR BED BUG INFESTATIONS.

You agree that you have read the information provided in this Addendum and that you are not aware of any infestation or presence of bed bugs in your current or previous dwellings, furniture, clothing, personal property, or possessions. You also acknowledge that you have fully disclosed to us any previous bed bug infestations or bed bug issues that you have experienced.

If you disclose to us a previous experience with bed bug infestations or other bed bug related issues, we can review documentation of the previous treatment(s) and inspect your personal property and possession to confirm the absence of bed bugs.

**5. ACCESS FOR INSPECTION AND PEST TREATMENT.** You must allow us and our pest control agents access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guests, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the dwelling and building. We can select the method of treating the dwelling, building and common areas for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation even if those dwellings are not the source or cause of the known infestation. Unless otherwise prohibited by law, you are responsible for and must, at your own expense, have your own personal property, furniture, clothing and possessions treated according to accepted treatment methods established by a licensed pest control firm that we approve. You must do so as close as possible to the time we treated the dwelling. If you fail to do so, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed bug infestation on your own.

**6. NOTIFICATION.** You must promptly notify us in writing:

- of any known or suspected bed bug infestation or presence in the dwelling, or in any of your clothing, furniture or personal property.
- of any recurring or unexplained bites, stings, irritations, or sores of the skin or body which you believe is caused by bed bugs, or by any condition or pest you believe is in the dwelling.
- if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or of any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

**7. COOPERATION.** If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest control agents to treat and eliminate the bed bugs. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned as close as possible to the time we treated the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing and personal belongings in order for us to perform pest control services. If you fail to cooperate with us, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

**8. RESPONSIBILITIES.** You may be required to pay all reasonable costs of cleaning and pest control treatments incurred by us to treat your dwelling unit, other dwelling units, or common areas for bed bugs. If we confirm the presence or infestation of bed bugs after you vacate your dwelling, you may be responsible for the cost of cleaning and pest control treatments. If we must move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may be liable for payment of any lost rental income and other expenses incurred by us to relocate the neighboring residents and to clean and perform pest control treatments to eradicate infestations in other dwellings. If you fail to pay us for any costs you are liable for, you will be in default, and we will have the right to seek collection against you for all costs related to any infestation you have caused.

© 2022, National Apartment Association, Inc. - 6/2022, Washington

9. **TRANSFERS.** If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest control professional. You must provide proof of such cleaning and treatment to our satisfaction.

10. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**You are legally bound by this document. Please read it carefully.**

**Resident or Residents**
*(All residents must sign)*

**Owner or Owner's Representative**
*(Signs below)*

**Date of Signing Addendum**

*You are entitled to receive an original of this Addendum after it is fully signed. Keep it in a safe place.*

© 2022, National Apartment Association, Inc. - 6/2022, Washington

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

**Bed bugs don't discriminate**

Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

While bed bugs are, by their very nature, more attracted to clutter, they're certainly not discouraged by cleanliness.

Bottom line: bed bugs know no social and economic bounds; claims to the contrary are false.

**Bed bugs don't transmit disease**

There exists no scientific evidence that bed bugs transmit disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease transmitting pests. Again, claims associating bed bugs with disease are false.

**Identifying bed bugs**

*Bed bugs can often be found in, around and between:*

- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Around, behind and under wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Along window and door frames
- Ceiling and wall junctions
- Crown moldings
- Behind and around wall hangings and loose wallpaper
- Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Inside electronic devices, such as smoke and carbon monoxide detectors
- Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes, the origination of such markings often go misdiagnosed. However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.
- While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And, because they shed, it's not uncommon for skin casts to be left behind in areas typically frequented by bed bugs.

**Preventing bed bug encounters when traveling**

Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

**Bed bug do's and don'ts**

- **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction into a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainty that a piece of second-hand furniture is bed bug-free, residents should assume that the reason a seemingly nice looking leather couch, for example, is sitting curbside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.
- **Do address bed bug sightings immediately.** Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- **Do not attempt to treat bed bug infestations.** Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.
- **Do comply with eradication protocol.** If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management company.

JEFFREY NELSON
SIGNED 9/10/2023 AT 5:46PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

© 2022, National Apartment Association, Inc. - 6/2022, Washington

# Community Policies/Master Lease Addendum

## 1. Preface

This Master Lease Addendum contains community rules, regulations, and/or policies that are incorporated into and part of your Lease Contract. They apply to you and your occupants, guests, and invitees. Use of "we", "us", and "our" in this Addendum refers collectively to the owner of the community and the owner's authorized agents/representatives. Violation of any provision of this Addendum may result in termination of your right of possession and/or your Lease Contract. The community rules, regulations, and/or policies in this Addendum may be added to, amended or repealed at any time in accordance with your Lease Contract. This Addendum is intended to supplement your Lease Contract. To the extent there is any inconsistency between this Addendum and the Lease Contract, the provisions of the Lease Contract control.

## 2. No Reliance on Security Devices or Measures

You acknowledge that cameras may be installed at some or all of the gates and in various common areas throughout the community. If cameras are installed, these areas may be recorded. Cameras, if installed, are for the sole purpose of protecting our real and personal property. Such cameras are not intended to protect, monitor, provide security for, or give a sense of security to you or any occupant or guest. You acknowledge that, given the limited purpose for which cameras may be installed or used, we have no obligation to cause such cameras to be monitored. We have no obligation to preserve or make available the contents of any recordings to you or others.

## 3. Entry Devices

In the event your community requires an entry device, the following policies apply.

a) **Access Card, Remote or Key Fob:** You and each occupant if you request, will receive one controlled access device of our choice. Additional devices may be available for an additional charge of $_______________.
b) **Damaged, Lost or Unreturned Cards, Remotes, or Fobs:** If a controlled access device is lost, misplaced, stolen damaged, or not returned at termination of this Agreement, a fee of $_______________ will be charged for each device replacement.
c) **Duplicate, Lost or Unreturned Keys:** A charge of $ 50 will be owed for each duplicate, lost or unreturned key.
d) **Re-keying Lock:** If you wish to have your apartment home, storage, mailbox, and/or garage lock(s) re-keyed because you have lost your key or for any other reason you agree to pay a re-keying fee of $_______________ which is due prior to changing your locks.
e) **After Hours Lock Outs:** After office hours, you must contact and pay for a locksmith if you have locked yourself out.
f) **Lock Outs During Office Hours:** If you are locked out of your apartment home during business hours, contact us. A picture I.D. may be required to gain access to your apartment home.

## 4. Patios / Balconies / Private Yards

In the event your community has patios, balconies, or private yards, the following policies apply.

**Items Prohibited**

| | | |
|---|---|---|
| Combustible Materials | Flags | Furniture designed for Indoor Use |
| Firewood | Charcoal & Gas Grills | Bicycles hung from ceilings or walls |
| Unsightly or Heavy Items | Propane Tanks | Laundry |
| Motorcycles | Automobile Tires, Parts, Equipment | Signs |

a) **Resident Responsible for Private Yard:** In the event your apartment home has a private yard and you are responsible for maintenance of the yard, maintenance will include, but not be limited to, mowing, edging, shrub trimming, watering, debris removal, weeding, etc. You agree to maintain the landscaping in a healthy condition (free of weeds, holes, fungus/parasites, pet feces, trash, debris and consistent color in sod, etc.). If your private yard is not maintained to the community standards, we have the right to maintain it and charge our actual cost each time maintenance is required. Upon move-out, we can deduct any amounts owed for damage to the private yard which exceed ordinary wear and tear from the security deposit as allowable under the Lease Contract.
b) **Community Landscaper Utilized for Private Yard:** In the event your apartment home has a private yard and your community landscaper maintains the private yard, there may be an additional monthly fee of $_______________ required. You are still responsible for maintaining the landscaping in a healthy condition (free of weeds, holes, fungus/parasites, pet feces, trash, debris and consistent color in sod, regular watering, etc.). You agree to provide access so that routine yard management maintenance can occur. If your private yard is not maintained to the community standards, we have the right to maintain it and charge our actual cost each time maintenance is required. Upon move-out, we can deduct any amounts owed for damage to the private yard which exceed ordinary wear and tear from the security deposit paid as allowable under the Lease Contract.

## 5. Gardens

In the event your community has a garden for the enjoyment of all residents, the following policies apply.

a) Unless otherwise posted, the hours are from dawn to dusk.
b) Use at your own risk. In case of emergency, call 911.
c) You agree to plant the garden plot within two weeks of being assigned a designated area.
d) You agree to maintain the designated plot and to keep plants within the assigned/designated area.
e) We encourage an organic gardening program. Use of pesticides, herbicides, and insecticides made from synthetic materials as well as use of chemical fertilizers are not advisable. Slug bait is permitted only when used in enclosed containers, which must be removed from the site after use. Use of raw human and/or animal waste is not allowed due to environmental and health concerns. Fully composted manures, such as steer and chicken manure, are allowed.
f) No illegal plants may be grown, including but not limited to any plant listed by the state agencies and weed control board as noxious weeds.
g) Only water your assigned garden plot.
h) Maintain healthy plants and remove dead plants in a timely manner (not to exceed one week duration).
i) Materials other than plants are prohibited, except items that assist in growth.
j) All tools provided by us must remain in designated areas. We are not responsible for injuries due to the use of tools. If you need any additional tools, they are your responsibility.
k) Debris after planting, any remaining soil, fertilizer, etc. must be swept immediately.
l) Garden plots will expire with your lease, and may be renewed at the time of lease renewal. If you decide not to renew usage, the plot must be cleaned out and left in the original condition. Renewal is not guaranteed.
m) We are not responsible for lost, stolen, or damaged plants or other items.
n) Please be respectful of the neighbors who live around the gardens. No smoking, noise disturbances, or horseplay is allowed.
o) Animals are not allowed in the garden plot areas, except assistance animals.

## 6. Inside or Near the Apartment Home

**6.1 Windows and Doors:** Any window treatment installed by you shall present a uniform appearance with the exterior of the building. The use of foil and other similar materials, on windows is strictly prohibited. You will not obstruct any windows or doors.

**6.2 Welcome Mats and Heavy Items:** You may place a welcome mat in front of your entry door subject to our approval. Rugs or carpet remnants are not permitted. You shall not place any unusually heavy objects on the floor of the Premises, such as pool tables, waterbeds, etc. without our prior written permission. You will not obstruct any doorways, stairs, entry passages, breezeways, courtyards, or halls of the community.

**6.3 Soliciting:** Soliciting is not permitted in the community. Unless allowed by law or following our prior written permission, you shall not distribute, post, or hang any signs, flyers, advertisements, or notices in any portion of the community.

**6.4 Fireplace:** In the event your apartment home has a fireplace, you agree to use the fireplace for the intended purpose and at your own risk. Never use flammable liquids to start fires and never burn anything other than seasoned firewood. Clean your hearth of any flammable materials. Do not attempt to clean the inside of the chimney. Report maintenance needs to us immediately. Use a mesh screen and leave glass doors open when burning fires. If applicable, open the flue/damper before lighting a fire. Close the flue/damper only when the fire is completely out, the smoke has ceased to rise, and the wood is cool. Never leave a fire unattended. Put all fires out completely before going to bed or leaving the apartment home.

**6.5 Furniture, Televisions, Appliances:** In the event your apartment home has furniture, televisions, and/or appliances included, you agree to maintain them in a clean condition, reasonable wear and tear excepted. Removal of these items is not allowed. Upon move-out, these items must be placed in the same location they were upon move-in. You will pay the cost to repair, replace, or clean the furniture, televisions, and/or appliances.

**6.6 Wires and Personal Items Outside the Home:** No radio, television other wires are permitted on any part of the apartment home. You shall not store personal items in the outside walkways, breezeways or under stairs.

## 7. Odors

You, your occupants, guests, and invitees acknowledge that we cannot prevent odors in and around your apartment home and community.

**7.1 Resident Responsibilities:** If you create odors, you shall provide proper ventilation so you do not disturb or cause inconvenience to others.

**7.2 Removal of Odors:** If the carpet, walls, A/C ducts, or other items in the apartment home retain odors due to your use or surrounding residents complain about the odors, you will be responsible for the cost for removing unwanted smells and odors.

## 8. Parking and Vehicles

In the event your community has parking for residents, the following policies apply. Guests must park in guest parking only.

a) **Speed Limit:** Unless otherwise posted, the speed limit is ten (10) miles per hour.
b) **Posted Signs:** You are responsible for following all posted signs including height restrictions, mounted mirrors, and traffic control devices.
c) **Unassigned Parking:** In the event parking at your community is unassigned, you can park on a first-come, first-serve basis, except in designated areas. Parking spaces are not guaranteed.
d) **Assigned Parking:** In the event parking at your community is assigned, you must park only in your assigned space.
e) **Limitation of Vehicles:** We will advise you if your community has a limitation on the number of vehicles allowed.
f) **Restricted Vehicles:** Unless specifically allowed in designated areas, including carports and/or garages, the following are not allowed: campers, trailers, boats, buses, large trucks, commercial vehicles, mobile homes, trailers, recreational vehicles and equipment. Violators will be towed away without notice at the vehicle/equipment owner's expense.
g) **No Vehicle Repairs:** Automobile repair work is not allowed on the community. Washing vehicles is not allowed unless there is a designated car care facility.
h) **Vehicle Insurance:** All vehicles will be parked at your own or the vehicle's owner's risk, and you will maintain proper insurance on your vehicles.
i) **No Loitering or Recreational Activities:** You, your occupants, guests, and invitees may not engage in the following activities in parking areas: loitering (standing or waiting around), recreational activities, or disrupting the flow of traffic.
j) Improperly parked, non-operable, abandoned, or unauthorized vehicles or equipment are not permitted in the community and may be removed by us at your expense or the expense of any other person owning same, for storage or public or private sale, at our option with no right of recourse against us. The definition of improperly parked, non-operable, abandoned, or unauthorized vehicles or equipment shall be liberally construed in our favor. In addition, but not limited to their generally accepted definitions, "improperly parked", "non-operable", "abandoned", and "unauthorized" shall also mean vehicles or equipment which: (1) Are noxious, offensive, unsightly, unpleasant or unkempt such as could reasonably affect the appearance or rental marketability of the community or such as could reasonably cause embarrassment, discomfort, annoyance, or nuisance to us or other residents; (2) Are not displaying any required hangtag, decal, or other identifier provided by us; (3) Are left unattended for a period of not less than thirty (30) days without anyone having claimed ownership of it.

## 9. Parking Tags/Stickers

In the event your community requires parking tags/stickers, the parking tag/sticker must be visibly displayed either on the rear-view mirror or taped next to the vehicle registration. We are not responsible for damage to tint or glass due to the sticker. The vehicle can be towed without notice at the vehicle owner's expense in accordance with state law.

a) You agree to advise your guests and invitees to park in the designated guest parking spaces only.
b) If your sticker/tag is lost, stolen, damaged, or not returned upon move-out, a replacement fee of $________________ will be assessed to your account.

## 10. Animals

**10.1 Assistance Animals:** Assistance animals required pursuant to a disability-related need are welcome. Assistance animals must be disclosed to and approved by us. The appropriate reasonable accommodation process will apply.

**10.2 Pet Policies:** No animals of any kind are permitted in your apartment or the community without our prior written consent. In the event your community allows pets, the following policies apply.

a) **No More Than Two Pets:** A maximum of two pets per apartment home is permitted.
b) **Weight Limits:** Pets shall not exceed your community's weight limit.
c) **Restricted Breeds and Prohibited Dogs**: The following breeds are not permitted on the community: Rottweiler, Doberman Pinscher, Pit Bull Terrier/Staffordshire Terrier, Chow, Presa Canarios, Akita, Alaskan Malamutes, Wolf-Hybrid, or any mix thereof. Specific communities may have additional breed restrictions. In addition, we prohibit any dog with a history of biting, injuring any person or animal, or damaging property.
d) **Determination of Breed:** Regardless of your representation as to the breed or classification of any animal, you agree that we shall make the final determination as to the breed or classification of your pet or animal in our sole and absolute discretion. Restricted Breeds shall have the broadest possible meaning, and includes, but is not limited to, any animal displaying physical traits or characteristics of any restricted breed animal, whether by observation or by standards established by the American Kennel Club, or other applicable association, or defined by any law, statute, or ordinance. If applicable, a canine DNA test may be requested at your expense.
e) **Cats:** Cats must be spayed or neutered.
f) **Animals Not Allowed in Amenities:** Animals, except Assistance Animals, are not permitted in the pool, pool area, or community amenity areas such as the business and fitness centers. No animals will be allowed in the pool or spa water.
g) **No Staking Animals:** Animals may not be tied to any fixed object anywhere outside the dwelling units, except in fenced yards (if any) for your exclusive use.
h) **Aquariums:** Aquariums up to 20 gallons are allowed without a pet deposit or fee. Aquariums over 20 gallons may require a pet deposit or fee in addition to proof of renter's insurance.
i) **Secure Animals During Service Requests:** Remove animals or place them in a room behind a closed door or kennel/crate with notification to us.

## 11. Trash Removal and Disposal

a) **Curbside Pick Up:** In the event your community offers curbside trash pick-up, contact us for the scheduled days and times of pick-up. You agree not to leave any trash out on days that are not scheduled for pick-up. We reserve the right to remove curbside trash pick-up service upon written notice to you of the change.
b) **No Curbside Pick Up:** In the event your community does not offer curbside trash pick-up, you shall dispose of your bagged and tied trash inside the compactor/dumpster facility as instructed by us or by the sign near the compactor/dumpster.
c) **Trash Chutes:** In the event your community has trash chutes, contact us for the scheduled hours of operation. Securely tied, kitchen-sized bags are required. No loose items can be put in the trash chute. Do not use the chute for recycling. No boxes or large trash can be placed in the chutes. Contact us for details or questions regarding the use of the trash chutes.
d) **Recycling:** In the event recycling is offered at your community, you are responsible for complying with all recycling regulations.
e) **Potential Charges:** You may be charged $25 per bag for any trash left outside your apartment home or in breezeways. Please contact us if you require further instruction regarding proper disposal of garbage with the compactors, dumpsters, or chutes.

f) **No Litter:** Do not leave cigarette butts or other trash near or around patios/balconies, under windows, or near entry doors. We reserve the right to assess a fine of $25 per incident.
g) **No Furniture as Trash:** No furniture may be left for trash removal.
h) **Dumpster Use for Residents Only:** Only you and your occupants are permitted to use the dumpster/compactor.
i) **No Dumpster Diving:** Do not retrieve items from the dumpster. Digging or scavenging is prohibited.
j) **General:** Please break down empty boxes. Keep the area clean and litter free. If applicable, close the lid after use.
k) **No Parking in Front of Dumpster:** Parking in front of the dumpster/compactor is not allowed.
l) **Prohibited Items:** You understand that you cannot place the following items in or around the trash dumpster or compactor: propane tanks, flammable or toxic materials, furniture, bedding, appliances, auto batteries, tires, and oil/petroleum products.

## 12. Pest Control

**12.1 Extermination:** Unless prohibited by statute or otherwise stated in your Lease Contract, we may have extermination operations conducted in the apartment home several times a year and as needed to prevent insect infestation. If pest control services are provided, you shall pay the amount of $____2____ on or before the first day of each month to reimburse us for extermination services to the apartment home. You shall pay such fee in the same time and manner as you pay rent pursuant to your Lease Contract. You must request in writing extermination treatments in addition to those regularly provided by us.

**12.2 Preparations for Extermination:** If the apartment home is not prepared for a scheduled treatment date, we will reschedule treatment at your expense. You agree to perform the tasks necessary to prepare the apartment home for extermination, including:
a) removing people sensitive to the extermination treatment from the apartment home;
b) removing animals or placing them in bedrooms with notification to us;
c) removing animal food bowls;
d) removing all food, utensils, glasses, and dishes and food containers from countertops and floors;
e) removing chain locks or other obstructions on the day of service;
f) removing contents from shelves, cabinets, and floors where pests have been seen;
g) cleaning all cabinets, drawers, and closets in kitchen and pantry; and
h) refraining from wiping out cabinets after the treatment.

**12.3 Notify Us of Health Issues:** You are solely responsible for notifying us in writing prior to extermination of any anticipated health or other concerns related to extermination and the use of pesticides.

**12.4 Your Responsibilities:** To reduce the possibility of pests, you shall: (a) store all food in sealed containers; (b) not leave food or dirty dishes out; (c) empty all cans and bottles and rinse them with water; (d) immediately dispose of unused paper grocery sacks; (e) sweep and mop the kitchen regularly; (vi) vacuum carpets frequently to remove crumbs and other food particles; (f) remove trash immediately; (g) not put wet garbage in the trash; (h) use the garbage disposal if available; (i) not leave windows or doors open allowing pests to enter; and (j) comply with any instructions/protocol from the extermination company.

## 13. Packages / Deliveries

In the event your community accepts packages for residents we do so in our sole discretion and the following policies apply:
a) We will only accept packages from a commercial delivery service (UPS, Federal Express, etc.) and United States Postal Service. We will not accept any package shipped COD or having postage due.
b) In the event your community offers a package locker system**,** couriers will make all deliveries exclusively through the locker system. Refer to your community for the locker location name to be placed on address delivery label(s), which will instruct couriers of proper delivery.
c) We will not be responsible or liable for any lost or stolen deliveries which we sign for or accept. While your deliveries are in our possession, both during and after office hours, your deliveries are not secured.
d) Pick up your deliveries within 48 hours. If you do not pick up your delivery within 48 hours, we reserve the right to return to sender.
e) Occasionally the number of deliveries may become too great or too cumbersome; therefore, we reserve the right at all times to refuse deliveries.
f) We have no obligation to contact you when accepting packages. This is your and the deliverer's responsibility.
g) Deliveries or service requiring entrance into your apartment home by anyone other than us will be allowed only with your prior written permission.
h) We are not responsible for articles or parcels left at your door or in the office by delivery services.
i) We will not be available after hours to allow you access to your deliveries. You must pick up your packages during regular office hours.
j) You shall not have perishable goods delivered to the office unless your community has approved such delivery in advance or offers refrigerated lockers.
k) We may not accept packages that are over 25 pounds or larger than 2'x2'x2'.
l) You may be required to present a photo ID and/or signature when picking up a package.

## 14. Maintenance Emergencies

Service requests will be handled after office hours if they are emergencies. We define emergencies as the following:
a) Electrical or gas failure of any nature
b) Broken or non-working exterior doors, locks, windows
c) Malfunctioning access gates that are locked and will not open
d) No heat (when outside temperature is below 60 degrees)
e) No air conditioning (when outside temperature is above 85 degrees)
f) No water
g) Overflowing toilet
h) Flooding
i) Broken pipes
j) Fire (call 911 immediately)
k) After business hours, emergency service requests can be reported by calling the office. The on-duty service technician will be notified and will respond as quickly as possible.

## 15. Apartment Home Transfers

When transferring to another apartment home within the community:
a) You shall not replace or transfer your interest in the Lease Contract, or any part hereof, without our prior written consent. If you are in violation of the Lease Contract, you will not be approved for a transfer.
b) You must sign a Transfer form.
c) The criteria for qualifications of credit, income and employment, residence, and criminal must be met for residents that transfer within the lease term or at the end of the lease term.
d) You must fulfill at least 3 months of your current lease term before you will be eligible to transfer to a new apartment home.
e) If applicable, a transfer fee must be paid prior to transferring. A new security deposit may be required to secure the new apartment home. In addition, market rent, new pet deposit/fees (if applicable) and other applicable fees must be paid.
f) You are required to provide a written move-out notice according to your Lease Contract from the current apartment home. The vacated apartment home must be left in the condition described in the move-out cleaning instructions. We will inspect the apartment home and forward statements and deposit refunds to your new address.
g) If you cancel the transfer after the new apartment home has been assigned and taken off the market, you will be responsible for any economic loss sustained resulting from your failure to rent the new apartment home.
h) You shall be responsible for all moving costs including those associated with switching utilities and services to the new apartment home if a transfer is approved.

## 16. Amenities / Facilities

| | | | | |
|---|---|---|---|---|
| *Swimming Pool* | *BBQ Grill/Fire Pit* | *Spa or Hot Tub* | *Club Room* | *Dog Park/Spa* |
| *Sports Court* | *Car Cleaning Facility* | *Game Room/Theater* | *Laundry Room* | |
| *Tanning Facilities* | *Sauna* | *Business Center* | *Fitness Facilities* | |
| *Video Library* | *Nature/Hiking Trail* | *Playground* | *Roof Top Deck* | |

In the event that your community hosts any of the above or other amenities, the following apply:

- In an emergency, call 911
- Attendants are not provided
- Use amenities at your own risk
- Comply with posted signs
- Use equipment in the manner it is intended
- Do not destroy any equipment/amenity
- Report any equipment needing repair or vandalism
- Do not remove any equipment
- Wear appropriate attire
- Be mindful of others when using amenities and limit time as necessary
- Only two guests are allowed and must be accompanied by you
- We are not responsible for accidents, injuries, or lost, stolen, damaged, or misplaced items
- You agree to hold us harmless from any and all claims, damages, or expenses related to the use of amenities

## 17. Amenity / Facility Safety-Related Restrictions

**17.1 Safety-Related Restrictions:** Our community contains amenities/facilities that are intended to enhance the living experience for you and your occupants. You agree that, for safety-related reasons, certain amenities/facilities may require restrictions on use. You agree to abide by posted signs. You further agree that you, your occupants or guests will be supervised, as needed, by someone possessing the proper skills to supervise the particular activity at the amenities/facilities.

**17.2 Residents Shall Exercise Their Own Prudent Judgment:** You, occupants and guests are advised to exercise their own prudent judgment with respect to the unsupervised use of the facilities located throughout the community. By establishing safety-related use restrictions, we are not in any manner representing, guaranteeing or ensuring the safety of any persons when participating in the activities or using the facilities of the community with or without supervision.

## 18. Swimming Pool and Spa / Hot Tub

In the event your community has a pool and/or hot tub for the enjoyment of all residents, the following policies apply. Please follow posted signage.

a) We do not provide, at any time, safety or supervisory personnel at the pools, hot tubs, spas, or any other common area. LIFEGUARDS ARE NOT PROVIDED. SWIM AT YOUR OWN RISK. FOR YOUR SAFETY, DO NOT SWIM ALONE.
b) No diving. Diving may result in injury or death.
c) We cannot and do not assure, guarantee or warrant your safety.
d) Assistance animals are allowed in the pool area if necessary due to a disability-related need; however, no animals will be allowed in the pool or spa water.
e) We are not responsible for accidents, injuries, or lost, stolen, damaged or misplaced items.
f) No jumping into the pool from balconies, patios, fountains, or other structures near the pool.
g) Keep gates closed at all times.
h) Respect others by covering pool furniture with a towel. Do not remove pool furniture from pool areas. Dispose of trash properly.
i) Overexposure to hot water may cause dizziness, nausea, and fainting. Hot water exposure limitations vary from person to person.
j) Check the hot tub temperature before entering the hot tub. Do not use the hot tub if the temperature is above 104 degrees. Do not operate the hot tub if the suction outlet cover is missing, broken, or loose.
k) Do not place electrical appliances (telephone, radio, TV, etc.) within five feet of the pool or hot tub.
l) Appropriate swimwear is required at all times as determined by us. Diapers are not allowed unless they are swim diapers.
m) You are limited to 2 guests to any pool/hot tub area, and you must accompany your guests at all times.

## 19. Sports Courts (Tennis, Volleyball, Basketball, etc.)

In the event your community has sports courts (tennis, volleyball, basketball, etc.) for the enjoyment of all residents, the following policies apply.

a) Motorcycles, bicycles, tricycles, roller blades, skateboards and skates are not permitted on the court surface.
b) Do not sit or lean on the net. Do not hang from or climb on the goal or nets.
c) Proper athletic shoes with rubber soles are required.

## 20. Club Room / Game Room / Theater

In the event that your community provides a club room, game room, and/or theater for the enjoyment of all residents, the following policies apply.

a) No wet clothing permitted.
b) Clubroom hours are determined by us.
c) All items must be returned, in the condition in which they were received prior to leaving.
d) Use the facility at your own risk. Use the equipment only in the manner intended by manufacturer.
e) Do not remove or damage equipment and supplies.

## 21. Tanning Bed, Tanning Dome, or Spray Tan Booth

In the event a tanning device(s) is provided for the enjoyment of all residents, the following policies apply:

a) Failure to use the eye protection may result in permanent damage to your eyes.
b) Overexposure to ultraviolet light (whether from natural or artificial sources) causes burns.
c) Repeated exposure to ultraviolet light (whether from natural or artificial sources) may result in premature aging of the skin and skin cancer.
d) Abnormal skin sensitivity or burning may be caused by reactions of ultraviolet light to certain food, cosmetics, and medications.

## 22. Video / DVD Library

In the event your community provides a video/DVD library, the following policies apply.

a) You acknowledge and agree to be fully responsible for any and all videos/DVDs borrowed by self or other occupants while using the video services provided.
b) All videos/DVDs must be returned in good working condition (except reasonable wear and tear) within 48 hours.
c) We are not responsible for persons borrowing videos/DVDs that may not be suitable for themselves or others.
d) We may charge your account the total amount owed including late charges and/or market value of all items not returned in good working condition.

## 23. Business / Computer Center

In the event your community has a business center for the enjoyment of all residents, the following policies apply:

a) The center is for use by you and occupants only.
b) We are not responsible for lost, stolen or damaged items, content viewed, viruses or loss of information.

c) Smoking, food and drinks are prohibited.
d) Please be considerate of others. Limit computer use to 30 minutes when others are waiting.
e) You must provide their own document/data storage. Do not install or download any program, file or software on the business center equipment. Data created, stored or saved on the business center equipment will not be private, may be used by us for any purpose and will likely be deleted. *Incoming faxes are prohibited.*
f) We reserve the right to monitor, intercept, review, and erase, without further notice, all content created on, transmitted to, received or printed from, or stored or recorded on the courtesy devices.
g) Users should not use the courtesy device to transmit or store personal information, including user names, passwords, addresses, driver's license numbers, social security numbers, bank information, or credit card information.
h) The courtesy device and associated access to the internet may not be used to (a) violate United States, state, or foreign laws; (b) transmit or receive material that is threatening, obscene, harassing, discriminatory, defamatory, illicit, or pornographic; or (c) interfere with or disrupt network users, services, or equipment.
i) Attempts to remove equipment from the business center will engage the alarm system.
j) Users may not alter or damage existing hardware or software. Do not modify screensavers or background images on business center equipment.
k) Violation of any or all of the above stated rules may result in termination of business center use or other remedies under the lease.

## 24. Barbecue Grill / Outdoor Kitchen / Fire Pit / Fire Place

In the event your community has barbeque grills, outdoor kitchens, fire pits, or fire places for the enjoyment of all residents, the following policies apply.
a) Barbecue grill instructions may be posted at each location or are available from us. Please contact us before attempting to use these grills.
b) Keep pets and persons requiring supervision away from open flames.
c) Your community may require a deposit or fee to use the facility. Contact us for further details.
d) Never leave a fire unattended. Do not leave until the fire is completely out.
e) Keep flammable materials away from the fire.

## 25. Laundry Room

In the event your community has laundry rooms, the following policies apply.
a) Use appropriate settings on washers and dryers. Any loss or damage to clothing is not our responsibility.
b) No dying of clothes is permitted.
c) Do not wash or dry oversized items.
d) Remove lint from dryer before and after each use. Wipe down after use. Please leave machines clean.
e) Facilities are for use by you and occupants only.

## 26. Dog Park/Spa

In the event your community has a Dog Park or Spa for the enjoyment of all residents, the following policies apply.
a) Animal owners are responsible their animal's behavior, for damage or injury inflicted to or by their animal(s). Animal owners must remain with dogs in fenced area at all times.
b) You are limited to 2 animals per person in the Dog Park or Spa
c) Dogs must be leashed when entering and exiting the park and must be leashed in the transition corridor, if applicable. You must have a visible leash for each dog at all times.
d) Animals with a known history of dangerous or aggressive behavior are prohibited. Immediately leash your dog(s) and leave the Dog Park if your dog behaves aggressively.
e) Puppies under 6 months of age and female dogs in heat are not allowed in the Dog Park.

## 27. Roof Top Deck

In the event your community has a roof top deck for the enjoyment of all residents, the following policies apply.
a) You, your occupants and guests shall not walk in any areas on the roof other than the designated walkway and roof top deck itself.
b) Nothing shall be thrown or intentionally dropped over the edge of the roof. You, upon the first infraction of this policy by you, your occupants or guests, may have use privileges revoked and/or residency terminated.

## 28. Photographs, Digital Images, Video

All residents, occupants, visitors and guests, while in common areas, give Owner, management company, their employees, agents, subsidiaries and authorized vendors the right to record their image and/or voice, and grant Owner and management company all rights to use these sound, still, or moving images in any and all media, now or hereafter known, and for any purpose whatsoever.

A release to Owner, management company, their employees, agents, subsidiaries and authorized vendors is granted for all rights to exhibit this work in all media, including electronic form, publicly or privately. The rights, claims or interest controlling the use of identity or likeness in the sound, still or moving images is waived and any uses described herein may be made without compensation or consideration.

## 29. Wildlife

**29.1 Definition of Wildlife:** Wildlife can include the presence of alligators, bears, crocodiles, snakes, opossums, raccoons, or other non-domesticated animals. In the event wildlife is found on the community, you agree to the following.

**29.2 Resident Acknowledgements:** You assume the risk with respect to having wildlife near your apartment home and acknowledge that we are not liable for any injuries, damages or losses to persons or property caused by or related to the wildlife.

**29.3 Resident Responsibilities:** You will be responsible for informing occupants, guests and invitees about the wildlife and enforcing their compliance with the following:

You, your occupants and guests will not:
a) feed, get close to, or attempt to catch the wildlife;
b) swim, wade or play near the wildlife;
c) dispose of garbage of scraps near a water source, pond, lake, or other area that may contain wildlife.

## 30. Body of Water (Lake, Pond, Water Features)

You will be responsible for informing occupants, guests and invitees about the bodies of water and enforcing their compliance with the following:
No one will
a) swim or wade in any body of water that is not designated as a swimming pool;
b) boat on any body of water unless approved by us;
c) ice skate or conduct any other type of water sport in or on the bodies of water.

## 31. Elevators

In the event your community has an elevator (s) for the enjoyment of all residents, the following policies apply.
a) Do not attempt to maneuver or stop closing doors. Wait for the next elevator car.
b) In the event of a fire or other situation that could lead to a disruption in electrical services, take the stairs.
c) When entering and exiting the elevator, watch your step as the elevator car may not be perfectly level with the floor.
d) Do not climb out of a stalled elevator. Use the alarm, help, or telephone button to call for assistance.

## 32. Construction or Renovation

In the event your community is under construction or renovation, the following policies apply:

a) **Inform Occupants and Guests:** You will be responsible for informing occupants, guests, and invitees about these policies.
b) **Stay Away from Construction Areas:** You agree to observe all warning signs and blockades. You agree to stay away from the construction areas and shall not climb on or enter onto scaffolding or other construction equipment at any time. You acknowledge there may be construction debris, trip hazards, and uneven surfaces. Construction crews may work throughout the days to complete construction.
c) **Machinery and Equipment:** You acknowledge the construction areas will have machinery and equipment to be used by authorized personnel only and entry into those areas by you, your occupants, guests or invitees is strictly prohibited.
d) **Minor Disturbances:** You acknowledges that the construction/renovation may cause noise, dust, and minor disturbances to the egress/ingress on or about the community and minor disturbances to the quiet and enjoyment of the apartment home.
e) **Amenities May Be Unavailable:** You further agree that the amenities, including the clubhouse, pool, or other common areas, may be unavailable for use by you, your occupants, guests and invitees during the period of construction.
f) **Resident Waives Right to Withhold Rent:** Except as otherwise prohibited by law, you hereby waive any right to withhold rent due to inconvenience or disturbance of quiet enjoyment of your apartment home or the inability to use the amenities or common areas or put forward such noise or construction activity as a breach of our duty pursuant to applicable law.
g) **Move-In Date Not Guaranteed Due to Construction Delays:** You acknowledge that the move-in date cannot be guaranteed in the case of unforeseen construction delays. You acknowledge that you will not be compensated for any unforeseen occupancy delays. If you terminate the Lease Contract early for any reason other than construction delays, you will be responsible for all applicable early termination charges and procedures.

## 33. Prevention of Mold

You agree not to conduct any mold or other environmental testing of your apartment without giving us at least 72 hours advance written notice to enable us to have a representative present during testing. You agree that failure to provide such notice means the testing is not admissible in any legal proceedings.

## 34. Fire/Freezing Weather/Floods/Other Emergencies

Emergency situations may occur during your residency. Please remember that you are responsible for your own safety and the safety of your occupants, guests and invitees. You should look to the proper authorities for any assistance when needs exceed your abilities. Please note the following regarding certain emergency situations.

**34.1 Fire Hazards:**

a) Follow fire safety and fire safety regulations while in the apartment home and community.
b) No flammable or combustible objects/substances are to be stored on patios, balconies, under stairwells, in your garage or storage space and should not be within 30 inches of an item which produces heat (water heater, furnace, stove, oven, candle, curling iron, etc.).
c) Items which require an open flame to operate or which produce heat (e.g., Bunsen burners, sterno/canned heat, lighted candles, alcohol burners, heating elements, irons, curling irons, halogen bulbs, stove, oven) must be supervised at all times during use and should never be left unattended.
d) Do not obstruct or use the driveways, sidewalks, entry passages, stairs, breezeways, courtyards, or halls for any purpose other than ingress or egress.
e) Fireworks are prohibited inside the apartment home or anywhere within the community.

**34.2 Fire Alarms:** In the event residents are given procedures for fire alarms, you, your occupants, guests and invitees are required to adhere to all procedures.

a) You and your occupants, guests, and invitees must not tamper with, interfere with, or damage any alarm equipment and/or installation.
b) In the event the community has a fire sprinkler system, you acknowledge and hereby agree that it is important to be careful near fire sprinkler heads so as not to falsely trigger or activate them. If you trigger or activate the fire sprinkler system, you will be responsible for all damages caused by the activation.
c) Anyone found to falsely pull a fire alarm will be subject to criminal charges, a fine, and/or a default of the Lease Contract.
d) An extension cord must be UL approved, 16 gauges, and not exceed an un-spliced length of six feet with a polarized plug and a single outlet; it may not be placed under floor coverings or furnishings and may not be secured by penetrating the insulation.

**34.3 Freezing Weather:** You shall follow these precautions when subfreezing weather occurs.

a) Leave the heat on 24 hours a day at a temperature setting of no less than 55 degrees. Keep all windows closed.
b) Leave open the cabinet doors under the kitchen sink and bathroom sink to allow heat to get to the plumbing.
c) Drip all your water faucets 24 hours a day. If severe subfreezing weather occurs, it may be necessary to run your faucets at a steady, pencil-lead stream when you are in the apartment home and when you are gone. This includes hot and cold water in your kitchen, bathroom lavatories, bathtubs, shower, wet bar sinks, etc.
d) Leave all drains open and clear of obstacles; including lavatories, sinks and bathtubs.
e) If you notice a water leak, icy spot or other hazardous condition on the community, notify us IMMEDIATELY.

**34.4 Floods:**

a) If heavy rain, storms or flooding is forecast, you should follow the guidelines below. Do not put tape on the windows unless directed by us.
b) Unplug all appliances and televisions. Do not plug appliances back in until the water completely recedes and community personnel give you permission.

## 35. Power Outage

In the event of a power outage that lasts more than 24 hours, we have the right, but not an obligation, to dispose of the contents of the refrigerator/freezer in your apartment home. You waive any claim and hold us harmless for the disposal of such contents. You agree not to seek recovery against us for interruption of power that results in disposal, loss, or spoilage of refrigerated or frozen food.

## 36. Payments

Unless otherwise allowed at your community, we only accept electronic payments. Cash, paper checks, paper money orders or other forms of payment will not be accepted. Credit and Debit Card transactions may not be allowed.

**36.1 ACH, Credit, and Debit Cards:** Automated electronic payments include ACH and Credit and Debit Card transactions. ACH refers to the nationwide network of banking institutions that have agreed to process electronic payments automatically from your bank account to our bank accounts. Virtually all banks and credit unions participate. Credit and debit card transactions refers to credit and debit card transactions, including those cards bearing the Visa, MasterCard, Discover and American Express logos. Collectively, “automated electronic payments” are paperless transactions that occur instantly and automatically without a check being hand-processed through a local bank clearinghouse or the Federal Reserve System.

**36.2 Advantages in Paying Rent via ACH:** There are advantages for you in paying your rent via automated electronic payments, including:

a) Greater convenience since you won’t have to worry each month with writing, mailing or delivering a rent check;
b) No late charges since your rent will be paid timely, assuming there are sufficient funds in your checking account;
c) Greater security since there is little chance that a check signed by you will fall into the wrong hands or get lost in the mail; and
d) Proof that you’ve paid since your bank statement is evidence of payment according to ACH and card network rules.

**36.3 Electronic Money Orders:** We also accept electronic money orders. Details on this payment option are available at the office.

**36.4 Check Scanner:** If your community accepts paper checks and uses a check scanner, you are hereby advised that personal checks remitted for normal payments will be scanned and the funds will be electronically withdrawn from your bank account via “Automated Clearing House” (ACH). If you wish to opt out of this process, you must choose another payment method. Standard ACH bank drafts occur after one business day.

**36.5 Electronic Check Conversion:** If your community accepts paper checks, please be aware that we may use electronic check conversion. This is a process in which your check is used as a source of information (for the check number, your account number, and the number that identifies your financial institution). The information is then used to make a one-time electronic payment from your account (an electronic fund transfer). The check itself is not the method of payment. Your electronic transaction may be processed faster than a check. Be sure you have enough money in your account at

the time you make a purchase or payment. Your financial institution will not return any checks that are converted, even if you normally receive your original checks or images of those checks with your statement. Always review your regular account statement from your financial institution. You should immediately contact your financial institution if you see a problem. You have only 60 days (from the date your statement was sent) to tell the financial institution about a problem. Depending on the circumstances, the financial institution may take up to 45 days from the time you notify it to complete its investigation. Your checking account statement will contain information about your payment, including the date, the check number, the name of the person or company you have paid, and the amount of the payment.

## 37. Data and Communication

You understand and accept that we may collect, retain, use, transfer, and disclose personal information, such as the first name, last name, email address, and phone number of you or your occupants in the unit. We may collect, retain, and use that information, or disclose that information to third parties to, among other things, (a) operate the Property; (b) provide services consistent with the Lease; (c) refer you to third parties that provide products or services that may be of interest to you or your occupants in the unit; (d) collect debts; and (e) conduct and analyze resident surveys. Please review the privacy policy of the owner's authorized agent at the time of residence for a discussion of the treatment of information during your lease. The current policy may be viewed at https://www.greystar.com/privacy.

Providing an email address or cell phone number to us enables us to send important announcements, including notices regarding an emergency water shut off, work to be done at the Property, or changes in office hours. By providing this contact information, you and your occupants consent to receive communications regarding marketing materials, promotional offers, community messages, and service reminders via e-mail, voicemail, calls and/or text.

By providing your and your occupants' phone numbers, you acknowledge and agree that we may contact you and your occupants at the phone number(s) that you and your occupants have provided, including through an automatic telephone dialing system and/or an artificial prerecorded voice, with information and notifications about the community and for other non-marketing, informational purposes, including in connection with expiration of your lease. You further warrant to us that you or your occupants are the subscriber for any wireless number that you or your occupants have provided. You agree to immediately notify us if you or your occupants are no longer the subscriber for a wireless number, or if a wireless number changes. Text messaging and data rates may apply.

You authorize us to deliver messages regarding renewal of your lease and other offers to you at the telephone number(s) that you have provided, including through the use of an automatic telephone dialing system and/or artificial or prerecorded voice. You acknowledge and agree that this authorization is made voluntarily.

The permissions and consents granted herein apply to the owner of the community and the owner's authorized agents/representatives, including its property manager, and will continue even after your lease expires, the owner of the community sells the community, or the property manager no longer manages the community.

## 38. Subletting and Replacements

**38.1 When Allowed**: Replacing a resident, subletting, assigning, or licensing a resident's rights are allowed only when we consent in writing. Residency at your community is subject to an application and/or approval by us. Occupancy is restricted to only the named residents and occupants that are identified in your Lease Contract.

**38.2 Advertising Your Apartment**: You are not allowed to advertise your apartment homes(s) without our written consent. This prohibition on advertising includes online postings, print advertising or other formats such as craigslist, Airbnb, etc.

## 39. Conduct

You agree to communicate and conduct yourself at all times in a lawful, courteous, and reasonable manner when interacting with us; our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person in the community. Any acts of unlawful, discourteous, or unreasonable communication or conduct by you or your occupants, guests or invitees, shall be a material breach of this Agreement and will entitle us to exercise all of our rights and remedies for default.

You agree not to engage in any abusive behavior, either verbal or physical, or any form of intimidation or aggression directed at us; our employees, agents, independent contractors, and vendors; other residents, occupants, guests or invitees; or any other person in the community. Any acts of abusive or offensive behavior whether verbal or physical by you or your occupants, guests or invitees, shall be a material breach of this Lease and will entitle us to exercise all of our rights and remedies for default.

If requested by us, you agree to conduct all further business with us in writing.

**Summary**

| Section and Description | Charge |
|---|---|
| Additional Controlled Access Device | $ |
| Damaged/Lost/Unreturned Cards/Remotes/Fobs (per device) | $ |
| Duplicate/Lost/Unreturned Key | $ 50 |
| Re-keying Lock | $ |
| Private Yard Maintenance Fine | $ |
| Lost/Stolen/Unreturned Parking Tag/Sticker (per item) | $ |
| Trash Clean-up (per bag) | $ 25 |
| Litter Fine (per incident) | $ 25 |
| Pest Control Monthly Fee | $ 2 |

This is a binding document. Read carefully before signing.

**Resident(s) Signature(s)** *(18 years of age and over)*

______________________ **Date:** ____________

______________________ **Date:** ____________

______________________ **Date:** ____________

______________________ **Date:** ____________

______________________ **Date:** ____________

______________________ **Date:** ____________

**Owner's Representative Signature:**

______________________



JE[illegible]
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:47PM PDT

DOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

# FIRE SAFETY AND PROTECTION INFORMATION

This Fire Safety and Protection Information form is incorporated into the Lease Contract executed on September 6, 2023 between 10227 20th (Park), LLC ("We") and Jeffrey Nelson ("You") of Apt. No. E103 located at 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*, and is in addition to all terms and conditions in the Lease Contract.

1. The dwelling is equipped with smoke detection devices as required by RCW 43.44.110. These smoke detection devices are ☐ hard wired ☐ battery operated ☒ hard-wired with a battery backup. The devices have been inspected and are properly operating at the commencement of the tenancy. It is the resident's responsibility to maintain the devices in proper operating condition including replacement of batteries, if necessary.
2. A diagram showing the emergency evacuation routes for residents is attached as Exhibit A.
3. The dwelling complex ☒ does ☐ does not have a fire sprinkler system.
4. The dwelling complex ☒ does ☐ does not have a fire alarm system.
5. The dwelling complex ☒ does ☐ does not have a smoking policy. If applicable, a copy of any smoking policy is attached as Exhibit B.
6. The dwelling complex ☐ does ☒ does not have an emergency notification plan for residents. If applicable, a copy of any such plan is attached as Exhibit C.
7. The dwelling complex ☐ does ☒ does not have an emergency relocation plan for residents. If applicable, a copy of any such plan is attached as Exhibit D.
8. The dwelling complex ☐ does ☒ does not have an emergency evacuation plan for residents. If applicable, a copy of any such plan is attached as Exhibit E.

**Resident or Residents**
*(All residents must sign here)*

______________________

**Owner or Owner's Representative**
*(signs here)*

______________________

**Date of Lease Contract**

September 6, 2023



©2023, National Apartment Association, Inc. - 5/2023, Washington

# ADDENDUM REGARDING RECREATIONAL and MEDICAL MARIJUANA and LANDLORD'S COMMITMENT TO ENFORCEMENT OF CRIME FREE ADDENDUM

NATIONAL APARTMENT ASSOCIATION — We Lead the Way Home

**1. DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:
Jeffrey Nelson

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3.** Washington State law permits the limited use of medical and recreational marijuana in specific and limited circumstances. However, this is not the case under federal law. Under federal law, specifically the Federal Controlled Substances Act (CSA), marijuana is still categorized as a Schedule I substance. This means that under federal law, and U.S. Supreme Court decisions, the manufacture, distribution, or possession of marijuana is strictly prohibited. Because the U.S. Department of Housing and Urban Development is controlled by the federal government, HUD policy is that the use of marijuana, whether prescribed for medical reasons or not, is a criminal offense and will not be protected under the fair housing laws or allowed in HUD funded housing. Therefore, apartment complexes are not required to accommodate the use of marijuana by a tenant who is a current medical marijuana user. Disabled tenants who are registered medical marijuana users, however, should not feel discouraged to request reasonable accommodations if the need arises.

**4.** The Premises listed above follows and complies with federal law regarding marijuana use and is, and will continue to be, a drug free community. Possession, use, manufacture or sale of any illegal substance, including marijuana, or any use of marijuana by the tenant and/or guests will result in immediate termination. If you have any questions or concerns about this policy, please speak to management.

**5.** By signing below, the resident acknowledges his or her understanding of the terms and conditions as stated above, and his or her agreement to comply with those terms and conditions.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

| **Resident or Residents** *(sign here)* | **Date of Signing Addendum** |
|---|---|
| | |

| **Owner or Owner's Representative** *(signs here)* | **Date of Signing Addendum** |
|---|---|
| | |

JEFFREY NELSON
SIGNED 9/10/2023 AT 5:48PM PDT

DOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

©2019, National Apartment Association, Inc. - 8/2019, Washington

# LEASE CONTRACT ADDENDUM FOR SATELLITE DISH OR ANTENNA

NATIONAL APARTMENT ASSOCIATION — We Lead the Way Home

Under a Federal Communications Commission (FCC) order, you as our resident have a right to install a transmitting or receiving satellite dish or antenna on the leased dwelling, subject to FCC limitations. We as a rental housing owner are allowed to impose reasonable restrictions relating to such installation. You are required to comply with these restrictions as a condition of installing such equipment. This addendum contains the restrictions that you and we agree to follow.

**1. DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:
Jeffrey Nelson

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. NUMBER AND SIZE.** You may install 0 satellite dish(es) or antenna(s) on the leased premises. A satellite dish may not exceed one meter (3.3 feet) in diameter. Antennas that only transmit signals or that are not covered by 47 CFR § 1.4000 are prohibited.

**4. LOCATION.** Your satellite dish or antenna must be located: (1) inside your dwelling; or (2) in an area outside your dwelling such as a balcony, patio, yard, etc. of which you have exclusive use under your lease. Installation is not permitted on any parking area, roof, exterior wall, window, window sill, fence or common area, or in an area that other residents are allowed to use. A satellite dish or antenna may not protrude beyond the vertical and horizontal space that is leased to you for your exclusive use. You understand that not all dwellings shall be capable of receiving satellite signals, depending on the location of the dwelling, and that inability to receive signals shall not be construed in any way as a breach of the agreement by Landlord nor for a reduction in the rent.

**5. SAFETY AND NON-INTERFERENCE.** Your installation: (1) must comply with all applicable ordinances and laws and all reasonable safety standards; (2) may not interfere with our cable, telephone or electrical systems or those of neighboring properties; (3) may not be connected to our telecommunication systems; and (4) may not be connected to our electrical system except by plugging into a 110-volt duplex receptacle. If the satellite dish or antenna is placed in a permitted outside area, it must be safely secured by one of three methods: (1) securely attaching it to a portable, heavy object such as a small slab of concrete; (2) clamping it to a part of the building's exterior that lies within your leased premises (such as a balcony or patio railing); or (3) any other method approved by us in writing. No other methods are allowed. We may require reasonable screening of the satellite dish or antenna by plants, etc., so long as it does not impair reception.

**6. SIGNAL TRANSMISSION FROM EXTERIOR DISH OR ANTENNA TO INTERIOR OF DWELLING.** You may not damage or alter the leased premises and may not drill holes through outside walls, door jams, window sills, etc. If your satellite dish or antenna is installed outside your dwelling (on a balcony, patio, etc.), the signals received by it may be transmitted to the interior of your dwelling only by the following methods: (1) running a "flat" cable under a door jam or window sill in a manner that does not physically alter the premises and does not interfere with proper operation of the door or window; (2) running a traditional or flat cable through a pre-existing hole in the wall (that will not need to be enlarged to accommodate the cable); (3) connecting cables "through a window pane," similar to how an external car antenna for a cellular phone can be connected to inside wiring by a device glued to either side of the window—without drilling a hole through the window; (4) wireless transmission of the signal from the satellite dish or antenna to a device inside the dwelling; or (5) any other method approved by us in writing. Running the cable along any portion of the common areas is strictly prohibited.

**7. SAFETY IN INSTALLATION.** In order to assure safety, the strength and type of materials used for installation must be approved by us. Installation must be done by a qualified person or company approved by us. Our approval will not be unreasonably withheld. An installer provided by the seller of the satellite dish or antenna is presumed to be qualified.

**8. MAINTENANCE.** You will have the sole responsibility for maintaining your satellite dish, antenna and all related equipment.

**9. REMOVAL AND DAMAGES.** You must remove the satellite dish or antenna and all related equipment when you move out of the dwelling. In accordance with the Lease Contract, you must pay for any damages and for the cost of repairs or repainting caused by negligence, carelessness, accident or abuse which may be reasonably necessary to restore the leased premises to its condition prior to the installation of your satellite dish, antenna or related equipment. You will not be responsible for normal wear.

**10. LIABILITY INSURANCE. You must take full responsibility for the satellite dish, antenna and related equipment. If the dish or antenna is installed at a height that could result in injury to others if it becomes unattached and falls, you must provide us with evidence of liability insurance (if available) to protect us against claims of personal injury and property damage to others, related to your satellite dish, antenna and related equipment.** The insurance coverage must be $ ______, which is an amount reasonably determined by us to accomplish that purpose. Factors affecting the amount of insurance include height of installation above ground level, potential wind velocities, risk of the dish/antenna becoming unattached and falling on someone, etc.

**11. SECURITY DEPOSIT.** An additional security deposit of $ ______ will be charged. We *(check one)* ❑ will consider or ❑ will not consider this additional security deposit a general security deposit for all purposes. The security deposit amount in the Security Deposit paragraph of the Lease Contract *(check one)* ❑ does or ❑ does not include this additional deposit amount. Refund of the additional security deposit will be subject to the terms and conditions set forth in the Lease Contract regardless of whether it is considered part of the general security deposit.

©2018, National Apartment Association, Inc. - 9/2018, Washington

This additional security deposit is required to help protect us against possible repair costs, damages, or failure to remove the satellite dish, antenna and related equipment at time of move-out. Factors affecting any security deposit may vary, depending on: (1) how the dish or antenna is attached (nails,screws, lag bolts drilled into walls); (2) whether holes were permitted to be drilled through walls for the cable between the satellite dish and the TV; and (3) the difficulty and cost repair or restoration after removal, etc.

12. **WHEN YOU MAY BEGIN INSTALLATION.** You may start installation of your satellite dish, antenna or related equipment only after you have: (1) signed this addendum; (2) provided us with written evidence of the liability insurance referred to in paragraph 10 of this addendum; (3) paid us the additional security deposit, if applicable, in paragraph 11; and (4) received our written approval of the installation materials and the person or company that will do the installation, which approval may not be unreasonably withheld.

13. **MISCELLANEOUS.** If additional satellite dishes or antennas are desired, an additional lease addendum must be executed.

14. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*(All residents must sign here)*

**Owner or Owner's Representative**
*(Signs here)*

**Date of Lease Contract**

September 6, 2023



JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:48PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

© 2018, National Apartment Association, Inc.
Washington/National Apartment Association Official Form, September 2018.

# LEASE ADDENDUM
# LIABILITY INSURANCE REQUIRED OF RESIDENT

1. **Addendum.** This Addendum is incorporated into the Lease (referred to in this addendum as "Lease Contract" or "Lease") dated 09/06/2023 signed and agreed to by Owner and Resident(s) for the premises located at 10227 20th St. SE #E103, Lake Stevens, WA, 98258.

2. **Acknowledgment Concerning Insurance or Damage Waiver.** You acknowledge that we do not maintain insurance to protect you against personal injury, loss or damage to your personal property or belongings, or to cover your own liability for injury, loss or damage you (or your occupants or guests) may cause others. You also acknowledge that by not maintaining your own policy of personal liability insurance, you may be responsible to others (including us) for the full cost of any injury, loss or damage caused by your actions or the actions of your occupants or guests. You understand that your Lease Contract requires You to maintain a liability insurance policy, which provides limits of liability to third parties in an amount not less than $100,000 per occurrence. Proof of coverage must be submitted for all leaseholders. You will ensure that the liability insurance policy identifies this apartment community, C/O Greystar, P.O. Box 115009, Carrollton, TX 75011-5009 as a "Party of Interest" or "Interested Party" (or similar language as may be available). When insurance providers are paperless and only submit communications electronically, they are required to submit policy documents to insurance@policyvalidator.com. You understand and agree to maintain at all times during the Term of the Lease Contract and any renewal periods, a policy of personal liability insurance with this limit and otherwise satisfying the requirements listed below, at your sole expense.

3. **Required Policy**. You are required to purchase and maintain personal liability insurance covering you, your occupants and guests, for personal injury and property damage any of you cause to third-parties (including damages to our property), with the minimum policy coverage amount set forth in paragraph 2 above, from a carrier with an AM Best rating of A-VII or better, authorized to issue such insurance in (state). The Carrier must provide notice to us within 30 days of any cancellation, non-renewal, or material change in your coverage. We retain the right to hold you responsible for any loss in excess of your insurance coverage.

4. **No Solicitation.** Unless otherwise acknowledged in writing, you acknowledge that we have made no solicitations, guarantees, representations, or promises whatsoever concerning any insurance or services provided by any insurance company. You were and are free to contract for the required insurance with the provider of your choosing so long as that provider comports with the requirements of paragraph 3 above.

5. **Subrogation Allowed.** You and we agree that subrogation is allowed by all parties and that this agreement supersedes any language to the contrary in the Lease Contract. Accordingly, our insurance carrier may sue you for losses it pays as a result of your negligence, and your insurance carrier may sue us for losses it pays as a result of our negligence.

6. **Your Insurance Coverage.** By signing this addendum, you acknowledge that you have purchased (or will purchase) the insurance described in paragraphs 2 and 3, and that you will provide written proof of this insurance to on-site staff prior to taking possession of the apartment. You further acknowledge that you will keep this insurance policy in-force for the entire term of the lease and provide written proof of active renter's liability coverage upon request. If any material terms of your insurance policy change, you agree to promptly provide proof of the modified policy terms to the on-site staff. For the purposes of this paragraph, either the written policy itself or the declaration page to the policy shall constitute written proof.

7. **Default.** Unless otherwise prohibited by law, any default under the terms of this Addendum shall be deemed an immediate, material and incurable default under the terms of the Lease Contract, and we shall be entitled to exercise all rights and remedies under the law. If you allow your outside policy to expire or cancel, you will be in default under the terms of your lease. If you fail to provide written proof of insurance as required by paragraph 6, we reserve the right to procure coverage to address the deficiency and you agree to reimburse us in the form of a $15.00 Building Loss Protection Fee for all costs and administrative expenses associated with such a purpose. The Building Loss Protection Fee is not prorated. In addition, you will be listed on our Blanket Renter Protection Policy and will not receive a copy of the policy, as you are not the policy holder. We may continue to charge you for such insurance coverage until such time as you provide proof of insurance pursuant to paragraph 6.

8. **Miscellaneous.** Except as specifically stated in this Addendum, all other terms and conditions of the Lease Contract shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease Contract, the terms of this Addendum shall control.

## IMPORTANT DISCLOSURES – READ CAREFULLY BEFORE SIGNING

1. **The insurance required by the Lease Contract is not required by any law. Your obligation to provide insurance stems solely from the Lease Contract.**
2. **The insurance required by the Lease is not an attempt to limit the Owner's liability for its own negligence or your liability for your own negligence.**
3. **CAS Insurance Agency, LLC, a licensed insurance agency and affiliate of property manager, may receive compensation on policies issued by the preferred insurance provider for administrative, brokerage or marketing support. Owner may be receiving compensation or other payments from CAS Insurance Agency, LLC or one of its affiliates where permitted by law.**
4. **The insurance required by the Lease Contract is not in lieu of, or in any way a component of, the security deposit required by the Lease Contract.**
5. **You understand that every term of the agreement between you and the Owner is set forth in the Lease Contract, any addenda thereto, and in the Rules and Regulations which collectively constitute the entire agreement between you and the Owner. There are no other terms except those which may be implied by law.**
6. **You agree that you have not received any oral representations from Owner or any representative of Owner which are inconsistent with or not contained in the Lease Contract, the addenda attached to the Lease Contract, or in the Rules and Regulations. If you have received any such oral representations, you agree that you did not rely on them to decide to enter in the Lease Contract or this Addendum.**

| Resident or Residents *[All residents must sign here]* | Owner or Owner's Representative *[signs here]* |
|---|---|
| ____________________ | ____________________ |
| ____________________ | **Date of Lease Contract** |
| ____________________ | ____________________ |
| ____________________ | |
| ____________________ | |
| ____________________ | |

JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:48PM PDT

Revised 2/2/2022

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

EQUAL HOUSING OPPORTUNITY

# LEASE ADDENDUM
# FOR REMOTE CONTROL, CARD, OR CODE ACCESS GATE

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

1. **DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:
Jeffrey Nelson

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

3. **REMOTE CONTROL/CARDS/CODE FOR GATE ACCESS.**
   - ☐ **Remote control for gate access.** Each person who is listed as a resident on the lease will be given a remote control at no cost to use during his or her residency. Each additional remote control for you or other occupants will require a $ ______ non-refundable fee.
   - ☒ **Cards for gate access.** Each person who is listed as a resident on the lease will be given a card at no cost to use during his or her residency. Each additional card for you or other occupants will require a $ 50.00 non-refundable fee.
   - ☐ **Code for gate access.** Each resident will be given, at no cost, an access code (keypad number) for the pedestrian or vehicular access gates. It is to be used only during your residency. We may change the access code at any time and will notify you of any such changes.

4. **DAMAGED, LOST OR UNRETURNED REMOTE CONTROLS, CARDS OR CODE CHANGES.**
   - ☐ If a remote control is lost, stolen or damaged, a $ ______ fee will be charged for a replacement. If a remote control is not returned or is returned damaged when you move out, there will be a $ ______ deduction from the security deposit.
   - ☒ If a card is lost, stolen or damaged, a $ 50.00 fee will be charged for a replacement card. If a card is not returned or is returned damaged when you move out, there will be a $ 50.00 deduction from the security deposit.
   - ☐ We may change the code(s) at any time and notify you accordingly.

5. **REPORT DAMAGE OR MALFUNCTIONS.** Please immediately report to the office any malfunction or damage to gates, fencing, locks or related equipment.

6. **FOLLOW WRITTEN INSTRUCTIONS.** We ask that you and all other occupants read the written instructions that have been furnished to you regarding the access gates. This is important because if the gates are damaged by you or other occupants, guests or invitees through negligence or misuse, you are liable for the damages under your lease, and collection of damage amounts will be pursued.

7. **PERSONAL INJURY AND/OR PERSONAL PROPERTY DAMAGE.** Except as specifically required by law, we have no duty to maintain the gates and cannot guaranty against gate malfunctions. We make no representations or guarantees to you concerning security of the community. Any measures, devices,or activities taken by us are solely for the benefit of us and for the protection of our property and interests, and any benefit to you of the same is purely incidental. Anything mechanical or electronic is subject to malfunction. Fencing, gates or other devices will not prevent all crime. No security system or device is foolproof or 100 percent successful in deterring crime. Crime can still occur. Protecting residents, their families, occupants, guests and invitees from crime is the sole responsibility of residents, occupants and law enforcement agencies. You should first call 911 or other appropriate emergency police numbers if a crime occurs or is suspected. We are not liable to any resident, family member, guest, occupant or invitee for personal injury, death or damage/loss of personal property from incidents related to perimeter fencing, automobile access gates and/or pedestrian access gates. We reserve the right to modify or eliminate security systems other than those statutorily required. You will be held responsible for the actions of any persons to whom you provide access to the community.

8. **RULES IN USING VEHICLE GATES.**
   - Always approach entry and exit gates with caution and at a very slow rate of speed, and wait for gate to stop moving before proceeding under it.
   - Never stop your car where the gate can hit your vehicle as the gate opens or closes.
   - Never follow another vehicle into an open gate. Always use your card to gain entry.
   - Report to management the vehicle license plate number of any vehicle that piggybacks through the gate.
   - Never force the gate open with your car.
   - Never get out of your vehicle while the gates are opening or closing.
   - If you are using the gates with a boat or trailer, please contact management for assistance. The length and width of the trailer may cause recognition problems with the safety loop detector and could cause damage.
   - Do not operate the gate if there are small children nearby who might get caught in it as it opens or closes.
   - If you lose your card, please contact the management office immediately.
   - Do not give your card or code to anyone else.
   - Do not tamper with gate or allow your occupants to tamper or play with gates.

©2018, National Apartment Association, Inc. - 9/2018, Washington

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*(All residents must sign here)*

**Owner or Owner's Representative**
*(Signs here)*

**Date of Lease Contract**

September 6, 2023



EDOCUMENT SIGNER
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:48PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

© 2018, National Apartment Association, Inc.
Washington/National Apartment Association Official Form, September 2018.

# NO-SMOKING ADDENDUM

Date: September 6, 2023
(when this Addendum is filled out)

*All use of any tobacco product involving smoking, burning, or combustion of tobacco is prohibited in any portion of the apartment community. You are entitled to receive an original of this No-Smoking Addendum after it is fully signed. Keep it in a safe place.*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:
Jeffrey Nelson

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. DEFINITION OF SMOKING.** Smoking refers to any use or possession of a cigar, cigarette, e-cigarette, hookah, vaporizer, or pipe containing tobacco or a tobacco product while that tobacco or tobacco product is burning, lighted, vaporized, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus Nicotiana or the species N. tabacum which is cultivated for its leaves to be used in cigarettes, cigars, e-cigarettes, hookahs, vaporizers, or pipes. Smoking also refers to use or possession of burning, lighted, vaporized, or ignited non-tobacco products if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons.

**4. SMOKING ANYWHERE INSIDE BUILDINGS OF THE APARTMENT COMMUNITY IS STRICTLY PROHIBITED.** All forms and use of burning, lighted, vaporized, or ignited tobacco products and smoking of tobacco products inside any dwelling, building, or interior of any portion of the apartment community is strictly prohibited. Any violation of the no-smoking policy is a material and substantial violation of this Addendum and the Lease Contract.

The prohibition on use of any burning, lighted, vaporized, or ignited tobacco products or smoking of any tobacco products extends to all residents, their occupants, guests, invitees and all others who are present on or in any portion of the apartment community. The no-smoking policy and rules extend to, but are not limited to, the management and leasing offices, building interiors and hallways, building common areas, dwellings, club house, exercise or spa facility, tennis courts, all interior areas of the apartment community, commercial shops, businesses, and spaces, work areas, and all other spaces whether in the interior of the apartment community or in the enclosed spaces on the surrounding community grounds. Smoking of non-tobacco products which are harmful to the health, safety, and welfare of other residents inside any dwelling or building is also prohibited by this Addendum and other provisions of the Lease Contract.

**5. SMOKING OUTSIDE BUILDINGS OF THE APARTMENT COMMUNITY.** Smoking is permitted only in specially designated areas outside the buildings of the apartment community. Smoking must be at least 25 feet from the buildings in the apartment community, including administrative office buildings. If the previous field is not completed, smoking is only permitted at least 25 feet from the buildings in the apartment community, including administrative office buildings. The smoking-permissible areas are marked by signage.

Smoking on balconies, patios, and limited common areas attached to or outside of your dwelling ☐ is ☒ is not permitted.

The following outside areas of the community may be used for smoking: None

Even though smoking may be permitted in certain limited outside areas, we reserve the right to direct that you and your occupants, family, guests, and invitees cease and desist from smoking in those areas if smoke is entering the dwellings or buildings or if it is interfering with the health, safety, or welfare or disturbing the quiet enjoyment, or business operations of us, other residents, or guests.

**6. YOUR RESPONSIBILITY FOR DAMAGES AND CLEANING.** You are responsible for payment of all costs and damages to your dwelling, other residents' dwellings, or any other portion of the apartment community for repair, replacement, or cleaning due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees, regardless of whether such use was a violation of this Addendum. Any costs or damages we incur related to repairs, replacement, and cleaning due to your smoking or due to your violation of the no-smoking provisions of the Lease Contract are in excess of normal wear and tear. Smoke related damage, including but not limited to, the smell of tobacco smoke which permeates sheetrock, carpeting, wood, insulation, or other components of the dwelling or building is in excess of normal wear and tear in our smoke free apartment community.

**7. YOUR RESPONSIBILITY FOR LOSS OF RENTAL INCOME AND ECONOMIC DAMAGES REGARDING OTHER RESIDENTS.** You are responsible for payment of all lost rental income or other economic and financial damages or loss to us due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees which results in or causes other residents to vacate their dwellings, results in disruption of other residents' quiet enjoyment, or adversely affects other residents' or occupants' health, safety, or welfare.

**8. LEASE CONTRACT TERMINATION FOR VIOLATION OF THIS ADDENDUM.** We have the right to terminate your Lease Contract or right of occupancy of the dwelling for any violation of this No-Smoking Addendum. Violation of the no-smoking provisions is a material and substantial default or violation of the Lease Contract. Despite the termination of the Lease Contract or your occupancy, you will remain liable for rent through the end of the Lease Contract term or the date on which the dwelling is re-rented to a new occupant, whichever comes first. Therefore, you may be responsible for payment of rent after you vacate the leased premises even though you are no longer living in the dwelling.

**9. EXTENT OF YOUR LIABILITY FOR LOSSES DUE TO SMOKING.** Your responsibility for damages, cleaning, loss of rental income, and loss of other economic damages under this No-Smoking Addendum are in addition to, and not in lieu of, your responsibility for any other damages or loss under the Lease Contract or any other addendum.

**10. YOUR RESPONSIBILITY FOR CONDUCT OF OCCUPANTS, FAMILY MEMBERS, AND GUESTS.** You are responsible for communicating this community's no-smoking policy and for ensuring compliance with this Addendum by your occupants, family, guests, and invitees.

**11. THERE IS NO WARRANTY OF A SMOKE FREE ENVIRONMENT.** Although we prohibit smoking in all interior parts of the apartment community, there is no warranty or guaranty of any kind that your dwelling or the apartment community is smoke free. Smoking in certain limited outside areas is allowed as provided above. Enforcement of our no-smoking policy is a joint responsibility which requires your cooperation in reporting incidents or suspected violations of smoking. You must report violations of our no-smoking policy before we are obligated to investigate and act, and you must thereafter cooperate with us in prosecution of such violations.

This is an important and binding legal document. By signing this Addendum you are agreeing to follow our no-smoking policy and you are acknowledging that a violation could lead to termination of your Lease Contract or right to continue living in the dwelling. If you or someone in your household is a smoker, you should carefully consider whether you will be able to abide by the terms of this Addendum.

**12. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

______________________________________________

**Resident or Residents**
*(All residents must sign here)*

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

**Owner or Owner's Representative**
*(Signs here)*

______________________________________________

JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:49PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT



© 2018, National Apartment Association, Inc.
Washington/National Apartment Association Official Form, October 2018.

# RESIDENT PARKING ADDENDUM

Date: September 6, 2023
(when this Addendum is filled out)

**1. DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:
Jeffrey Nelson

The term of this Parking Addendum is as follows: Begins on ________, ________ and ending on ________, ________.

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**RESIDENT AND OWNER AGREE AS FOLLOWS:**

**3.** You agree to properly register all vehicles with management. If you get a new or replacement vehicle you must notify us and complete a revised agreement. If you fail to do so, your unregistered vehicle may be towed at your sole expense. No parking of trailers, oversize vehicles, commercial vehicles, RV's, or recreational vehicles without our prior written permission, and then only in those areas we specifically designate.

**4.** If you are provided with a parking tag or sticker it must be properly installed and displayed, and any vehicle without a properly displayed tag or sticker is subject to tow.

**5.** Unless your vehicle(s) has been assigned a specific space(s) you may park in any available space(s) in the parking areas, with the exception of spaces reserved for a particular use or any marked handicap space, unless you posses a government issued handicap decal or similar signage. Parking is not guaranteed. We reserve the right to require you to temporarily park in other locations, upon written notice, due to construction or other work being performed at the community.

**6.** If you are assigned a specific parking space(s) we shall assign you the space(s) and retain the right to change assigned spaces or to terminate any right to park on the property, without cause, at our sole discretion with thirty (30) days written notice, even during a lease term.

**7.** You understand and accept that we have the right at any time, without notice, to tow unauthorized or non-registered vehicles from any parking space on the property.

**8.** You agree to use parking spaces in accord with the terms of the Lease and Community Rules and to make all guests or invitees aware of the parking rules.

**9.** Any vehicles which are improperly parked or are in violation of this addendum, the terms of the Lease or Community Rules will be towed at your expense. You agree that, to the greatest extent allowed by law, we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

**10.** Parking spaces may not be used for storage of vehicles. Your vehicle(s) must be moved every ________ days, including vehicles parked in all guest or handicapped spaces. If you have a reserved parking space, or a garage, you are required to use that space, or your garage, first.

**11.** You understand that we will not be held liable for any damage or theft that may occur while your vehicle(s) is parked on any part of the property. Upon signing this agreement you knowingly accept the risk of parking any vehicle(s) on the property.

**12.** Any action by you, any occupant, guest, or visitor that violates this addendum shall constitute a material violation of the Lease Contract.

**13.** You understand and agree that any judgment of possession entered against you shall be a judgment for possession of any parking spaces which you are entitled to under this addendum. Once such judgment is rendered and executed upon you, you shall immediately remove all vehicles from the property parking areas. If you fail to remove your vehicle(s), we shall tow the vehicle(s) at your expense. You agree that we shall not be liable to you for damages related to the physical towing nor any consequential damages you may incur through loss of use of the vehicle(s).

**COST FOR PARKING:**

Resident agrees to pay a onetime fee of $ 0.00 per vehicle on or before the ________ day of ________, ________. In alternative resident agrees to pay $ 35.00 monthly per vehicle due on or before the 5th day of the month. If no amount is filled in parking shall be free for properly registered and authorized vehicles.

Resident understands and accepts that all-parking rights and privileges will immediately be revoked in the case that Resident is 6 days delinquent in paying the required parking fee.

Resident agrees to pay $ 50.00 NSF fee for all checks returned for non-sufficient funds.

**VEHICLE INFORMATION:**

**Vehicle 1**
Make: Chevrolet
Model & Year: 1999
State: WASHINGTON
License Plate: C98165T
Permit Number:
Phone Number:
Parking Space: 272

**Vehicle 2**
Make:
Model & Year:
State:
License Plate:
Permit Number:
Phone Number:
Parking Space:

**Vehicle 3**
Make:
Model & Year:
State:
License Plate:
Permit Number:
Phone Number:
Parking Space:

©2022, National Apartment Association, Inc. - 6/2022, Washington

**14. SPECIAL PROVISIONS.**

**Resident or Residents**
*(All residents must sign)*

**Owner or Owner's Representative**
*(Signs below)*

**Date of Signing Addendum**

JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:49PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT



© 2022, National Apartment Association, Inc.
Washington/National Apartment Association Official Form, June 2022

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

# SUPPORT OR SERVICE ANIMAL AMENDMENT TO ANIMAL ADDENDUM

Date: September 6, 2023
(when this Addendum is filled out)

**1. DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:
Jeffrey Nelson

You acknowledge that the ownership of or need for the support or service animal does not entitle you to permit the animal to bother, threaten or harm other residents or persons without cause. While in common areas the animal must be supervised and the resident must retain control of the animal at all times. Resident is responsible for the proper disposal of animal waste. You acknowledge that if the animal violates the rules in the Animal Addendum or community rules, we have the right to evict both you and the support or service animal, as well as exercise other remedies under the lease.

The resident is responsible for the care of the support or service animal. In the event the support or service animal is sick or injured and you are unavailable to seek treatment for the animal, we will have the right (but not the duty) to contact a veterinarian and incur on your behalf any necessary veterinarian charges to render aid or treatment to the animal.

We will not charge a security deposit for your support or service animal. You will, however, be liable for any damages that this animal may cause.

**3. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**You are legally bound by this document. Please read it carefully.**

**Resident or Residents**
*(All residents must sign)*

**Owner or Owner's Representative**
*(Signs below)*

**Date of Signing Addendum**

JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:49PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

© 2018, National Apartment Association, Inc. - 9/2018, Washington

# LEASE CONTRACT BUY-OUT AGREEMENT

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

1. **DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:

Jeffrey Nelson

3. The purpose of this Buy-Out Agreement is to give you the right to buy out of your Lease Contract early—subject to any special provisions in paragraph 9 below. In order to buy out early, your notice must be signed by all residents listed in paragraph 1 of the Lease Contract and you must comply with all provisions of this Buy-Out Agreement.

4. **BUY-OUT PROCEDURES.** You may buy out of the Lease Contract prior to the end of the lease term and cut off all liability for paying rent for the remainder of the lease term if all of the following occur:
   (a) you give us written notice of buy-out at least 20 days prior to the new termination date (i.e., your new move-out date), which *(check one)* ☐ must be the last day of a month or ☒ may be during a month (if no number is entered, then the default is 30 days notice);
   (b) you specify the new termination date in the notice, i.e., the date by which you'll move out;
   (c) you are not in default under the Lease Contract on the date you give us the notice of buy-out;
   (d) you are not in default under the Lease Contract on the new termination date (move-out date);
   (e) you move out on or before the new termination date and do not hold over;
   (f) you pay us a buy-out fee (consideration) of $ 3420.00 ;
   (g) you pay us the amount of any concessions you received when signing the Lease Contract on the date that you give notice to buy out;
   (h) you are current in the payment of rent and all other amounts owing under the lease through the terminating date;
   (i) you comply with any special provisions in paragraph 9 below; and
   (j) if you choose to exercise the buy-out provision, and the unit re-rented at any time, you understand and agree that you are not eligible for, nor will receive any refund of any portion of the buy-out fee.

5. **WHEN PAYABLE.** The buy-out fee in paragraph 4(f) is due and payable no later than 10 days after you give us your buy-out notice. If no number is written in, the default shall be seven (7) days. The total dollar amount of any concessions regarding rent or other monetary lease obligations for the entire lease term is $ ________ and is due payable on the same day as the buy-out fee, subject to any special provisions in paragraph 9 regarding the amount, calculation method, or payment date.

6. **SHOWING UNIT TO PROSPECTIVE RESIDENTS.** After you give us notice of buy-out, the Lease Contract gives us the right to begin showing your unit to prospective residents and telling them it will be available immediately after your new termination date.

7. **COMPLIANCE ESSENTIAL.** Our deposit of all amounts due under paragraphs 4(f) and 4(g) constitutes our approval of the new termination date stated in your notice of buy-out. If you fail to comply with any of the procedures or requirements in this agreement after we deposit such monies, your buy-out right and this agreement will be voided automatically; and (1) any amounts you have paid under this agreement will become part of your security deposit, and (2) the lease will continue without buy-out. Then, if you move out early, you are subject to all lease remedies, including reletting fees and liability for all rents for the remainder of the original lease term.

8. **MISCELLANEOUS.** If moving out by the new termination date becomes a problem for you, contact us. An extension may be possible if we have not already relet the dwelling unit to a successor resident. We and any successor residents who may be leasing your unit will be relying on your moving out on or before the new termination date. Therefore, you may not hold over beyond such date without our written consent—even if it means you have to make plans for temporary lodging elsewhere. "Default" as used in paragraphs 4(c) and 4(d) of this agreement means default as defined in the Lease Contract. You will continue to be liable for any damages and any sums accruing and unpaid prior to the new termination date.

9. **SPECIAL PROVISIONS.** Your right of buy-out *(check one)* ☐ is or ☒ is not limited to a particular fact situation. If limited, buy-out may be exercised only if the following facts (see below) occur and any described documents are furnished to us. Any special provisions below will supersede any conflicting provision of this printed agreement. Any false statements or documents presented to us regarding buy-out will automatically void your right to buy-out of the Lease Contract. The special provisions are:

Buy-Out fee is equivalent to two (2) months rent and must be paid within 10 days of when written notice is provided to the management company. Buy-Out fee must be paid in Certified funds. Cash payment or personal checks will not be accepted. The Full Concession must be paid back if the Lease Term is not fulfilled for any reason.



©2018, National Apartment Association, Inc. - 9/2018, Washington

**Resident or Residents**
*(All residents must sign)*

**Owner or Owner's Representative**
*(Signs below)*

**Date of Lease Contract**

September 6, 2023

JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:50PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT



© 2018, National Apartment Association, Inc.
Washington/National Apartment Association Official Form, September 2018.

# CRIME/DRUG FREE HOUSING ADDENDUM

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

**1. DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:
Jeffrey Nelson

**3. ADDENDUM APPLICABILITY.** In the event any provision in this Addendum is inconsistent with any provision(s) contained in other portions of, or attachments to, the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this Addendum, the term "Premises" shall include the dwelling unit, all common areas, all other dwelling units on the property or any common areas or other dwelling units on or about other property owned by or managed by the Owner. The parties hereby amend and supplement the Lease Contract as follows:

**4. CRIME/DRUG FREE HOUSING.** Resident, members of the Resident's household, Resident's guests, and all other persons affiliated with the Resident:

A. Shall not engage in any illegal or criminal activity on or about the premises. The phrase, "illegal or criminal activity" shall include, but is not limited to, the following:

1. Engaging in any act intended to facilitate any type of criminal activity.
2. Permitting the Premises to be used for, or facilitating any type of criminal activity or drug related activity, regardless of whether the individual engaging in such activity is a member of the household, or a guest.
3. The unlawful manufacturing, selling, using, storing, keeping, purchasing or giving of an illegal or controlled substance or paraphernalia as defined in city, county, state or federal laws, including but not limited to the State of Washington and/or the Federal Controlled Substances Act.
4. Violation of any federal drug laws governing the use, possession, sale, manufacturing and distribution of marijuana, regardless of state or local laws. (So long as the use, possession, sale, manufacturing and distribution of marijuana remains a violation of federal law, violation of any such federal law shall constitute a material violation of this rental agreement.)
5. Engaging in, or allowing, any behavior that is associated with drug activity, including but not limited to having excessive vehicle or foot traffic associated with his or her unit.
6. Any breach of the Lease Contract that otherwise jeopardizes the health, safety, and welfare of the Owner, Owner's agents, or other Residents, or involving imminent, actual or substantial property damage.
7. Engaging in or committing any act that would be a violation of the Owner's screening criteria for criminal conduct or which would have provided Owner with a basis for denying Resident's application due to criminal conduct.
8. Engaging in any activity that constitutes waste, nuisance, or unlawful use.

B. AGREE THAT ANY VIOLATION OF THE ABOVE PROVISIONS CONSTITUTES A MATERIAL VIOLATION OF THE PARTIES' LEASE CONTRACT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this Addendum shall be deemed a serious violation, and a material default, of the parties' Lease Contract. It is understood that a single violation shall be good cause for termination of the Lease Contract. Notwithstanding the foregoing comments, Owner may terminate Resident's tenancy for any lawful reason, and by any lawful method, with or without good cause.

**5. CRIMINAL CONVICTION NOT REQUIRED.** Unless otherwise provided by law, proof of violation of any criminal law shall not require a criminal conviction.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

| Resident or Residents *(sign here)* | Date of Signing Addendum |
|---|---|
| | |

| Owner or Owner's Representative *(signs here)* | Date of Signing Addendum |
|---|---|
| | |

JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:50PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

© 2018, National Apartment Association, Inc. - 9/2018, Washington

# Chapter 7.25 THIRD PARTY BILLING REGULATION

## 7.25.010 Short title and purpose.

A. This chapter may be known and be cited as "Third Party Billing Regulation." The general purpose of this chapter is to prevent landlords, either themselves or through a third party billing agent, from billing tenants for master metered or other unmetered utility services without proper notice and disclosure of billing practices to tenants, and to protect tenants from deceptive or fraudulent billing practices, and to these ends the provisions of this chapter shall be liberally construed.

B. Nothing in this chapter shall be construed to prevent a landlord from including a tenant's cost of master metered or other unmetered utility services within the rent set forth in a rental agreement, and the practice of including such cost within a tenant's rent shall not be considered a billing practice or methodology affected by the provisions of this chapter.

C. Nothing in this chapter shall be construed to affect the practices used by Seattle Public Utilities or Seattle City Light to bill and collect residential multi-unit building owners or landlords for master metered or other unmetered utility service.

(Ord. 121320 § 1, 2003.)

## 7.25.020 Definitions.

As used in this chapter:

A. "Billing entity" means the landlord or third party billing agent, as the case may be, responsible for billing residential multi-unit building tenants for master metered or other unmetered utility service.

B. "Disclosure" means providing tenants with complete and accurate written information in a clear, concise, and understandable manner in all notices required under this chapter and on each bill presented from the billing entity to tenants.

C. "Landlord" means a "landlord" as defined in and within the scope of RCW 59.18.030 and RCW 59.18.040 of the Residential Landlord Tenant Act of 1973 ("RLTA") in effect at the time the rental agreement is executed, and shall also mean the owner of a mobile home park or boat moorage. At the time of passage of the ordinance codified in this chapter, RLTA defined "landlord" as "the owner, lessor, or sublessor of the dwelling unit or the property of which it is a part," and included "any person designated as representative of the landlord."

D. "Master metered utility service" means a utility service supplied to more than one (1) unit in a multi-unit building and measured through a single inclusive metering system.

E. "Methodology" refers to any method, technique, or criterion used to apportion to tenants charges billed to the landlord by the utility for master metered utility service or unmetered utility service, including but not limited to Ratio Utility Billing Systems, installation of submetering, and hot water metering.

F. "Multi-unit building" refers to a residential building or group of buildings (which may include a mobile home park or boat moorage) with 3 or more tenant units with a master metered utility service or unmetered utility service, such as solid waste collection, that is provided to the building or group of buildings as a whole.

G. "Personally identifiable information" means specific information about a tenant, including but not limited to the tenant's social security number, birth date, mother's maiden name, banking data or information, or any other personal or private information.

H. "Ratio Utility Billing System" or "RUBS" refers to any methodology by which the cost of master metered or other unmetered utility service provided to tenants and common areas of a multi-unit building is apportioned to tenants through the use of a formula that estimates the utility usage of each rental unit in the building based on the number of occupants in a unit, number of bedrooms in a unit, square footage of a unit, or any similar criterion.

I. "Rental agreement" means a "rental agreement" as defined in and within the scope of RCW 59.18.030 and RCW 59.18.040 of the RLTA in effect at the time the rental agreement is executed, and is deemed to include any month-to-month tenancy arrangement, whether written or oral. At the time of the passage of the ordinance codified in this chapter, the RLTA defined "rental agreement" as "all agreements which establish or modify the terms, conditions, rules, regulations, or any other provisions concerning the use and occupancy of a dwelling unit."

J. "Service charge" refers to any charge or fee imposed by the billing entity to cover the costs of providing or administering the billing practices, regardless of the label applied to such charge or fee.

K. "Tenant" means a "tenant" as defined in and within the scope of RCW 59.18.030 and RCW 59.18.040 of the RLTA in effect at the time the rental agreement is executed, and shall also mean a tenant of a mobile home park or boat moorage. At the time of passage of the ordinance codified in this chapter, the RLTA defined "tenant" as "any person who is entitled to occupy a dwelling unit primarily for living or dwelling purposes under a rental agreement."

L. "Billing practices" refers to the practices of a landlord or third party billing agent, as defined herein, that bills residential multi-unit building tenants for the purpose of apportioning master metered or other unmetered utility services provided to the building(s) as a whole, either by directly submetering tenants' usage or by otherwise apportioning such utility services among tenants, and also refers to any practices related thereto, including but not limited to collecting, using or disclosing tenants' personally identifiable information (other than name and address), attempting to collect unpaid amounts from tenants, verifying tenants' credit, and reporting unpaid balances to credit reporting agencies.

M. "Third party billing agent" refers to any entity retained or authorized by a landlord to bill tenants for master metered or other unmetered utility service on behalf of and as the agent of a landlord.

N. "Utilities" or "utility service(s)" refers to water, sewer, electric, and solid waste services.

(Ord. 121320 § 1, 2003.)

## 7.25.030 Prohibited billing practices.

A. It is a deceptive and fraudulent business practice for any landlord or third party billing agent to bill tenants separately for utility services except as permitted in this chapter.

B. It is a deceptive and fraudulent business practice for a landlord to engage, retain, or authorize, and a landlord shall be liable for the actions of, a third party billing agent that does not comply with the requirements of this chapter.

C. As of the effective date of this ordinance, no landlord may disclose to a third party billing agent a tenant's personally identifiable information under any circumstances, provided, however, that nothing in this chapter shall prevent a landlord from disclosing a tenant's name and address to a third party billing agent for the purpose of engaging in permitted billing practices.

D. A third party billing agent who prior to the effective date of this ordinance has obtained any tenant's personally identifiable information (other than name and address) shall not use, sell, convey, or otherwise disclose that personally identifiable information to any other person, except as expressly permitted in this chapter, and must destroy all such information upon a tenant's request, when the tenancy terminates and the account is paid, or when the landlord terminates the third party billing agency relationship.

E. No third party billing agent may inform a credit reporting agency of a claim against a tenant except as expressly permitted in RCW Chapter 19.16, regardless of whether the third party billing agent is licensed by the state pursuant to that chapter.

(Ord. 121320 § 1, 2003.)

## 7.25.040 Billing requirements—Submeter testing fee.

A. Notwithstanding the prohibition against submetering electric service in SMC 21.49.100.G, a landlord may, itself or through a third party billing agent, bill tenants for master metered or other unmetered utility services, including electric service provided to tenants of multi-unit buildings, provided that the following requirements are met:

1. Notice. Billing practices may be adopted only upon advance written notice to a tenant as part of a new or renewed rental agreement. Tenants must receive such written notice at least 90 days before expiration of their rental agreements, or, in the case of month-to-month tenancies, at least 90 days before any such billing practices may become effective. Notwithstanding the foregoing two sentences, if billing practices are already in place at the time the ordinance codified in this chapter becomes effective, written notice must be given within 30 days of the effective date of the ordinance codified in this chapter.

2. Methodology. The notice required under section A.1 above must include a copy of this chapter and a detailed written disclosure of the methodology used by the billing agent to allocate the charges to each tenant, including the methodology used to allocate utility services for common areas of the building, along with all other terms and conditions of the billing arrangement. If submetering is used, the notice required under section A.1 shall also include descriptions of the location of the submeter and of the access requirements, if any, required by the landlord for access to tenant units for submeter installation, reading, repair, maintenance, or inspections, including removal of the submeter for testing, consistent with the provisions of RCW 59.18.150 of the RLTA. An additional written notice must also be given at least 30 days prior to the due date of the next rental payment in order to implement a change in billing agents, apportionment methodology, fees, or other terms and conditions of the billing arrangement.

3. Posting of Information.

   a. In addition to the written notification required by subsection A.2. above, any landlord employing billing practices shall post in a conspicuous public space in the interior of the building copies of the three most current utility bills for master metered or other unmetered utility services provided to the building as a whole that are included in the bill sent to the tenant, together with a written description of the methodology used to allocate each such utility service and a copy of this chapter.

   b. Where such posting is physically impracticable due to the absence of a suitable conspicuous public space, a landlord may satisfy this posting requirement by hand-delivering or mailing to tenants a paper copy of the written notification required by subsection A.2, together with a written description of the methodology used to allocate each such utility service and a copy of this chapter. In lieu of posting the three most current utility bills for master metered or other

unmetered utility services provided to the building as a whole that are included in the bill sent to the tenant, the landlord must make such utility bills available upon request within five business days and must inform tenants in the written notification required by subsection A.2 of the method by which they may request such utility bills.

c. Landlords shall keep bills for master metered or other unmetered utility services on file in the building for at least two years and shall make such bills available to tenants for inspection and copying upon request. Where it is physically impracticable to keep such bills on file due to the absence of a suitable office or other storage space, a landlord may store the bills in another location and must make such bills available within 5 business days of receiving a request from a tenant.

4. Limitations on Charges. The total of all charges for any utility service included in the bills sent to all units cumulatively shall not exceed the amount of the bill sent by the utility itself for the building as a whole, less any late charges, interest or other penalties owed by the landlord, with the exception of the following, which may be included in each bill covering an independent unit within the multi-unit building:

a. A service charge of no more than $2 per utility per month, not to exceed a cumulative service charge of $5 per month for all the utilities included in any bill.

b. Late payment charges of no more than $5 per month plus interest at a rate not to exceed one percent per month, which late payment charge shall not accrue until at least 30 days after the tenant receives the bill.

c. Insufficient funds check charges for dishonored checks, not to exceed $31 per dishonored check.

5. Licensing of Third Party Billing Agents. Any third party billing agent must be properly registered and licensed to do business in the State of Washington and City of Seattle and must be in compliance with all applicable Washington state and Seattle laws and regulations, and all applicable Washington and Seattle license identification numbers, if any, must be disclosed upon request.

6. Content of Bills. Each billing statement sent to a tenant by a billing entity must disclose all required information in a clear and conspicuous manner and at minimum must:

a. Include the name, business address & telephone number of the billing entity;

b. Identify and show the basis for each separate charge, including service charges and late charges, if any, as a line item, and show the total amount of the bill;

c. If the building units are submetered, include the current and previous meter readings, the current read date, and the amount consumed (or estimated to have been consumed if Seattle Public Utilities or Seattle City Light has provided the landlord with an estimated bill);

d. Specify the due date, the date upon which the bill becomes overdue, the amount of any late charges or penalties that may apply, and the date upon which such late charges or penalties may be imposed;

e. Identify any past due dollar amounts;

f. Identify a mailing address and telephone number for billing inquiries and disputes, identify the entity responsible for resolving billing inquiries and disputes and its business hours and days of availability, and describe the process used to resolve disputes related to bills as set forth in this chapter; and

g. Include a statement to the effect that "this bill is from [landlord name] and not from Seattle Public Utilities or Seattle City Light."

7. Protection of Personally Identifiable Information.

   a. A third party billing agent who prior to the effective date of this ordinance has obtained a tenant's personally identifiable information shall take such actions as are necessary to protect such personally identifiable information and to prevent its use or disclosure except as expressly permitted in this chapter.

   b. A third party billing agent who prior to the effective date of this ordinance has obtained a tenant's personally identifiable information may disclose such personally identifiable information only to the extent necessary to render its billing services.

   c. To the extent required by federal, state, or local law, a billing entity may disclose personally identifiable information in its possession (i) pursuant to a subpoena or valid court order authorizing such disclosure, or (ii) to a governmental entity.

8. Estimated Billing. If Seattle Public Utilities or Seattle City Light has billed the landlord using an estimate of utility service consumed, the billing agent may estimate the charges to be billed to tenants until billing based on actual consumption resumes. Upon receipt of a corrected bill showing that the estimated bill overstated charges, the landlord must refund the difference to tenants. Upon receipt of a corrected bill showing that the estimated bill understated charges, the landlord may attempt to recover the underpayment from the tenants that actually incurred the charges during the billing period, but shall not attempt to recover an underpayment from a tenant who did not reside in the unit during the billing period in which the charges were incurred.

9. Submetering. Submetering is permitted as a way of allocating master metered utility services to tenants provided the following conditions are met:

   a. The submeters must be read prior to each billing.

   b. A landlord may not enter a unit without, and a tenant may not unreasonably withhold, consent to enter the unit in order to perform submeter installation, reading, repair, maintenance, and inspection, including removal of the submeter for testing, provided, however, that a landlord may enter a unit without a tenant's consent in the case of a submeter leak or emergency related to that unit's submeter.

   c. (i) The accuracy tolerance for the maximum flow rate shall be within 1.5-percent for all submeter types. The accuracy tolerance for the minimum flow rate shall be within 3-percent for Multi-jet submeter types, and within a 1.5-percent over-registration and a 5-percent under-registration for other than Multi-jet submeter types.

      (ii) If a tenant contests the accuracy of the submeter, the tenant shall have the option of demanding that the City of Seattle provide an independent test of the meter through the Department of Finance and Administrative Services. If the meter reads within these ranges of accuracy, the tenant requesting the test shall pay the meter test fee. If the meter reads outside these ranges of accuracy, the landlord shall pay the meter test fee and within 30 days refund any overpayments for the past three months based on a recalculation of the past year's billings by correcting for the inaccuracy of the submeter. Submetering thereafter shall only be permitted with a repaired submeter.

      (iii) The meter test fee for each test of a submeter pursuant to this subsection shall be $65.

B. Nothing in this section shall be construed to prevent a landlord from addressing billing of master metered or other unmetered utility services in a written addendum to a lease. A lease addendum may be used to give the notice required under subsection A.1 of this subsection, so long as the lease addendum is provided to the tenant with the notice required under that subsection, and so long as all other requirements of this chapter are satisfied.

(Ord. 123361 , § 235, 2010; Ord. 122213 , § 1, 2006; Ord. 121320 § 1, 2003.)

## 7.25.050 Dispute resolution and remedies.

A. A dispute regarding the amount of charges or other terms and conditions contained in a bill shall be resolved as follows:

1. The tenant must notify the entity responsible for billing disputes as identified in the bill ("Responsible Entity") of the nature of and reason for the dispute by calling the number shown on the bill or by writing a letter to the Responsible Entity within 30 days of receiving the bill. The tenant must have a good faith basis for any such dispute.

2. Within 30 days of receiving notice of a billing dispute, the Responsible Entity must contact the tenant to discuss the dispute, and the Responsible Entity and tenant must determine the amount of disputed and undisputed charges. The tenant must pay all undisputed charges within 30 days of reaching agreement with the Responsible Entity.

3. No late fees or interest charges shall accrue on any disputed portions of a bill while the amount is being resolved in accordance with subsections A.1 and 2, and no collection activity related to the disputed portions of a bill may be instituted against a tenant that has notified the Responsible Entity of a dispute in accordance with this chapter.

4. The tenant and Responsible Entity shall continue to discuss in good faith any remaining disputed amounts and attempt to reach an agreement on the amount due, if any, within 60 days of the Responsible Entity's receipt of notice of a billing dispute. If a tenant is unable to reach a satisfactory resolution of any portion of a disputed charge within the allotted time, the tenant may exercise any of the remedies set forth in Section B below or any other available remedies, provided, however, that if within 120 days of the Responsible Entity's receipt of notice of a billing dispute, the tenant has not either exercised one of the remedies set forth in Section B or paid the remaining disputed amounts, the landlord may exercise any legal or equitable remedies available to it to collect the unpaid amounts, and provided further that nothing in this subsection shall be construed to deprive a landlord of its right to exercise any legal or equitable remedies available to it against a tenant that has not paid any undisputed charges, has not followed the procedures set forth in this section, or has not exercised good faith in disputing a charge.

B. If a tenant believes that it has been or will be subject to billing practices that violate any provision set forth in this chapter, the tenant may, at its option, file a complaint against the landlord with the Office of the Hearing Examiner or institute a civil action against the landlord, as follows:

1. The Office of the Hearing Examiner is hereby vested with the authority to hear and resolve tenant complaints against landlords regarding billing practices in accordance with its rules and procedures then in force governing contested cases. The filing fee for such a case shall be set at $5.00. Upon the finding of a violation of this chapter, the Hearing Examiner shall award actual damages (including but not limited to refund of any overpayment or other fees or charges resulting from such violation, and costs of pursuing the claim) and a penalty of one hundred dollars, and may permit the tenant to terminate the rental agreement by written notice in accordance with RCW 59.18.090. If the Hearing Examiner determines that the landlord engaged in prohibited billing practices in deliberate violation of this chapter, the penalty mentioned in the preceding sentence shall be two hundred dollars, and the Hearing Examiner shall also award attorneys' fees to the tenant. A final order or decision of the Hearing Examiner may be subject to judicial review in the King County Superior Court in accordance with the Hearing Examiner's rules and procedures.

2. In the alternative, a tenant may institute a civil action against the landlord. Upon a finding that a landlord engaged in billing practices that violate this chapter, the court shall award actual damages (including but not limited to refund of any overpayment or other fees or charges resulting from such violation, and costs of pursuing the claim) and a penalty of one hundred dollars, and may permit the tenant to terminate the rental agreement by written notice in accordance with RCW 59.18.090. If the court determines that the landlord engaged in prohibited billing practices in deliberate violation of this chapter, the penalty mentioned in the preceding sentence shall be two hundred dollars, and the court shall also award attorneys' fees to the tenant.

3. No late fees or interest charges shall accrue on any disputed portions of a bill while the amount is being resolved by the Hearing Examiner or court, and no collection activity or unlawful detainer action alleging default in the payment of rent related to the disputed portions of a bill may be instituted against a tenant that has filed a complaint with the Hearing Examiner or instituted a civil action in accordance with this chapter while the amount is being resolved by the Hearing Examiner or court. If the Hearing Examiner or court resolves the dispute and finds that a tenant that has not acted in good faith in asserting a billing dispute, the Hearing Examiner or court may order the tenant to pay late fees and/or interest charges on some or all of the disputed portions of the bill.

4. A landlord shall not pass on, charge, or otherwise allocate to tenants, in any manner whatsoever, any damages, fine or penalty (including attorneys' fees) that the landlord is ordered to pay under this chapter.

C. The existence of an unresolved or pending billing dispute does not relieve a tenant of its obligation to pay in a timely fashion all undisputed charges, including those undisputed charges that accrue after the dispute resolution procedures of this chapter have been invoked.

(Ord. 121320 § 1, 2003.)



JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:56PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

NATIONAL APARTMENT ASSOCIATION
We Lead the Way Home

# ADDITIONAL SPECIAL PROVISIONS

**DWELLING UNIT DESCRIPTION.** Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

**LEASE CONTRACT DESCRIPTION.** Lease Contract date: September 6, 2023

Owner's Name: 10227 20th (Park), LLC

Residents *(list all residents)*: Jeffrey Nelson

**Resident(s)**
*(All residents must sign)*

**Date of Signing Addendum**

**Owner or Owner's Representative**

**Date of Signing Addendum**

JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:56PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

© 2018, National Apartment Association, Inc. - 9/2018, Washington

# PACKAGE ACCEPTANCE ADDENDUM

**1. DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 (street address) in Lake Stevens (city), Washington, 98258 (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:
Jeffrey Nelson

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. PURPOSE OF ADDENDUM.** By signing this Addendum, you wish for us to sign for, and to accept, U.S. mail and privately-delivered packages or other items on your behalf, subject to the terms and conditions set forth herein.

**4. PACKAGE ACCEPTANCE.**

**A. Generally.** You hereby authorize us and our agent to accept, on your behalf, any package or item delivered to our on-site management office during disclosed business hours, including but not limited to any package delivered by the U.S. Postal Service or by any private courier service or individual. You also specifically authorize us to sign on your behalf if the person or entity delivering said package or item requires an adult signature prior to delivery, including but not limited to the delivery of certified or registered mail. A photo I.D. is required before any packages will be released. Packages will only be released to verified Residents or approved representatives.

**B. Limitations.** You understand and agree that we may refuse to accept any package for any reason or no reason at all including, but not limited to, packages addressed to any person not named in the Lease or perishable packages.

**5. TIME LIMITATION.** Due to limited storage space, we must ask that you pick up your package as soon as possible. You also agree that we shall have no duty whatsoever to hold or store any package for more than ________ days after receipt (if blank, the default period of time is 10 days after receipt of package. Accordingly, you should notify the management office if you are going to be away from the apartment home and expect to be receiving a package(s)). After said time, you agree that any such package is deemed abandoned and you authorize us to return the package to its original sender.

**6. DUTY OF CARE, INDEMNIFICATION, ASSUMPTION OF RISKS AND WAIVER.** As to any package for which we sign and/or receive on your behalf, you understand and agree that we have no duty to notify you of our receipt of such package, nor do we have any duty to maintain, protect, or deliver said package to you, nor do we have any duty to make said package available to you outside disclosed business hours. Any packages or personal property delivered to us or stored by us shall be at your sole risk, and you assume all risks whatsoever associated with any loss or damage to your packages and personal property. To the greatest extent allowed by Washington law, you, your guests, family, invitees, and agents hereby waive any and all claims against us or our agents of any nature regarding or relating to any package or item received by us, including but not limited to, claims for theft, misplacing or damaging any such package, except in the event of our or our agent's gross negligence or willful misconduct. To the greatest extent allowed by Washington law, you also agree to defend and indemnify us and our agents and hold us both harmless from any and all claims that may be brought by any third party relating to any injury sustained relating to or arising from any package that we received on your behalf. To the greatest extent allowed by Washington law, you also agree to indemnify us and our agents and hold us harmless from any damage caused to us or our agents by any package received by us for you. You also authorize us to throw away or otherwise dispose of any package that we, in our sole discretion, deem to be dangerous, noxious, or in the case of packaged food, spoiled, and waive any claim whatsoever resulting from such disposal.

**7. SEVERABILITY.** If any provision of this Addendum or the Lease Contract is illegal, invalid or unenforceable under any applicable law, then it is the intention of the parties that (a) such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease, (b) the remainder of this Addendum shall not be affected thereby, and (c) it is also the intention of the parties to this Addendum that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Addendum a clause or provision similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

**8. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*(All residents must sign)*

**Owner or Owner's Representative**
*(Signs below)*

**Date of Signing Addendum**

JEFFREY NELSON
SIGNED 9/10/2023 AT 5:57PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

©2021, National Apartment Association, Inc. - 6/2021, Washington

# CLASS ACTION WAIVER ADDENDUM

NAA NATIONAL APARTMENT ASSOCIATION We Lead the Way Home

1. **DWELLING UNIT DESCRIPTION.**
Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

Residents *(list all residents)*:
Jeffrey Nelson

3. **ADDENDUM.** This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

4. **CLASS ACTION WAIVER.** You agree that you hereby waive your ability to participate either as a class representative or member of any class action claim(s) against us or our agents. While you are not waiving any right(s) to pursue claims against us related to your tenancy, you hereby agree to file any claim(s) against us in your individual capacity, and you may not be a class action plaintiff, class representative, or member in any purported class action lawsuit ("Class Action"). Accordingly, **you expressly waive any right and/or ability to bring, represent, join, or otherwise maintain a Class Action or similar proceeding against us or our agents in any forum.**

**Any claim that all or any part of this Class Action waiver provision is unenforceable, unconscionable, void, or voidable shall be determined solely by a court of competent jurisdiction.**

**YOU UNDERSTAND THAT, WITHOUT THIS WAIVER, YOU MAY HAVE POSSESSED THE ABILITY TO BE A PARTY TO A CLASS ACTION LAWSUIT. BY SIGNING THIS AGREEMENT, YOU UNDERSTAND AND CHOOSE TO WAIVE SUCH ABILITY AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY. THIS CLASS ACTION WAIVER SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE CONTRACT.**

5. **SEVERABILITY.** If any clause or provision of this Addendum is illegal, invalid or unenforceable under any present or future laws, then it is the intention of the parties hereto that the remainder of this Addendum shall not be affected thereby.

6. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident's Acknowledgment** | **Date of Signing Addendum**

**Landlord (or Landlord Agent) Acknowledgment** | **Date of Signing Addendum**

JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:57PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

© 2018, National Apartment Association, Inc. - 9/2018, Washington

# SMOKE/CARBON MONOXIDE ALARM ADDENDUM

NATIONAL APARTMENT ASSOCIATION — We Lead the Way Home

Date: September 6, 2023
(when this Addendum is filled out)

This SMOKE/CARBON MONOXIDE ALARM ADDENDUM is incorporated into the Apartment Lease Contract dated September 6, 2023, by and between Jeffrey Nelson

Resident(s) *(list all residents)* and 10227 20th (Park), LLC

the Landlord located at E103 *(Apt. No.)*, 10227 20th St. SE #E103

*(street address)*, in Lake Stevens *(city)*, Washington, 98258 *(zip code)*.

**SMOKE ALARM:** Your Premises are equipped with ________ (number) smoke alarms. Each smoke alarm is powered by ☐ a battery ☐ electricity ☒ electricity with battery backup. The smoke alarms were tested by the Landlord at the commencement of your tenancy and found to be in good working condition.

**CARBON MONOXIDE ALARM:** As required by law, your Premises are outfitted with a carbon monoxide alarm. The carbon monoxide alarm is a ☐ **battery** ☐ **electric** ☒ **electric with battery backup** powered device. The carbon monoxide alarm was tested by the Landlord at the commencement of your tenancy and found to be in good working condition.

**RESIDENT'S DUTIES:** Resident shall (a) test any alarm so provided at least once every six months (but preferably once per month); (b) keep the alarm's case clean and free from dirt, debris, and infestation; (c) replace batteries as needed; (d) immediately notify Landlord of any operating deficiencies; and (e) not remove, damage, alter, modify, obstruct, or tamper with any properly functioning alarm or remove working batteries from the same. If the Premises are so equipped, Resident shall not tamper with, obstruct, damage or otherwise alter or modify the indoor sprinkler system.

☐ If this box is checked, then (a) do not replace batteries, (b) immediately notify the Landlord if you think that any batteries should be replaced, and (c) initial here: ____________________.

**TESTING YOUR ALARM:** You must test the alarm by using the test button. (When pressed, this button affects the smoke alarm like real smoke would during a fire, and the carbon monoxide alarm if carbon monoxide exceeds the alarm's acceptable levels.) To use the test button, firmly press the test button until the alarm sounds (normally 2-10 seconds later). Shortly after the button is released, the alarm will stop sounding. Do not test any alarm with a flame. When battery power is low, the alarm will beep about once a minute for at least 30 days. When the battery is dead, the alarm will not sound.

**HUSH FEATURE:** You can silence an alarm equipped with a hush feature by holding the hush button until the alarm stops sounding. Do not disconnect battery to stop alarm sounding.

**BATTERY:** Use only with the following batteries: Mallory or Duracell Alkaline No. MN 1604, Eveready 552 9-volt, or an equivalent of these batteries. Do not use ordinary or heavy-duty carbon-zinc batteries. Use of any other battery may be detrimental to the operation of the alarm.

**WHEN TO REPLACE:** A defective, low power, or dying battery must be replaced immediately so as to ensure proper operation and safety.

## SMOKE AND CARBON MONOXIDE ALARMS: RESIDENT RESPONSIBILITIES

**I have received the smoke alarm, carbon monoxide alarm, in Apartment #** E103 **in good working order. I understand it is MY responsibility to test and maintain the alarm(s) within said unit and to immediately notify the Landlord or authorized agent of any deficiencies.**

| **Resident or Residents** *(sign here)* | **Date of Signing Addendum** |
| --- | --- |
| | |

| **Landlord or Landlord's Representative** *(sign here)* | **Date of Signing Addendum** |
| --- | --- |
| | |

JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:58PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

© 2023, National Apartment Association, Inc. - 5/2023, Washington

# TENANT DESIGNATION PURSUANT TO RCW 59.18.590

**DWELLING UNIT DESCRIPTION.** Unit No. E103, 10227 20th St. SE #E103 *(street address)* in Lake Stevens *(city)*, Washington 98258 *(zip code)*.

**LEASE CONTRACT DESCRIPTION.** Lease Contract date: September 6, 2023
Owner's name: 10227 20th (Park), LLC

If residents have not provided this information to the Owner prior to executing the Lease Contract, then Residents will need to complete and return this form to the Owner after executing the Lease Contract.

**Tenant 1:**
The undersigned, Jeffrey Nelson,
a resident at #E103, 10227 20th St. SE #E103, Lake Stevens, WA 98258,
hereby designates ______ *(designee)*,
as the person to act on my behalf pursuant to RCW 59.18.590 in the event that I am the sole occupant of the premises on the date of my death.

My designee's mailing address and phone number are:

Mailing Address: ______
Phone Number: ______;

and the address for electronic communications, if any is: ______.

My designee is allowed to have access to the premises, remove my personal property, receive funds due me from my landlord, and dispose of my property consistent with my last will and testament and any applicable intestate succession law.

**I understand that this designation will remain in effect until revoked by me or replaced with a new designation. I also understand that I may change my designee or revoke this designation in writing at any time prior to my death.**

---

**Tenant 2:**
The undersigned, ______,
a resident at #E103, 10227 20th St. SE #E103, Lake Stevens, WA 98258,
hereby designates ______ *(designee)*,
as the person to act on my behalf pursuant to RCW 59.18.590 in the event that I am the sole occupant of the premises on the date of my death.

My designee's mailing address and phone number are:

Mailing Address: ______
Phone Number: ______;

and the address for electronic communications, if any is: ______.

My designee is allowed to have access to the premises, remove my personal property, receive funds due me from my landlord, and dispose of my property consistent with my last will and testament and any applicable intestate succession law.

**I understand that this designation will remain in effect until revoked by me or replaced with a new designation. I also understand that I may change my designee or revoke this designation in writing at any time prior to my death.**

---

**Tenant 3:**
The undersigned, ______,
a resident at #E103, 10227 20th St. SE #E103, Lake Stevens, WA 98258,
hereby designates ______ *(designee)*,
as the person to act on my behalf pursuant to RCW 59.18.590 in the event that I am the sole occupant of the premises on the date of my death.

My designee's mailing address and phone number are:

Mailing Address: ______
Phone Number: ______;

and the address for electronic communications, if any is: ______.

My designee is allowed to have access to the premises, remove my personal property, receive funds due me from my landlord, and dispose of my property consistent with my last will and testament and any applicable intestate succession law.

**I understand that this designation will remain in effect until revoked by me or replaced with a new designation. I also understand that I may change my designee or revoke this designation in writing at any time prior to my death.**

**Tenant 4:**
The undersigned, ______________________________,
a resident at #E103, 10227 20th St. SE #E103, Lake Stevens, WA 98258,
hereby designates ______________________________ *(designee)*,
as the person to act on my behalf pursuant to RCW 59.18.590 in the event that I am the sole occupant of the premises on the date of my death.

My designee's mailing address and phone number are:

Mailing Address: ______________________________
Phone Number: ____________;

and the address for electronic communications, if any is: ______________________________.

My designee is allowed to have access to the premises, remove my personal property, receive funds due me from my landlord, and dispose of my property consistent with my last will and testament and any applicable intestate succession law.

**I understand that this designation will remain in effect until revoked by me or replaced with a new designation. I also understand that I may change my designee or revoke this designation in writing at any time prior to my death.**

---

**Tenant 5:**
The undersigned, ______________________________,
a resident at #E103, 10227 20th St. SE #E103, Lake Stevens, WA 98258,
hereby designates ______________________________ *(designee)*,
as the person to act on my behalf pursuant to RCW 59.18.590 in the event that I am the sole occupant of the premises on the date of my death.

My designee's mailing address and phone number are:

Mailing Address: ______________________________
Phone Number: ____________;

and the address for electronic communications, if any is: ______________________________.

My designee is allowed to have access to the premises, remove my personal property, receive funds due me from my landlord, and dispose of my property consistent with my last will and testament and any applicable intestate succession law.

**I understand that this designation will remain in effect until revoked by me or replaced with a new designation. I also understand that I may change my designee or revoke this designation in writing at any time prior to my death.**

---

**Tenant 6:**
The undersigned, ______________________________,
a resident at #E103, 10227 20th St. SE #E103, Lake Stevens, WA 98258,
hereby designates ______________________________ *(designee)*,
as the person to act on my behalf pursuant to RCW 59.18.590 in the event that I am the sole occupant of the premises on the date of my death.

My designee's mailing address and phone number are:

Mailing Address: ______________________________
Phone Number: ____________;

and the address for electronic communications, if any is: ______________________________.

My designee is allowed to have access to the premises, remove my personal property, receive funds due me from my landlord, and dispose of my property consistent with my last will and testament and any applicable intestate succession law.

**I understand that this designation will remain in effect until revoked by me or replaced with a new designation. I also understand that I may change my designee or revoke this designation in writing at any time prior to my death.**

**Resident or Residents**
*(All resident's must sign here)*

______________________________
______________________________
______________________________
______________________________
______________________________
______________________________

**Owner or Owner's Representative**
*(Signs here)*

______________________________

**Date of Signing Addendum**

______________________________

JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:58PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

# COMMUNITY POLICIES, RULES AND REGULATIONS ADDENDUM

*This Addendum is incorporated into the Lease Contract (the "Lease") identified below and is in addition to all the terms and conditions contained in the Lease. If any terms of this Addendum conflict with the Lease, the terms of this Addendum shall be controlling:*

*Property Owner:* 10227 20th (Park), LLC

*Resident(s):* Jeffrey Nelson

*Unit No:/Address:* #E103, 10227 20th St. SE #E103, Lake Stevens, WA 98258

*Lease Date:* 09/06/2023

**I. GENERAL CONDITIONS FOR USE OF DWELLING PROPERTY AND RECREATIONAL FACILITIES.**

Resident(s) permission for use of all common areas, Resident amenities, and recreational facilities (together, "Amenities") located at the Dwelling Community is a privilege and license granted by Owner, and not a contractual right except as otherwise provided for in the Lease. Such permission is expressly conditioned upon Resident's adherence to the terms of the Lease, this Addendum, and the Community rules and regulations ("Rules") in effect at any given time, and such permission may be revoked by Owner at any time for any lawful reason. In all cases, the most strict terms of either the Lease, this Addendum, or the Community Rules shall control. Owner reserves the right to set the days and hours of use for all Amenities and to change the character of or close any Amenity based upon the needs of Owner and in Owner's sole and absolute discretion, without notice, obligation or recompense of any nature to Resident. As allowed by law, Owner and management may make changes to the Rules for use of any Amenity at any time. No management provided facilities, including, but not limited to, fitness rooms, pools, spas, courts, or theater rooms, and no common areas or garages, may be used by any Tenant for any commercial or business purpose including, but not limited to, teaching classes or training.

**Additionally, Resident(s) expressly agrees to assume all risks of every type, including but not limited to risks of personal injury or property damage, of whatever nature or severity, related to Resident's use of the amenities at the Community. Resident(s) agrees to hold Owner harmless and release and waive any and all claims, allegations, actions, damages, losses, or liabilities of every type, whether or not foreseeable, that Resident(s) may have against Owner and that are in any way related to or arise from such use. This provision shall be enforceable to the fullest extent of the law.**

**THE TERMS OF THIS ADDENDUM SHALL ALSO APPLY TO RESIDENT(S)' OCCUPANTS, AGENTS AND INVITEES, TOGETHER WITH THE HEIRS, ASSIGNS, ESTATES AND LEGAL REPRESENTATIVES OF THEM ALL, AND RESIDENT(S) SHALL BE SOLELY RESPONSIBLE FOR THE COMPLIANCE OF SUCH PERSONS WITH THE LEASE, THIS ADDENDUM, AND COMMUNITY RULES AND REGULATIONS, AND RESIDENT(S) INTEND TO AND SHALL INDEMNIFY AND HOLD OWNER HARMLESS FROM ALL CLAIMS OF SUCH PERSONS AS DESCRIBED IN THE PRECEDING PARAGRAPH. The term "Owner" shall include the Management, officers, partners, employees, agents, assigns, Owners, subsidiaries and affiliates of Owner.**

**II. POOL.** This Community ☐ **DOES;** ☒ **DOES NOT** have a pool. When using the pool, Resident(s) agrees to the following:
- Residents and guests will adhere to the rules and regulations posted in the pool area and Management policies.
- All Swimmers swim at their own risk. Owner is not responsible for accidents or injuries. No lifeguard is provided by Owner.
- For their safety, Residents should not swim alone.
- Pool hours are posted at the pool.
- No glass, pets, or alcoholic beverages are permitted in the pool area. Use paper or plastic containers only.
- Proper swimming attire is required at all times and a swimsuit "cover up" should be worn to and from the pool.
- No running or rough activities are allowed in the pool area. Respect others by minimizing noise, covering pool furniture with a towel when using suntan oils, leaving pool furniture in pool areas, disposing of trash, and keeping pool gates closed.
- Resident(s) must accompany their guests at all times.
- Resident(s) must notify Owner any time there is a problem or safety hazard at the pool.

**IN CASE OF EMERGENCY DIAL 911**

**III. FITNESS CENTER.** This Community ☒ **DOES;** ☐ **DOES NOT** have a fitness center. When using the fitness center, Resident agrees to the following:
- Residents and guests will adhere to the rules and regulations posted in the fitness center and Management policies.
- The Fitness Center is not supervised. Resident(s) are solely responsible for their own appropriate use of equipment.
- Resident(s) shall carefully inspect each piece of equipment prior to Resident's use and shall refrain from using any equipment that may be functioning improperly or that may be damaged or dangerous.
- Resident(s) shall immediately report to Management any equipment that is not functioning properly, is damaged or appears dangerous, as well any other person's use that appears to be dangerous or in violation of Management Rules and Policies.
- Resident(s) shall consult a physician before using any equipment in the Fitness Center and before participating in any aerobics or exercise class, and will refrain from such use or participation unless approved by Resident's physician.
- Resident(s) will keep Fitness Center locked at all times during Resident's visit to the Fitness Center.
- Resident(s) will not admit any person to the Fitness Center who has not registered with the Management Office.
- Resident(s) must accompany guests, and no glass, smoking, eating, alcoholic beverages, pets, or black sole shoes are permitted in the Fitness Center.

Card # issued: (1) ________ (3) ________ (5) ________
(2) ________ (4) ________ (6) ________

**IV. PACKAGE RELEASE.** This Community ☒ **DOES;** ❑ **DOES NOT** accept packages on behalf of Residents.

***For communities that do accept packages on behalf of its Residents:***
Resident(s) gives Owner permission to sign and accept any parcels or letters sent to Resident(s) through UPS, Federal Express, Airborne, United States Postal Service or the like. Resident agrees that, to the fullest extent allowed by law, Owner does not accept responsibility or liability for any lost, damaged, or unordered deliveries, and agrees to hold Owner harmless for the same. Any packages not picked up after 30 days notice to Resident shall be returned to sender at Resident's expense. No packages addressed to persons not listed on the Lease will be accepted, and will be refused or returned immediately to sender. Packages accepted by Owner will not be delivered to Resident's unit. Management reserves the right to refuse perishable packages.

**V. BUSINESS CENTER.** This Community ❑ **DOES;** ☒ **DOES NOT** have a business center.
Resident(s) agrees to use the business center at Resident(s) sole risk and according to the Rules and Regulations posted in the business center and Management policies. Owner is not responsible for data, files, programs or any other information lost or damaged on Business Center computers or in the Business Center for any reason. No software may be loaded on Business Center computers without the prior written approval of Community Management. For reasons of safety and protection of equipment, no inappropriate, offensive, or pornographic images or files (in the sole judgment of Owner) will be viewed or loaded onto the Business Center computers at any time. Residents will limit time on computers to 0 minutes if others are waiting to use them. Smoking, eating, alcoholic beverages, pets, and any disturbing behavior are prohibited in the business center.

**VI. AUTOMOBILES/BOATS/RECREATIONAL VEHICLES.** The following policies are in addition to those in the Lease, and may be modified by the additional rules in effect at the Community at any given time:
- Only ______________ vehicle(s) per unit is (are) allowed. Parking is not guaranteed.
- All vehicles must be registered at the Management office.
- Any vehicle(s) not registered, considered abandoned, or violating the Lease, this Addendum, or the Community Rules, in the sole judgment of Management, will be towed at the vehicle owner's expense after a _____________ hour notice is placed on the vehicle.
- Notwithstanding this, any vehicle illegally parked in a fire lane, designated no parking space or handicapped space, or blocking an entrance, exit, driveway, dumpster, or parked illegally in a designated parking space, will immediately be towed, without notice, at the vehicle owner's expense.
- The washing of vehicles is not permitted on the property unless specifically allowed in designated area.
- Any on property repairs and/or maintenance of any vehicle must be with the prior written permission of the Management.
- Recreational vehicles, boats or trailers may only be parked on the property with Management's permission (in Management's sole discretion), and must be registered with the Management Office and parked in the area(s) designated by Management.

**VII. FIRE HAZARDS.** In order to minimize fire hazards and comply with city ordinances, Resident shall comply with the following:
- Residents and guests will adhere to the Community rules and regulations other Management policies concerning fire hazards, which may be revised from time to time.
- No person shall knowingly maintain a fire hazard.
- **Grills, Barbeques, and any other outdoor cooking or open flame devices will be used only on the ground level and will be placed a minimum of _____________ feet from any building including overhangs or ceilings.** Such devices will not be used close to combustible materials, tall grass or weeds, on exterior walls or on roofs, indoors, on balconies or patios, or in other locations which may cause fires.
- **Fireplaces:** Only firewood is permitted in the fireplace. No artificial substances, such as Duraflame® logs are permitted. Ashes must be disposed of in metal containers, after ensuring the ashes are cold.
- Flammable or combustible liquids and fuels shall not be used or stored (including stock for sale) in dwellings, near exits, stairways, breezeways, or areas normally used for the ingress and egress of people. This includes motorcycles and any apparatus or engine using flammable or combustible liquid as fuel.
- No person shall block or obstruct any exit, aisle, passageway, hallway or stairway leading to or from any structure.
- Resident(s) are solely responsible for fines or penalties caused by their actions in violation of local fire protection codes.

**VIII. EXTERMINATING.** Unless prohibited by statute or otherwise stated in the Lease, Owner may conduct extermination operations in Residents' dwelling several times a year and as needed to prevent insect infestation. Owner will notify Residents in advance of extermination in Residents' Dwelling, and give Resident instructions for the preparation of the Dwelling and safe contact with insecticides. Residents will be responsible to prepare the Dwelling for extermination in accordance with Owner's instructions. If Residents are unprepared for a scheduled treatment date Owner will prepare Residents' dwelling and charge Residents accordingly. Residents must request extermination treatments in addition to those regularly provided by Owner in writing and those treatments shall be at Resident's expense. **Residents agree to perform the tasks required by Owner on the day of interior extermination to ensure the safety and effectiveness of the extermination. These tasks will include, but are not limited to, the following:**
- Clean in all cabinets, drawers and closets in kitchen and pantry.
- If roaches have been seen in closets, remove contents from shelves and floor.
- Remove infants and young children from the dwelling.
- Remove pets or place them in bedrooms, and notify Owner of such placement.
- Remove chain locks or other types of obstruction on day of service.
- Cover fish tanks and turn off their air pumps.
- Do not wipe out cabinets after treatment.

In the case of suspected or confirmed bed bug infestation, resident will agree to the following:
- Resident will wash all clothing, bed sheets, draperies, towels, etc. in extremely hot water.
- Resident will thoroughly clean, off premises, all luggage, handbags, shoes and clothes hanging containers.]
- Resident will cooperate with Owner's cleaning efforts for all mattresses and seat cushions or other upholstered furniture, and will dispose of same if requested.

**RESIDENTS ARE SOLELY RESPONSIBLE TO NOTIFY OWNER IN WRITING PRIOR TO EXTERMINATION OF ANY ANTICIPATED HEALTH OR SAFETY CONCERNS RELATED TO EXTERMINATION AND THE USE OF INSECTICIDES**

**IX. DRAPES AND SHADES.** Drapes or shades installed by Resident, when allowed, must be lined in white and present a uniform exterior appearance.

**X. WATER BEDS.** Resident shall not have water beds or other water furniture in the dwelling without prior written permission of Owner.

**XI. BALCONY or PATIO.** Balconies and patios shall be kept neat and clean at all times. No rugs, towels, laundry, clothing, appliances or other items shall be stored, hung or draped on railings or other portions of balconies or patios. No misuse of the space is permitted, including but not limited to, throwing, spilling or pouring liquids or other items, whether intentionally or negligently, over the balconies or patios.

**XII. SIGNS.** Resident shall not display any signs, exterior lights or markings on dwelling. No awnings or other projections shall be attached to the outside of the building of which dwelling is a part.

**XIII. SATELLITE DISHES/ANTENNAS.** You must complete a satellite addendum and abide by its terms prior to installation or use.

**XIV. WAIVER/SEVERABILITY CLAUSE.** No waiver of any provision herein, or in any Community rules and regulations, shall be effective unless granted by the Owner in a signed and dated writing. Our acceptance of rent shall not waive any prior defaults or our ability to either strictly enforce the terms, or enforce prior defaults. If any court of competent jurisdiction finds that any clause, phrase, or provision of this Part is invalid for any reason whatsoever, this finding shall not effect the validity of the remaining portions of this Addendum, the Lease Contract or any other addenda to the Lease Contract.

**XV. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________

I have read, understand and agree to comply with the preceding provisions.

| | | | |
|---|---|---|---|
| Resident | Date | Resident | Date |
| Resident | Date | Resident | Date |
| Resident | Date | Resident | Date |
| Owner Representative | | Date | |



JEFFREY NELSON
HEAD OF HOUSEHOLD
SIGNED 9/10/2023 AT 5:58PM PDT

EDOCUMENT SIGNER
Brittany Roberts
SIGNED 9/11/2023 AT 5:02PM PDT

# EXHIBIT 2

FILED
2025 APR 21 01:18 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 25-2-12121-6 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

JEFFREY NELSON, individually and on behalf of those similarly situated,

Plaintiff,

v.

GREP WASHINGTON, LLC, a foreign limited liability company; GREP SOUTHWEST, LLC, a foreign limited liability company; GREYSTAR DEVELOPMENT AND CONSTRUCTION, L.P., a foreign limited partnership; GREYSTAR DEVELOPMENT ENHANCEMENTS, LLC, a foreign limited liability company; GREYSTAR GP II, LLC, a foreign limited liability company; GREYSTAR MANAGEMENT SERVICES, L.P., a foreign limited partnership; GREYSTAR RS NW, LLC, a Washington Limited Liability Company; GREYSTAR RS WEST, LLC, a foreign limited liability company; and GREYSTAR SEATAC DEVELOPMENT, LLC, a foreign limited liability company,

Defendants.

No.

SUMMONS

TO: GREP WASHINGTON, LLC:

A lawsuit has been started against you in the above-entitled Court by plaintiff.



SCHROETER, GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

Plaintiff's claims are stated in the written Complaint, a copy of which is served upon you with this Summons.

In order to defend against the lawsuit, you must respond to the complaint by stating your defense in writing, and serve a copy upon the undersigned attorneys for the plaintiffs within 20 days after the service of this Summons, or within 60 days if this Summons was served outside the State of Washington, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where the plaintiff is entitled to what he asks for because you have not responded. If you serve a notice of appearance on the undersigned attorney, you are entitled to notice before a default judgment may entered.

You may demand that the plaintiff file the lawsuit with the Court. If you do so, the demand must be in writing and must be served upon the plaintiff. Within 14 days after the service of the demand, the plaintiff must file this lawsuit with the court, or the service on you of this Summons and Complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 21st day of April, 2025.

SCHROETER GOLDMARK & BENDER

[signature]

LINDSAY L. HALM, WSBA #37141
ANDREW D. BOES, WSBA #58508

ANDERSON SANTIAGO, PLLC
T. Tyler Santiago, WSBA #46004
Jason D. Anderson, WSBA #38014



SCHROETER, GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

207B Sunset Blvd. N.
Renton, WA 98057

Counsel for Plaintiff



SCHROETER, GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

# EXHIBIT 3

FILED
2025 APR 21 01:18 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 25-2-12121-6 SEA

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**FOR THE COUNTY OF KING**

| | |
|---|---|
| NELSON<br><br>VS<br><br>GREP WASHINGTON LLC ET AL | No. 25-2-12121-6 SEA<br><br>**CASE INFORMATION COVER SHEET AND AREA DESIGNATION**<br><br>(CICS) |

**CAUSE OF ACTION**

EMP - Employment

**AREA OF DESIGNATION**

SEA — Defined as all King County north of Interstate 90 and including all of Interstate 90 right of way, all of the cities of Seattle, Mercer Island, Issaquah, and North Bend, and all of Vashon and Maury Islands.

# EXHIBIT 4

FILED
2025 APR 21 01:18 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 25-2-12121-6 SEA

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**FOR THE COUNTY OF KING**

| | |
|---|---|
| NELSON<br><br>VS<br><br>GREP WASHINGTON LLC ET AL | No. 25-2-12121-6 SEA<br><br>**ORDER SETTING CIVIL CASE SCHEDULE**<br><br>**ASSIGNED JUDGE: Nelson Lee, Dept. 19**<br>FILED DATE: 04/21/2025<br>TRIAL DATE:04/27/2026 |

A civil case has been filed in the King County Superior Court and will be managed by the Case Schedule on Page 3 as ordered by the King County Superior Court Presiding Judge.

## I. NOTICES

**NOTICE TO PLAINTIFF:**
The Plaintiff may serve a copy of this **Order Setting Case Schedule (*Schedule*)** on the Defendant(s) along with the ***Summons and Complaint/Petition*.** Otherwise, the Plaintiff shall serve the *Schedule* on the Defendant(s) within 10 days after the later of: (1) the filing of the ***Summons and Complaint/Petition*** or (2) service of the Defendant's first response to the ***Complaint/Petition***, whether that response is a ***Notice of Appearance***, a response, or a Civil Rule 12 (CR 12) motion. The ***Schedule*** may be served by regular mail, with proof of mailing to be filed promptly in the form required by Civil Rule 5 (CR 5).

**NOTICE TO ALL PARTIES:**
All attorneys and parties should make themselves familiar with the King County Local Rules [*KCLCR*] -- especially those referred to in this ***Schedule***. In order to comply with the ***Schedule***, it will be necessary for attorneys and parties to pursue their cases vigorously from the day the case is filed. For example, discovery must be undertaken promptly in order to comply with the deadlines for joining additional parties, claims, and defenses, for disclosing possible witnesses [*See KCLCR 26*], and for meeting the discovery cutoff date [*See KCLCR 37(g)*].

**You are required to give a copy of these documents to all parties in this case.**

## I. NOTICES (continued)

**CROSSCLAIMS, COUNTERCLAIMS AND THIRD-PARTY COMPLAINTS:**
A filing fee of **$240** must be paid when any answer that includes additional claims is filed in an existing case.

**KCLCR 4.2(a)(2)**
A Confirmation of Joinder, Claims and Defenses or a Statement of Arbitrability must be filed by the deadline in the schedule. The court will review the confirmation of joinder document to determine if a hearing is required. If a Show Cause order is issued, all parties cited in the order must appear before their Chief Civil Judge.

**PENDING DUE DATES CANCELED BY FILING PAPERS THAT RESOLVE THE CASE:**
When a final decree, judgment, or order of dismissal of all parties and claims is filed with the Superior Court Clerk's Office, and a courtesy copy delivered to the assigned judge, all pending due dates in this *Schedule* are automatically canceled, including the scheduled Trial Date. It is the responsibility of the parties to 1) file such dispositive documents within 45 days of the resolution of the case, and 2) strike any pending motions by notifying the bailiff to the assigned judge.

Parties may also authorize the Superior Court to strike all pending due dates and the Trial Date by filing a *Notice of Settlement* pursuant to KCLCR 41, and forwarding a courtesy copy to the assigned judge. If a final decree, judgment or order of dismissal of all parties and claims is not filed by 45 days after a *Notice of Settlement*, the case may be dismissed with notice.

**If you miss your scheduled Trial Date**, the Superior Court Clerk is authorized by KCLCR 41(b)(2)(A) to present an *Order of Dismissal*, without notice, for failure to appear at the scheduled Trial Date.

**NOTICES OF APPEARANCE OR WITHDRAWAL AND ADDRESS CHANGES:**
*All parties to this action must keep the court informed of their addresses.* When a Notice of Appearance/Withdrawal or Notice of Change of Address is filed with the Superior Court Clerk's Office, parties must provide the assigned judge with a courtesy copy.

**ARBITRATION FILING AND TRIAL DE NOVO POST ARBITRATION FEE:**
A Statement of Arbitrability must be filed by the deadline on the schedule **if the case is subject to mandatory arbitration** and service of the original complaint and all answers to claims, counterclaims and crossclaims have been filed. If mandatory arbitration is required after the deadline, parties must obtain an order from the assigned judge transferring the case to arbitration. **Any party filing a Statement must pay a $250 arbitration fee**. If a party seeks a trial de novo when an arbitration award is appealed, a fee of $400 and the request for trial de novo must be filed with the Clerk’s Office Cashiers.

**NOTICE OF NON-COMPLIANCE FEES:**
**All** parties will be assessed a fee authorized by King County Code 4A.630.020 whenever the Superior Court Clerk must send notice of non-compliance of schedule requirements and/or Local Civil Rule 41.

**King County Local Rules are available for viewing at www.kingcounty.gov/courts/clerk.**

## II. CASE SCHEDULE

| * | CASE EVENT | EVENT DATE |
|---|---|---|
| | Case Filed and Schedule Issued. | 04/21/2025 |
| * | Last Day for Filing Statement of Arbitrability without a Showing of Good Cause for Late Filing [*See KCLMAR 2.1(a) and Notices on Page 2*]. **$250 arbitration fee must be paid** | 09/29/2025 |
| * | **DEADLINE** to file Confirmation of Joinder if not subject to Arbitration [*See KCLCR 4.2(a) and Notices on Page 2*]. | 09/29/2025 |
| | **DEADLINE** for Hearing Motions to Change Case Assignment Area [*KCLCR 82(e)*]. | 10/13/2025 |
| | **DEADLINE** for Disclosure of Possible Primary Witnesses [*See KCLCR 26(k)*]. | 11/24/2025 |
| | **DEADLINE** for Disclosure of Possible Additional Witnesses [*See KCLCR 26(k)*]. | 01/05/2026 |
| | **DEADLINE** for Jury Demand [*See KCLCR 38(b)(2)*]. | 01/20/2026 |
| | **DEADLINE** for a Change in Trial Date [*See KCLCR 40(e)(2)*]. | 01/20/2026 |
| | **DEADLINE** for Discovery Cutoff [*See KCLCR 37(g)*]. | 03/09/2026 |
| | **DEADLINE** for Engaging in Alternative Dispute Resolution [*See KCLCR 16(b)*]. | 03/30/2026 |
| | **DEADLINE**: Exchange Witness & Exhibit Lists & Documentary Exhibits [*KCLCR 4(j)*]. | 04/06/2026 |
| * | **DEADLINE** to file Joint Confirmation of Trial Readiness [*See KCLCR 16(a)(1)*] | 04/06/2026 |
| | **DEADLINE** for Hearing Dispositive Pretrial Motions [*See KCLCR 56; CR 56*]. | 04/13/2026 |
| * | Joint Statement of Evidence [*See KCLCR 4 (k)*] | 04/20/2026 |
| | **DEADLINE** for filing Trial Briefs, Proposed Findings of Fact and Conclusions of Law and Jury Instructions (Do not file proposed Findings of Fact and Conclusions of Law with the Clerk) | 04/20/2026 |
| | Trial Date [*See KCLCR 40*]. | 04/27/2026 |

*The * indicates a document that must be filed with the Superior Court Clerk's Office by the date shown.*

## III. ORDER

Pursuant to King County Local Rule 4 [*KCLCR 4*], IT IS ORDERED that the parties shall comply with the schedule listed above. Penalties, including but not limited to sanctions set forth in Local Rule 4(g) and Rule 37 of the Superior Court Civil Rules, may be imposed for non-compliance. It is FURTHER ORDERED that the party filing this action **must** serve this *Order Setting Civil Case Schedule* and attachment on all other parties.

DATED: 04/21/2025

Veta Shah

PRESIDING JUDGE

## IV. ORDER ON CIVIL PROCEEDINGS FOR ASSIGNMENT TO JUDGE

**READ THIS ORDER BEFORE CONTACTING YOUR ASSIGNED JUDGE.**
This case is assigned to the Superior Court Judge whose name appears in the caption of this case schedule. The assigned Superior Court Judge will preside over and manage this case for all pretrial matters.

**COMPLEX LITIGATION:** If you anticipate an unusually complex or lengthy trial, please notify the assigned court as soon as possible.

**APPLICABLE RULES:** Except as specifically modified below, all the provisions of King County Local Civil Rules 4 through 26 shall apply to the processing of civil cases before Superior Court Judges. The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**CASE SCHEDULE AND REQUIREMENTS:** Deadlines are set by the case schedule, issued pursuant to Local Civil Rule 4.

**THE PARTIES ARE RESPONSIBLE FOR KNOWING AND COMPLYING WITH ALL DEADLINES IMPOSED BY THE COURT'S LOCAL CIVIL RULES.**

**A. Joint Confirmation regarding Trial Readiness Report**
No later than twenty one (21) days before the trial date, parties shall complete and file (with a copy to the assigned judge) a joint confirmation report setting forth whether a jury demand has been filed, the expected duration of the trial, whether a settlement conference has been held, and special problems and needs (e.g., interpreters, equipment).

The Joint Confirmation Regarding Trial Readiness form is available at www.kingcounty.gov/courts/scforms. If parties wish to request a CR 16 conference, they must contact the assigned court. Plaintiff's/petitioner's counsel is responsible for contacting the other parties regarding the report.

**B. Settlement/Mediation/ADR**
a. Forty five (45) days before the trial date, counsel for plaintiff/petitioner shall submit a written settlement demand. Ten (10) days after receiving plaintiff's/petitioner's written demand, counsel for defendant/respondent shall respond (with a counter offer, if appropriate).

b. Twenty eight (28) days before the trial date, a Settlement/Mediation/ADR conference shall have been held. FAILURE TO COMPLY WITH THIS SETTLEMENT CONFERENCE REQUIREMENT MAY RESULT IN SANCTIONS.

**C. Trial**
Trial is scheduled for 9:00 a.m. on the date on the case schedule or as soon thereafter as convened by the court. The Friday before trial, the parties should access the court's civil standby calendar on the King County Superior Court website www.kingcounty.gov/courts/superiorcourt to confirm the trial judge assignment.

**MOTIONS PROCEDURES**

**A. Noting of Motions**

**Dispositive Motions:** All summary judgment or other dispositive motions will be heard with oral argument before the assigned judge. The moving party must arrange with the hearing judge a date and time for the hearing, consistent with the court rules. Local Civil Rule 7 and Local Civil Rule 56 govern procedures for summary judgment or other motions that dispose of the case in whole or in part. The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**Non-dispositive Motions:** These motions, which include discovery motions, will be ruled on by the assigned judge without oral argument, unless otherwise ordered. All such motions must be noted for a date by which the ruling is requested; this date must likewise conform to the applicable notice requirements.

Rather than noting a time of day, the Note for Motion should state "Without Oral Argument." Local Civil Rule 7 governs these motions, which include discovery motions. The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**Motions in Family Law Cases not involving children:** Discovery motions to compel, motions in limine, motions relating to trial dates and motions to vacate judgments/dismissals shall be brought before the assigned judge. All other motions should be noted and heard on the Family Law Motions calendar. Local Civil Rule 7 and King County Family Law Local Rules govern these procedures. The local rules can be found at www.kingcounty.gov/courts/clerk/rules.

**Emergency Motions:** Under the court's local civil rules, emergency motions will usually be allowed only upon entry of an Order Shortening Time. However, some emergency motions may be brought in the Ex Parte and Probate Department as expressly authorized by local rule. In addition, discovery disputes may be addressed by telephone call and without written motion, if the judge approves in advance.

**B. Original Documents/Working Copies/ Filing of Documents: All original documents must be filed with the Clerk's Office.** Please see information on the Clerk's Office website at www.kingcounty.gov/courts/clerk regarding the requirement outlined in LGR 30 that attorneys must e-file documents in King County Superior Court. The exceptions to the e-filing requirement are also available on the Clerk's Office website. The local rules can be found at www.kingcounty.gov/courts/clerk/rules.

The working copies of all documents in support or opposition must be marked on the upper right corner of the first page with the date of consideration or hearing and the name of the assigned judge. The assigned judge's working copies must be delivered to his/her courtroom or the Judges' mailroom. Working copies of motions to be heard on the Family Law Motions Calendar should be filed with the Family Law Motions Coordinator. Working copies can be submitted through the Clerk's office E-Filing application at www.kingcounty.gov/courts/clerk/documents/eWC.

**Service of documents:** Pursuant to Local General Rule 30(b)(4)(B), e-filed documents shall be electronically served through the e-Service feature within the Clerk's eFiling application. Pre-registration to accept e-service is required. E-Service generates a record of service document that can be e-filed. Please see the Clerk's office website at www.kingcounty.gov/courts/clerk/documents/efiling regarding E-Service.

**Original Proposed Order:** Each of the parties must include an original proposed order granting requested relief with the working copy materials submitted on any motion. **Do not file the original of the proposed order with the Clerk of the Court**. Should any party desire a copy of the order as signed and filed by the judge, a pre-addressed, stamped envelope shall accompany the proposed order. The court may distribute orders electronically. Review the judge's website for information: www.kingcounty.gov/courts/SuperiorCourt/judges.

**Presentation of Orders for Signature:** All orders must be presented to the assigned judge or to the Ex Parte and Probate Department, in accordance with Local Civil Rules 40 and 40.1. Such orders, if presented to the Ex Parte and Probate Department, shall be submitted through the E-Filing/Ex Parte via the Clerk application by the attorney(s) of record. E-filing is not required for self-represented parties (non-attorneys). If the assigned judge is absent, contact the assigned court for further instructions. If another judge enters an order on the case, counsel is responsible for providing the assigned judge with a copy.

**Proposed orders finalizing settlement and/or dismissal by agreement of all parties shall be presented to the Ex Parte and Probate Department.** Such orders shall be submitted through the E-Filing/Ex Parte via the Clerk application by the attorney(s) of record. E-filing is not required for self-represented parties (non-attorneys). Formal proof in Family Law cases must be scheduled before the assigned judge by contacting the bailiff, or formal proof may be entered in the Ex Parte Department. **If final order and/or formal proof are entered in the Ex Parte and Probate Department, counsel is responsible for providing the assigned judge with a copy.**

**C. Form**

Pursuant to Local Civil Rule 7(b)(5)(B), the initial motion and opposing memorandum shall not exceed 4,200 words and reply memoranda shall not exceed 1,750 words without authorization of the court. The word count includes all portions of the document, including headings and footnotes, except 1) the caption; 2) table of contents and/or authorities, if any; and 3): the signature block. Over-length memoranda/briefs and motions supported by such memoranda/briefs may be stricken.

***IT IS SO ORDERED. FAILURE TO COMPLY WITH THE PROVISIONS OF THIS ORDER MAY RESULT IN DISMISSAL OR OTHER SANCTIONS. PLAINTIFF/PEITITONER SHALL FORWARD A COPY OF THIS ORDER AS SOON AS PRACTICABLE TO ANY PARTY WHO HAS NOT RECEIVED THIS ORDER.***



PRESIDING JUDGE

# EXHIBIT 5

FILED
2025 MAY 01
KING COUNTY
SUPERIOR COURT CLERK

CASE #: 25-2-12121-6 SEA

SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF KING

| | |
|---|---|
| JEFFREY NELSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff(s),<br>Vs.<br><br>GREP WASHINGTON, LLC, a foreign limited liability company; et al.,<br><br>Defendant(s). | NO. 25-2-12121-6 SEA<br><br>DECLARATION OF SERVICE OF: SUMMONS; CLASS ACTION COMPLAINT; CASE INFORMATION COVER SHEET AND AREA DESIGNATION; ORDER SETTING CIVIL CASE SCHEDULE. |

STATE OF WASHINGTON
COUNTY OF KING

That I am now, and at all times herein mentioned, was a citizen of the United States and a resident of the State of Washington, over the age of 18 years, not a party to or interested in the above entitled action, and am competent to be a witness therein.

That at 10:16 A.M. on April 24th, 2025, at 711 Capitol Way South, Suite 204, Olympia, Washington, I duly served the above-described documents in the above-described matter upon GREP Washington, LLC, by then and there personally delivering a true and correct copy thereof by leaving the same with Jeff Miner, Intake Specialist for CT Corporation System, its Registered Agent, who is authorized to receive service.

I declare under the penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Signed at Seattle, Washington, on 4/30/25

| | |
|---|---|
| Process Fee: | 12.00 |
| Prep: | 16.00 |
| Travel: | 90.00 |
| Bad Address: | |
| SSA: | |
| Trace: | |
| Special Fee: | |
| Declaration Fee: | 12.00 |
| TOTAL | $130.00 |

RICHARD KOHNENBERGER KING CO. # 0203336

FILED
2025 APR 21 01:18 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 25-2-12121-6 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| JEFFREY NELSON, individually and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GREP WASHINGTON, LLC, a foreign limited liability company; GREP SOUTHWEST, LLC, a foreign limited liability company; GREYSTAR DEVELOPMENT AND CONSTRUCTION, L.P., a foreign limited partnership; GREYSTAR DEVELOPMENT ENHANCEMENTS, LLC, a foreign limited liability company; GREYSTAR GP II, LLC, a foreign limited liability company; GREYSTAR MANAGEMENT SERVICES, L.P., a foreign limited partnership; GREYSTAR RS NW, LLC, a Washington Limited Liability Company; GREYSTAR RS WEST, LLC, a foreign limited liability company; and GREYSTAR SEATAC DEVELOPMENT, LLC, a foreign limited liability company,<br><br>Defendants. | No.<br><br>SUMMONS |

TO: GREP WASHINGTON, LLC:

A lawsuit has been started against you in the above-entitled Court by plaintiff.



SCHROETER, GOLDMARK & BENDER
401 Union Street • Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

# EXHIBIT 6

HON. NELSON LEE, DEPT. 19

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

JEFFREY NELSON, individually and on behalf of those similarly situated,

Plaintiff,

v.

GREP WASHINGTON, LLC, a foreign limited liability company; GREP SOUTHWEST, LLC, a foreign limited liability company; GREYSTAR DEVELOPMENT AND CONSTRUCTION, L.P., a foreign limited partnership; GREYSTAR DEFVELOPMENT ENHANCEMENTS, LLC, a foreign limited liability company; GREYSTAR GP II, LLC, a foreign limited liability company; GREYSTAR MANAGEMENT SERVICES, L.P., a foreign limited liability company; GREYSTAR RS NW, LLC, a Washington Limited Liability Company; GREYSTAR RS WEST, LLC, a foreign limited liability company; and GREYSTAR SEATAC DEVELOPMENT, LLC, a foreign limited liability company,

Defendants.

**No. 25-2-12121-6 SEA**

**NOTICE OF FILING NOTICE OF REMOVAL**

[CLERK'S ACTION REQUIRED]

Please take note that Defendant GREP Washington has filed a Notice of Removal of this action with the United States District Court for the Western District of Washington at Seattle, pursuant to 28 U.S.C. §§ 1332(d), 1441, and 1446, containing a statement of facts to show that this matter may be removed. A copy of the Notice of Removal is attached as **Exhibit 1**.



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

You are also advised that Defendant has filed a copy of this Notice, together with a copy of the Notice of Removal, with the Clerk of the King County Superior Court, State of Washington, pursuant to 28 U.S.C. §1446(d).

DATED: May 23, 2025

COZEN O'CONNOR

By: */s/ Karl Neumann*
Karl Neumann, WSBA No. 48078
E-mail: kneumann@cozen.com
Jeremy Knight, WSBA No. 58607
E-mail: jknight@cozen.com

Attorneys for Defendant GREP Washington, LLC



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of May, 2025, a true and correct copy of the foregoing was served as indicated below:

*Attorneys for Plaintiff:*

| | |
|---|---|
| Lindsay L. Halm<br>Andrew D. Boes<br>Schroeter, Goldmark & Bender<br>401 Union Street, Suite 3400<br>Seattle, WA 98101<br>halm@sgb-law.com<br>boes@sgb-law.com | ☒ Via Messenger<br>☐ Via U.S. Mail<br>☒ Via E-Filing Notification<br>☒ Via E-mail<br>☐ Via Overnight Delivery |

and

| | |
|---|---|
| T. Tyler Santiago<br>Jason D. Anderson<br>Anderson Santiago, PLLC<br>207B Sunset Boulevard N.<br>Renton, WA 98057<br>tyler@alkc.net<br>jason@alkc.net | ☒ Via Messenger<br>☐ Via U.S. Mail<br>☒ Via E-Filing Notification<br>☒ Via E-mail<br>☐ Via Overnight Delivery |

*/s/ Dava Bowzer*
Dava Bowzer , Legal Practice Assistant



LAW OFFICES OF
COZEN O'CONNOR
A PROFESSIONAL CORPORATION
SUITE 1900
999 THIRD AVENUE
SEATTLE, WASHINGTON 98104
(206) 340-1000